IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GERARD SZUBIELSKI,

                         Plaintiff,

            v.

DAVID PIERCE, in his personal capacity, and          Civil Action No. 15-984-RGA
DANA METZGER, in his official capacity,

                         Defendants.

<u>MEMORANDUM OPINION</u>

Joanna J. Cline and Ellis E. Herington, TROUTMAN PEPPER HAMILTON SANDERS LLP,
Wilmington, DE; Laurence Z. Shiekman and Karli E. Cozen (argued), TROUTMAN PEPPER
HAMILTON SANDERS LLP, Philadelphia, PA; Courtney A. Munnings (argued) and Robyn R.
English-Mezzino, TROUTMAN PEPPER HAMILTON SANDERS LLP, Princeton, NJ,
attorneys for Plaintiff.


Ryan P. Connell (argued), Deputy Attorney General, DELAWARE DEPARTMENT OF
JUSTICE, Wilmington, DE, attorney for Defendants.


September 1, 2020

/s/ Richard G. Andrews
**ANDREWS, U.S. DISTRICT JUDGE:**

Gerard Szubielski, who is incarcerated in Delaware state prison, brought this action under 42 U.S.C. § 1983 against David Pierce, the former warden of the James T. Vaughn Correctional Center (JTVCC).[1] Szubielski alleges Pierce deprived him of his right to due process and retaliated against him for conduct protected under the First Amendment. (D.I. 59). Currently before me is Pierce's Motion for Summary Judgment. (D.I. 100). The matter has been fully briefed. (D.I. 101, 113, 118). I heard oral argument on June 11, 2020. (D.I. 132). Summary judgment is GRANTED for the due process claim, but it is DENIED for the First Amendment retaliation claim.

## I.     BACKGROUND

Szubielski arrived at JTVCC in 2007, and the prison immediately placed him in maximum security. (D.I. 105-1, Ex. 1). The prison reviews an inmate's security classification six months after the initial classification, and once per year after that. (D.I. 104-1 at A-553). According to Szubielski, the entire time he was classified as maximum security, he was held in solitary confinement in the Secure Housing Unit (SHU). (D.I. 7 at 2). Szubielski alleges he was subjected to extreme social isolation, allowed out of his cell only a few hours per week, and did not receive adequate care for his mental illness. (*Id.* at 6-10).

On August 6, 2015, the American Civil Liberties Union (ACLU) and the Community Legal Aid Society, Inc. (CLASI) sued Delaware's prison system, alleging that prison officials failed to provide adequate medical care to inmates with mental illness and that the officials held

---

[1] In the operative complaint (D.I. 59), Szubielski also named Dana Metzger, the current warden of the JTVCC, as a defendant to a count seeking injunctive relief. The parties, however, have agreed to dismiss that count because Szubielski is no longer housed at JTVCC. (D.I. 117).

1

the inmates in solitary confinement for unconstitutional periods of time. *See Cmty. Legal Aid Soc'y, Inc. v. Coupe,* No. 15-cv-688-GMS (D.I. 1) (D. Del. Aug. 6, 2015); *see also id.,* 2016 WL 1055741 (D. Del. Mar. 16, 2016). Although the lawsuit did not identify Szubielski by name, it did describe six exemplary inmates, *Cmty. Legal Aid*, No. 15-cv-688-GMS (D.I. 1 at ¶¶ 68-96), one of whom, Szubielski claims, is identifiably him. (D.I. 105 at 4). CLASI brought the lawsuit on behalf of the inmates under a federal law, the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801 *et seq.*, which allows certain advocacy groups to sue on behalf of individuals with mental illness.

Four days after the CLASI lawsuit was filed, on August 10, 2015, the prison's Multi-Disciplinary Team (MDT) recommended that Szubielski be classified as medium security. On September 1, the Institution Based Classification Committee (IBCC) approved the lower classification. (D.I. 104-1 at A-474). Warden Pierce vetoed the classification on October 24, 2015 without explanation, and Szubielski remained in maximum security for another year. (*Id.*).

## II.    LEGAL STANDARDS

### A.  Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011).

The moving party bears the initial burden of demonstrating the absence of material issues of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-

2

movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Summary judgment should be granted if the court finds, in consideration of all the evidence, that no reasonable trier of fact could find for the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 588.

### B. Qualified Immunity

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Courts must decide two issues: 1) whether the facts show a violation of a constitutional right; and 2) whether that right was clearly established at the time of the alleged misconduct. *Id.* at 232. A case does not have to be "directly on point for a right to be clearly established, [but] existing precedent must place the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

The Third Circuit Court of Appeals has recently emphasized two rules that district courts must follow during a qualified immunity analysis. *Williams v. City of York, Pennsylvania*, 967 F.3d 252 (3d Cir. 2020). First, a district court must "analyze separately, and state findings with respect to, the specific conduct of each [defendant]." *Id.* at 255. This rule ensures that a plaintiff establishes the "personal involvement" of each defendant in order to survive summary judgment. *Id.* Second, a district court must "specify those material facts that are and are not subject to genuine dispute and explain their materiality." *Id.* at 254-55.

3

## III.    DISCUSSION

### A.  Due Process Claim

In analyzing a procedural due process claim, the first question is "whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Second, "the question remains what process is due." *Id.*

A prison deprives an inmate of a constitutionally protected liberty interest if it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). In *Shoats v. Horn*, the Third Circuit held that even when solitary confinement triggers an inmate's due process rights, the prison does not need to provide a "detailed adversary proceeding." 213 F.3d 140, 144 (3d Cir. 2000). The prison must at least, however, provide an "'informal, nonadversary review' at which the prisoner has the opportunity to state his views." *Id.* The court explained:

> An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective. So long as this occurs, and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied.

*Id.* at 145 (quoting *Hewitt v. Helms*, 459 U.S. 460, 103 (1983)).

Szubielski argues that his due process rights were infringed in two ways: 1) his placement on a "Remain in SHU" list; and 2) Pierce's veto of a lower security classification. Prison records support Szubielski's claim he was on a "Remain in SHU" list. A 2011 document, for example, indicates Szubielski had been "placed on 'Remain in

4

SHU' list by upper management." (D.I. 113-6, Ex. F). In a 2012 note, a prison counselor informed Szubielski that the warden at the time had put him on the "Remain in SHU" list. (D.I. 113-7, Ex. G).

There is no evidence, however, that Warden Pierce was responsible for Szubielski's placement on that list. Pierce did not become the warden of JTVCC until 2014 (D.I. 103-1 at A-137, 9:22-24), and he testified that the "Remain in SHU" list was used "historically" by earlier administrators, not himself (*id.* at A-200, 261:3-13). "[A] § 1983 plaintiff must produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 291 (3d Cir. 2018). Thus, Szubielski's due process claim regarding the "Remain in SHU" list cannot survive summary judgment.

There is no dispute that Pierce was personally responsible for vetoing the lower security classification. He acknowledged as much during his deposition. (D.I. 103-1 at A-190-91, 221:24-222:2). The question then is whether Pierce's veto subjected Szubielski to an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. To answer this question, courts consider: "(1) the duration of the challenged conditions; and (2) whether the conditions overall imposed a significant hardship in relation to the ordinary incidents of prison life." *Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549, 560 (3d Cir. 2017) (citing *Shoats*, 213 F.3d at 144).

Szubielski claims he has been held in solitary confinement for nine years (D.I. 113 at 1), but Pierce's veto is only responsible for about one year of that confinement. Pierce's veto was in October 2015 (D.I. 104-1 at A-474), and Szubielski received a lower security classification in October 2016 (D.I. 59 ¶ 22) (*See also* D.I. 101, "Def.'s Opening Br.," at 15, n. 10)

(acknowledging "Warden Pierce's decision resulted in Plaintiff being held in maximum-security for no more than one year"). Szubielski claims he spent nearly twenty-four hours per day in his eleven-by-eighteen-foot cell. (D.I. 7 at 6-7). He alleges he was brought out of his cell for only one hour, every other day, for recreation and a shower. (*Id.*). According to Szubielski, harsh fluorescent lights were on eighteen to nineteen hours per day, he ate his meals by himself, he was not allowed books or educational materials, and he did not receive adequate treatment for his mental illness. (*Id.* at 7, 8, 10). In his brief on this motion, Pierce responds that Szubielski was actually housed in some double-bunk units during this period and that he had greater freedom at times than the inmates in the most restrictive units. (Def.'s Opening Br. at 5, 12). He does not, however, cite records that clearly support this claim.

Ultimately, I must find Pierce is entitled to qualified immunity on the due process claim. Szubielski has not shown his confinement implicated a clearly established liberty interest. In *Sandin*, the Supreme Court held that thirty days in solitary confinement was not an "atypical and significant hardship." 515 U.S. at 486-87. In *Wilkinson v. Austin*, the Court held that indefinite placement in "Supermax" prisons, where almost all human contact was prohibited and lights were on 24 hours per day, was atypical and significant. 545 U.S. 209, 223-24 (2005). In *Wilkinson*, the Court observed that "the Courts of Appeals have not reached consistent conclusions for identifying the baseline from which to measure what is atypical and significant in any particular prison system." 545 U.S. at 223. Unfortunately, fifteen years after *Wilkinson*, there is still not much clarity on the precise contours of what is "atypical and significant."

In *Shoats*, the Third Circuit found that eight years in near total isolation was atypical and significant. 213 F.3d at 144. In *Williams*, the Third Circuit concluded that the two plaintiffs, who were held in solitary confinement on death row for six years and eight years after their death

6

sentences were vacated, had also shown atypical and significant hardship. 848 F.3d at 561 (3d Cir. 2017).

Szubielski has not clearly shown that his hardship was as atypical or significant as the hardships in these cases. Szubielski was in solitary confinement (as a result of Pierce's actions) for one year, not eight years as in *Shoats,* six and eight years as in *Williams*, or the indefinite periods in *Wilkinson*. Szubielski's confinement (as he has described it) was undoubtedly extremely restrictive, but I cannot say it was as harsh as the conditions in the Supermax prison in *Wilkinson*. Because *Williams* was decided in 2017, after Pierce's veto in 2015, it does not "clearly establish[]" a right "at the time of the defendant's alleged misconduct." *Pearson,* 555 U.S. at 232.

Although I find Pierce is entitled to qualified immunity, I will nonetheless proceed to consider Szubielski's underlying constitutional claim. In *Pearson*, the Supreme Court held that the lower courts do not need to decide if a plaintiff has shown a violation of a constitutional right if that right was not clearly established at the time of the misconduct. 555 U.S. at 234. The Court recognized, however, that addressing the constitutional question is "often beneficial" because it "promotes development of constitutional precedent." *Id.* at 236. The Court ruled that "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion" in deciding whether to address both prongs of the qualified immunity analysis. *Id.*

With that guidance in mind, I conclude there is a genuine factual dispute over whether Szubielski's confinement implicated a constitutional liberty interest. Although that right was not clearly established at the time of Pierce's veto, the one year that Szubielski allegedly spent in solitary confinement was closer in kind to the multi-year periods in *Wilkinson*, *Williams*, and *Shoats* than it was to the 30-day period in *Sandin*. Like the plaintiffs in *Wilkinson*, *Williams*, and

7

*Shoats*, Szubielski was confined to his cell twenty-three or twenty-four hours per day, and he ate meals by himself, instead of in a common eating area. *See Shoats*, 213 F.3d at 144 (the plaintiff was "confined in his cell for 23 hours a day, five days a week, and 24 hours a day, two days a week . . . He eats meals by himself."); *see also Wilkinson*, 545 U.S. at 214 ("[i]nmates must remain in their cells" and "[a]ll meals are taken alone in the inmate's cell instead of in a common eating area."); *see also Williams,* 848 F.3d at 554-55 (the plaintiff "remained confined to his cell for almost twenty-two hours a day" and "[e]ven [his] meals were provided in the isolation of his cell.").

In *Williams*, the Third Circuit acknowledged that "the abundance of medical and psychological literature . . . firmly established . . . the dehumanizing effect of solitary confinement." 848 F.3d 549, 567 (3d Cir. 2017). "Anxiety and panic are common side effects. Depression, post-traumatic stress disorder, psychosis, hallucinations, paranoia, claustrophobia, and suicidal ideation are also frequent results . . . [I]n the absence of interaction with others, an individual's very identity is at risk of disintegration." *Id.* at 566. Research found that "psychological stressors such as isolation can be as clinically distressing as physical torture." *Id.* at 574. I conclude therefore that there is a genuine dispute over whether the year Szubielski spent in solitary confinement as a result of Warden Pierce's action was an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484.

The next question is whether Szubielski received adequate process. In *Shoats*, the Third Circuit held that an inmate must be given an "opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." 213 F.3d at 145. According to JTVCC policy, the MDT "will make recommendations after [an] interview with an offender." (D.I. 104-1 at A-548). The policy further provides, "The offender shall have

access to a staff member prior to the reclassification for advice and assistance. The staff member is expected to maintain continuing personal contact with the offender." (*Id.* at A-549). Pierce testified that the "inmate is part of the process in discussion with the counselor and the security representative about how they have been since their last classification, whatever concerns they might have, what programs they think they need, what programs and security level both security and treatment staff believe is appropriate for the inmate that helps develop the recommendations that move forward for the IBCC to consider." (D.I. 103-1 at A-171-72, 145:20-146:7).

Szubielski does not argue these procedures were not followed. Rather, he argues he was denied an opportunity to present his views to Pierce, who acted as the ultimate decision maker by vetoing the lower security classification recommended by the MDT and the IBCC. (D.I. 132 at 32:15-20). Pierce has failed to provide evidence to refute this point. Under *Shoats*, due process is not satisfied if an inmate merely has an opportunity to present his views to some prison official. Rather, he must have an opportunity to present his views "to the prison official charged with deciding whether to transfer him to administrative segregation." 213 F.3d at 145. In Szubielski's case, that prison official was Pierce. It was Pierce's decision to veto the lower classification that resulted in Szubielski's assignment to administrative segregation.

*Shoats* clarifies that an "informal, nonadversary review" is sufficient, and this requirement can be satisfied with either on oral presentation or a written statement. *Id. Shoats* does not state that an inmate has a right to present his views anew at each stage of an administrative review. Thus, conceivably, if Pierce reviewed the statement Szubielski presented to the MDT, that could satisfy due process. For example, in *Shoats*, the "inmate [was] permitted to respond to the rationale for administrative custody placement either orally or in writing" and a "Committee member then draft[ed] a summary of the inmate's statements." 213 F.3d at 145.

9

Pierce has not identified any evidence that he reviewed a summary of Szubielski's statements. Instead, the evidence is that Pierce simply wrote the word "veto" on Szubielski's notice of classification assignment—a document which contained no information about Szubielski's views. (D.I. 104-1 at A-474). Therefore, based on this evidence, I cannot conclude Szubielski had the "opportunity to present his views" to Pierce. The evidence (viewed in the light most favorable to Szubielski) is that Pierce did not review Szubielski's views at all, even as relayed by a third party.

Thus, Szubielski has shown there is a genuine factual dispute over whether Pierce violated his due process rights. But because the "constitutional question [was not] beyond debate" at the time of the alleged misconduct, *Kisela*, 138 S. Ct. at 1152, I must grant Pierce qualified immunity. I acknowledge that the doctrine of qualified immunity is currently the subject of considerable public debate. *See, e.g.,* Ending Qualified Immunity Act, H.R. 7085, 116th Cong. (2020). It is, however, the law, and I therefore apply it here.

### B.      First Amendment Claim

Szubielski alleges that Pierce violated his First Amendment rights by vetoing the lower security classification in retaliation for Szubielski's participation in the CLASI lawsuit. Retaliation for the exercise of constitutionally protected rights is itself a constitutional violation. *White v. Napoleon*, 897 F.2d 103, 111-12 (3d Cir. 1990). To prove unconstitutional retaliation, an inmate must show: 1) he engaged in constitutionally protected conduct; 2) he suffered an adverse action at the hands of a prison official; and 3) the protected conduct was a substantial or motivating factor in the prison official's decision to take adverse action. *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). If the plaintiff meets these requirements, then the burden shifts to the defendant to prove by a preponderance of the evidence that he or she would have taken the

same adverse action even if the plaintiff had not engaged in the protected activity. *Id.*

"Retaliation may be actionable . . . even when the retaliatory action does not involve a liberty

interest." *Allah v. Seiverling*, 229 F.3d 220, 224 (3d Cir. 2000). While "courts should afford

deference to decisions made by prison officials," *Rauser*, 241 F.3d at 334, "[p]rison walls do not

form a barrier separating prison inmates from the protections of the Constitution." *Turner v.

Safley*, 482 U.S. 78, 84 (1987).

      The first issue is whether Szubielski engaged in constitutionally protected conduct. There

are at least two lines of cases that establish Szubielski's right to participate in the CLASI

litigation. First, in *Allah*, the Third Circuit held, "It is well settled that prisoners have a

constitutional right to access to the courts." 229 F.3d at 224. Pierce responds, "While filing a

lawsuit is protected activity, being cited by others is not a protected activity." (Def.'s Opening

Br. at 17). The right discussed in *Allah*, however, is not so narrow. Inmates have the right to

"access to the courts," not merely the right to be a named plaintiff. The court explained that the

right includes "access to 'adequate law libraries or adequate assistance from persons trained in

the law' for filing challenges to criminal sentences, both direct and collateral, and civil rights

actions." *Allah*, 229 F.3d at 224 (quoting *Bounds v. Smith*, 430 U.S. 817, 828 (1977)). The right

also "requires that prisoners be provided the tools 'that the inmates need in order to attack their

sentences, directly or collaterally, and in order to challenge the conditions of their confinement.'"

*Id.* (quoting *Lewis v. Casey*, 518 U.S. 343, 355 (1996)).

      While Szubielski was not a named plaintiff in the CLASI litigation, the lawsuit was

brought on his behalf (and on behalf of other mentally ill inmates). CLASI had standing to sue

under the Protection and Advocacy for Individuals with Mental Illness Act, which is intended to

"ensure that the rights of individuals with mental illness are protected." 42 U.S.C. § 10801;

11

*Cmty. Legal Aid*, 2016 WL 1055741, at *2 (finding CLASI had standing). Szubielski's right to communicate with lawyers so that those lawyers could file a civil rights lawsuit on his behalf is part of his right to "access to the courts," as described in *Allah*. Those lawyers provided him with "adequate assistance . . . for filing . . . civil rights actions" and they helped him "challenge the conditions of [his] confinement." *Allah*, 229 F.3d at 224.

       Szubielski's right to participate in the CLASI litigation is also clearly established under cases that recognize an inmate's right to discuss the conditions of his confinement with people outside the prison. Szubielski wrote letters to the ACLU about the prison conditions before the ACLU and CLASI contacted him to participate in their lawsuit. (D.I. 105-5, Ex. 5 at 125:19-24). CLASI then interviewed Szubielski and other inmates to gather information for the lawsuit. (*Id.* at 126:7-14). Szubielski alleges that these communications prompted Pierce to retaliate against him.

       In *Procunier v. Martinez*, the Supreme Court invalidated prison regulations that allowed for the censorship of inmate mail containing statements that "'unduly complain' or 'magnify grievances,' express[] 'inflammatory political, racial, religious or other views,' and matter deemed 'defamatory' or 'otherwise inappropriate.'" 416 U.S. 396, 415 (1974). The Court found that "prison officials used the extraordinary latitude for discretion authorized by the regulations to suppress unwelcome criticism," and one institution authorized the rejection of letters "criticizing policy, rules or officials." *Id.* In *Thornburgh v. Abbott*, the Supreme Court limited its holding in *Procunier* to outgoing inmate mail. 490 U.S. 401, 413 (1989). The Court explained, "The implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials." *Id.* The Third Circuit later confirmed

*Procunier* is still binding precedent for outgoing inmate mail. *Nasir v. Morgan*, 350 F.3d 366, 371 (3d Cir. 2003).

At issue here are the letters Szubielski sent to the ACLU and the statements he made to the CLASI lawyers in prison. Thus, I conclude that Szubielski, like the plaintiffs in *Procunier*, had a right to "complain," express "grievances," and "criticiz[e] policy, rules, or officials" in communications with people outside the prison. 416 U.S. at 415. This right, as well as the right to access the courts, are clearly established, and I therefore conclude Pierce is not entitled to qualified immunity on the First Amendment claim on the basis that the right was not clearly established.

Pierce does not dispute that Szubielski suffered an adverse action (Def's Opening Br. at 17), so I turn now to the third issue: whether the protected conduct was a substantial or motivating factor in Pierce's action. *Rauser*, 241 F.3d at 333. Certainly, Szubielski has not proven at this stage that his participation in the CLASI litigation was a substantial or motivating factor in Pierce's veto. He has, however, provided enough evidence that I conclude this is a genuine dispute of material fact.

There is rarely direct evidence of motivation in a retaliation case such as this, so plaintiffs rely on circumstantial evidence. *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016). A plaintiff can satisfy his burden by showing: "1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action; or 2) a pattern of antagonism coupled with timing that suggests a causal link." *Id.* "Where the temporal proximity is not so close as to be 'unduly suggestive,' the appropriate test is 'timing plus other evidence.'" *Id.* at 424. There is "no bright line rule" limiting the time that may pass between protected speech and illegal retaliation. *Conard v. Pennsylvania State Police*, 902 F.3d 178, 183 (3d Cir. 2018). Alternatively,

13

"causation, like any other fact, can be established from the evidence gleaned from the record as a whole." *Watson*, 834 F.3d at 424.

Here, CLASI filed its lawsuit on August 6, 2015. Pierce vetoed Szubielski's lower security classification on October 24, 2015. (D.I. 104-1 at A-474). That timing is perhaps not "unduly suggestive." The veto could not have been an immediate reaction to the lawsuit. It was close enough though, especially considering that it was the first opportunity Pierce had to review Szubielski's security classification after the lawsuit was filed, that I believe the appropriate test is "timing plus other evidence."

Szubielski is referred to anonymously in the CLASI complaint, but he alleges the description is specific enough that Pierce would have been able to identify him. (D.I. 105 at 4). Szubielski also testified that he spoke to Pierce on his way to meet with CLASI lawyers, although it is unclear whether Pierce knew that was where Szubielski was headed. (D.I. 105-5 at 124:24-125:18). Pierce testified he knew of the lawsuit, although he said he was unsure when he became aware of it. (D.I. 103-1 at A-178, 170:9-19). He said he does not recall reading a copy of the complaint, and he did not know Szubielski was an exemplar in it. (*Id.* at A-178, 172:19-21; A-180, 179:6-9). When Pierce was presented with a copy of the complaint at his deposition, he said he was familiar with elements of some of the stories, but unfamiliar with others. (*Id.* at A-181, 184:7-185:15). He estimated there were about 270 inmates in secure housing in 2015. (*Id.* at A-182, 186:2-6). It is unclear how well Pierce knew Szubielski, although he remembers reading a letter from Szubielski and having an in-person conversation with him after the veto. (*Id.* at A-186, 204:6-205:20).

Prison records indicate Szubielski had no disciplinary infractions in 2015, which was what led the MDT and IBCC to support a reduction in his security classification. (*See* D.I. 105-8,

14

Ex. 8). Pierce provided no recorded explanation at the time of why he vetoed that decision. (D.I. 103-1 at A-174, 156:8-157:12). He testified that it was his practice to never explain his veto decisions beyond writing the word "veto" (*id.*), although this appears to violate departmental regulation. (*See* D.I. 105-11, Ex. 11 at 15) ("Wardens must submit written justification(s) for their veto decisions."). Pierce estimated that he used his veto power in "1 percent [of cases] at best." (D.I. 103-1 at A-173, 151:3-4).

Pierce acknowledged that his recollection of his decision was "fuzzy." (Def.'s Br. at 8). He claimed though that Szubielski was under investigation for trying to smuggle contraband into the prison. (D.I. 103-1 at A-187-188, 209:12-210:24). In an affidavit, Michelle Roberts, a prison investigator, states that Szubielski was caught with a phone in 2013, and she began monitoring his mail in 2014. (D.I. 104-1 at A-382). It is unclear how active this investigation was in October 2015 at the time of Pierce's veto.

It would be inappropriate for me to make any credibility determinations at this stage because that is a job for the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Drawing reasonable inferences in favor of Szubielski, I conclude there is a genuine dispute of material fact over whether Szubielski's participation in the CLASI litigation was a substantial or motivating factor in Pierce's veto. There is also a genuine dispute of material fact over whether Pierce would have vetoed the lower security classification even if Szubielski had not participated in the litigation. Although Pierce said the veto was because of a contraband investigation, a reasonable jury could disbelieve this testimony based on such evidence as Pierce's lack of a stated reason at the time (in apparent violation of departmental regulations), the rarity of his vetoes, Szubielski's testimony about seeing Pierce on the way to meet with the lawyers, the fact that Pierce acknowledged he was at least somewhat familiar with Szubielski, and the fact that

15

Pierce vetoed the lower security classification only a few months after the lawsuit was filed. Accordingly, I deny summary judgment on the First Amendment retaliation claim.

## IV.     CONCLUSION

Defendant's Motion for Summary Judgment (D.I. 100) is GRANTED for the due process claim, but it is DENIED for the First Amendment retaliation claim. I will enter an order consistent with this Memorandum Opinion.

16