```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF DELAWARE

 3

 4     GERARD SZUBIELSKI,             )
                                      )
 5                    Plaintiff,      )
                                      ) C.A. No. 15-984-RGA
 6     v.                             )
                                      )
 7     WARDEN DAVID PIERCE, et al.,   )
                                      )
 8                    Defendants.     )

 9
                                        J. Caleb Boggs Courthouse
10                                      844 North King Street
                                        Wilmington, Delaware
11
                                        Wednesday, June 23, 2021
12                                      11:32 a.m.
                                        Pretrial Conference
13

14     BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

15     APPEARANCES:

16               TROUTMAN PEPPER HAMILTON SANDERS LLP
                 BY:  JOANNA J. CLINE, ESQUIRE
17               BY:  KARLI E. COZEN, ESQUIRE
                 BY:  COURTNEY A. MUNNINGS, ESQUIRE
18               BY:  LAURENCE Z. SHIEKMAN, ESQUIRE

19                                      For the Plaintiff

20

21               STATE OF DELAWARE
                 DEPARTMENT OF JUSTICE
22               BY:  KENNETH L. WAN, ESQUIRE
                 BY:  ALLISON J. McCOWAN, ESQUIRE
23
                                        For the Defendant Pierce
24

25
```

|    |                                                        |
|----|--------------------------------------------------------|
| 1  | ***   PROCEEDINGS   *** |
| 2  |  |
| 3  | DEPUTY CLERK:  All rise. |
| 4  | THE COURT:  All right.  Good morning, everyone. |
| 5  | Please be seated.  And this is *Szubielski vs.* |
| 6  | *Pierce*, Civil Action Number 15-984. |
| 7  | So why don't we just first off have who's here. |
| 8  | Ms. Cline, for your side? |
| 9  | MS. CLINE:  Good morning, Your Honor.  This is |
| 10 | Joanna Cline of Troutman Pepper for the plaintiff, Gerry |
| 11 | Szubielski.  With me are my colleagues Mr. Larry Shiekman, |
| 12 | Courtney Munnings and Karli Cozen.  And if it pleases the |
| 13 | Court, Ms. Cozen and Ms. Munnings will be handling the |
| 14 | conference. |
| 15 | THE COURT:  That would be fine.  All right. |
| 16 | Mr. Wan and Ms. McCowan. |
| 17 | MR. WAN:  Good morning, Your Honor.  Ken Wan and |
| 18 | Allison McCowan for Defendant, David Pierce. |
| 19 | THE COURT:  All right.  Well, good morning to |
| 20 | you all. |
| 21 | So first thing, before we get to the Pretrial |
| 22 | Order, I wanted to address the schedule and the presiding |
| 23 | judge.  So right now we're scheduled to start on July 6th |
| 24 | which is Tuesday.  I'd like to change the date to July 7th, |
| 25 | the Wednesday. |

1          Is that a problem for either side?

2          MS. McCOWAN:  No problem for us.

3          THE COURT:  All right.  And I'm sorry,

4  Ms. Munnings I've seen before.  Maybe I've seen you before.

5          What is your name again?

6          MS. COZEN:  Karli Cozen, Your Honor.

7          THE COURT:  Cozen?

8          MS. COZEN:  Yes.

9          THE COURT:  Okay.  Hold on a second.

10          And I'm right, your name is Ms. Munnings?

11          MR. MUNNINGS:  Yes.

12          THE COURT:  And when you're speaking, you can

13  take off your mask because you guys have industrial grade,

14  and I can't hear you through the mask.  Okay?  If you have

15  trouble hearing me, I'll take mine off, too, but just -- so

16  in any event, Ms. Munnings, Ms. Cozen, Mr. Wan.

17          All right.  And so are you good with the date?

18          MR. WAN:  Yes, Your Honor.

19          THE COURT:  Okay.  So the presiding judge, it

20  seems like it's not going to be me.  What I'd like to

21  propose to you is that you consent to have one of our

22  magistrate judges preside over the trial.

23          Do you have any -- so what I'd actually like to

24  do is can the two sides just confer with each other for a

25  minute and see whether you both agree to that or consent, as

1    the word is?  If you don't, we'll move on.  But talk to

2    yourselves and talk to each other.

3              All right.  What's the decision?

4              MR. WAN:  Go ahead.  Your Honor, I'll let

5    Ms. Cozen talk.

6              MS. COZEN:  Your Honor, we'd like to talk to our

7    client to make sure he is okay with the magistrate judge --

8              THE COURT:  How long does that take?

9              MS. COZEN:  -- to preside over the trial.  We're

10   planning to talk to him later today.

11             THE COURT:  Okay.  That would be fine.

12             Okay.  So let's do this then, I'll hear back

13   from you later today on that.  And meanwhile, I have gone

14   over the proposed Pretrial Order, and I've tabbed a few

15   things.  So really what I was going to do was address the

16   disputes that are in the Pretrial Order, the motions in

17   limine, maybe ask you a question or two about the

18   evidentiary objections.  I'll tell you my reaction to the

19   voir dire, but I think that's something that is probably

20   something more better or more addressed by the person who's

21   actually going to do the voir dire, not me.

22             So the proposed Pretrial Order, let me see my

23   notes here.  So one of the things was on Page 13, there was

24   a disagreement about the testimony of Mr. Troxler and

25   Dr. Maduka-Exeh.  And I take it that we're agreed these

1    witnesses are available, so far as we know; right?

2                   MS. MUNNINGS:  Yes, Your Honor.

3                   THE COURT:  All right.  And so what is it that

4    causes the plaintiff to think that Rule 32(a)(3) applies

5    here?

6                   MS. MUNNINGS:  The fact that the witnesses,

7    Scarborough and the 30(b)(6) witnesses were speaking on

8    behalf of the Department of Correction, and therefore, their

9    interests were aligned with Pierce.

10                   THE COURT:  Well, they may be Rule 30(b)(6)

11   witnesses, but that's a slightly different thing than what's

12   said in the Pretrial Order which cites Rule 32(a)(3).  So

13   Rule 32 -- Rule 32(a)(3) says, An adverse party may use for

14   any purpose a deposition of a party.  Right?  So Mr. Troxler

15   and the doctor are not parties.  Or anyone who when deposed

16   was the party's officer, director or managing agent or

17   designee.

18                   And the two may be Delaware's or the Department

19   of Correction's people, but they're not Mr. Pierce who's

20   sued in his individual capacity.  Their officer, director or

21   his officer, director, managing agent, or designee.

22                   So Rule 32(a)(3), that doesn't apply; right?

23                   MS. MUNNINGS:  Yes, Your Honor.

24                   THE COURT:  Okay.  But so don't sit down.

25                   Was Mr. Troxler, and I imagine he was, and

1    Dr. Maduka-Exeh, were they offering Rule 30(b)(6) testimony?

2            MR. WAN:  Your Honor, my understanding is that

3    Mr. Scarborough wasn't and the remaining three were.

4            THE COURT:  I don't think we're talking about

5    Scarborough.

6            MR. WAN:  Yes, Troxler and Dr. Maduka-Exeh as

7    30(b)(6) deponents for the Department of Correction.

8            THE COURT:  All right.  And so the Rule 30(b)(6)

9    testimony, why can't they offer that, because after all the

10   Department of Correction is an entity.  They can't actually

11   call it as a witness.

12           Isn't that what Rule 30(b)(6) testimony is for

13   is to get the position, among other things, of a

14   corporation?

15           MR. WAN:  Well, Your Honor, but my understanding

16   is that if these witnesses are available, and that Federal

17   Rule of Evidence 804(b) applies.  So to get former testimony

18   in, they still have to show the unavailability.

19           THE COURT:  All right.  I'll take that under

20   advisement, but I think it's the case, but I'm not a hundred

21   percent sure, that because it was corporate testimony, just

22   because Mr. Troxler and the doctors are both actually

23   available individually, that I don't think trumps the

24   representative nature of the testimony.  But I'll check that

25   out because I don't think I actually had to decide that the

1    last time we had a trial.

2              And so we'll get back to you.  But in any event,

3    Rule 30(b)(6) is what you're relying on, and I'll figure

4    that one out.

5              So then there was, also, on Page 16, there was

6    this about the parties stipulate to the following and then

7    there's a sentence saying, Evidence relating to the 2020

8    State indictment against plaintiff is excluded, but you

9    can't reach the precise contours of the evidence to be

10   excluded.

11             Is there something here that I can resolve?

12             MS. COZEN:  Your Honor, I think the precise

13   disagreement here is what the motion in limine covers.  It's

14   our position that the motion in limine covers any

15   investigation related to this indictment that postdates the

16   veto.  The defendants want to limit that to specific dates

17   listed in the indictment, and we don't feel that that is a

18   fair thing.  We think anything that postdates the veto, any

19   investigation into these allegations related to our client

20   are no longer relevant for the claim in this trial.

21             THE COURT:  Well, so let's assume,

22   hypothetically, that the veto occurred on -- and I forget

23   the exact date, but October 1st of whatever year it is we're

24   talking about.  And on October 2nd, Mr. Szubielski was

25   arrested in the prison with a pound of cocaine and the

1    Warden now said, See, would that be irrelevant?

2              MS. COZEN:  No, Your Honor.  So the indictment

3    is specifically about allegations that range between

4    May 13th, 2019 to September 20th, 2019.

5              THE COURT:  Okay.  So that's a helpful thing to

6    say, but -- and I think that's a different issue because

7    you're saying anything that postdates the veto, which I

8    think was in 2016 or 2017 and, you know, talking about 2019

9    to 2020, you're in a much better position.  And that's the

10   reason why I was asking the question because you have then

11   or seemingly to me made it a much broader thing you were

12   trying to accomplish.

13             But are we really just talking about 2019 to

14   2020 now?

15             MS. COZEN:  So we're talking about those

16   allegations in 2019 and 2020.  It's our position that, let's

17   say, the allegations were investigated in December of 2019,

18   which would be outside the time frame that defendants have

19   articulated.  Those would also be --

20             THE COURT:  I'm sorry to interrupt, Ms. Cozen,

21   but of course the indictments have dates in them.  The

22   activity that is charged in these indictments, what's the

23   earliest date where the indictment says something happened?

24             MS. COZEN:  May 13th, 2019.

25             THE COURT:  Okay.  And the date that Warden

1    Pierce vetoed the security or classification, that was in

2    2017 or 2016?

3                    MS. COZEN:  2015, Your Honor.

4                    THE COURT:  2015?  Okay.

5                    MS. COZEN:  It was October 2015.

6                    THE COURT:  Even better for you.  All right.

7    I've got your position.

8                    How is that relevant?

9                    MS. McCOWAN:  Your Honor, we agree with that.

10   So if you look at our position, we agree that we would

11   introduce the indictment.  We wouldn't cross the plaintiff

12   on the indictment.  But what we weren't able to reach

13   agreement on, and if you look at plaintiff's position as

14   written in the pretrial conference, they would like to

15   exclude Mr. Szubielski's involvement in any contraband which

16   would be pre-veto and post-veto and any investigation --

17                   THE COURT:  Well -- yeah, keep going.  Sorry.

18                   MS. McCOWAN:  Any investigation that may have

19   led to the charges that were indicted.  What we will show at

20   trial is that Mr. Szubielski was under constant

21   investigation, at least from as early as 2014.  So during

22   our discussions, it appeared that plaintiff was trying to

23   keep those investigations out for this motion in limine.

24                   THE COURT:  Okay.  And let's assume, just as a

25   round number, that the veto was October 1st of 2015.  So I

1    don't know, I was going to say don't sit down, but in your

2    case, if you want to sit, please sit.

3                   MS. McCOWAN:  It's fine.

4                   THE COURT:  Ms. Munnings, do you agree that your

5    motion in limine doesn't include anything that occurred

6    before the veto?  Oh, I'm sorry, Ms. Cozen or sorry --

7                   MS. COZEN:  Yes, Your Honor.  We agree that

8    anything before the veto is not included.

9                   THE COURT:  All right.  Do you have stuff after

10   the veto that you want to get in?

11                  MS. McCOWAN:  Well, as Your Honor had mentioned

12   in the hypothetical, there are continuing contraband

13   allegations that we interviewed or we are preparing to

14   introduce as evidence after the veto that continue to prove

15   that Mr. Szubielski was -- may be smuggling contraband in

16   while he was in the SHU.  We think that is important to

17   negate the retaliation claim.

18                  THE COURT:  So can you be a little more specific

19   because to the extent --

20                  MS. McCOWAN:  Your Honor, I believe the last

21   piece of evidence was the 2018 incident report.

22                  THE COURT:  And the 2018 incident report related

23   to something that, according to the report, occurred in

24   2018?

25                  MS. McCOWAN:  Yes, Your Honor.

1          THE COURT:  And when you say "the last," you

2   mean the one closest in time to 2015?

3          MS. McCOWAN:  Yes, Your Honor.

4          THE COURT:  Okay.

5          MS. McCOWAN:  So Your Honor, our evidence list,

6   we have incident reports stemming from 2009 to 2019 that we

7   would argue show a pattern of conduct, among other things,

8   to negate the allegation that Mr. Pierce retaliated.

9          THE COURT:  Wait.  I lost you there for a

10  second.  Let me just go to -- so on your list of exhibits,

11  and you helpfully have included a date of pretty much

12  everything, there's four things in 2017 and 2018.  And the

13  first three, and these are Exhibits 9 through 12, the first

14  three are called Incident Reports and so there's Incident

15  Reports on May 19th and October 27th of 2017.

16          Do these have to do with contraband?

17          MS. McCOWAN:  I believe -- I believe so, Your

18  Honor.  I can confirm.

19          THE COURT:  Well, I guess what I'm wondering is,

20  even if they do, it's two years or not quite two years, a

21  year and eight months or so after the Warden's veto.  How

22  does that help prove a relevant fact for you?

23          MS. McCOWAN:  Well, I would -- I believe at that

24  point he had been, Mr. Szubielski had been moved out of the

25  classification that he was in.  So we would propose that

1    that confirms Mr. Pierce's belief that should he be moved

2    down to a lower security than maximum, he would engage in

3    this contraband conduct in further detail than he was in

4    maximum.

5              THE COURT:  But --

6              MS. McCOWAN:  And Your Honor, I understand that

7    there may be a relevancy objection here, but I don't think

8    that these have anything to do with the indictment.  And we

9    agree that we're not going to talk about the indictment or

10   cross their plaintiff about the indictment.

11             THE COURT:  And you also have listed incident

12   reports in 2013, 2014, 2012, 2009.  To the extent you're

13   trying to disprove retaliation, aren't those a whole lot

14   more relevant because Mr. Pierce, whatever his qualities may

15   be, he wasn't actually writing down or thinking, yeah, two

16   years from now, this is going to occur.  And you know, it's

17   a forward-looking decision that he made.

18             So what's relevant to -- because after all, what

19   I think the issue here boils down to is do you believe

20   Warden Pierce when he said this was his concern?  And you

21   know, it seems to me you have enough, without knowing what

22   all these incident reports are in particular, that you have

23   enough incident reports predating the 2015 so that they're

24   probative and relevant.  And so, yes, the indictment, as far

25   as I'm concerned, that's out.

1            But it strikes me that the incident reports from

2    2017 and 2018 are incredibly prejudicial.  They have nothing

3    to do with Warden Pierce's state of mind in October of 2015.

4    And you know, I think as a proposition, they're essentially

5    irrelevant.

6            Now, they might be relevant if Mr. Szubielski

7    takes the stand, depending on what he says.  That's a

8    different issue.  But just in terms of tending to prove or

9    disprove the underlying facts that are at issue here, I

10   think they're pretty much irrelevant.  And to the extent

11   they are relevant, I think they're incredibly prejudicial,

12   and that whatever probative value they might have would be

13   substantially outweighed by the unfair prejudice to the

14   plaintiff.  And of course, these things all occurred after

15   other people, I forget who, eventually maybe -- Warden

16   Pierce was the one who eventually approved his

17   declassification.

18           But in any event, by the time this occurred, you

19   know, he had been lowered down presumably because people

20   thought he could be lowered down.  So I don't see it as

21   being something that, absent something that Mr. Szubielski

22   or his counsel say, opens the door.  I don't think these

23   should be things that you're planning on getting in and

24   certainly not things that the jury should be hearing about

25   in any opening statement.

1          All right?

2          MS. McCOWAN:  We understand, Your Honor, but the

3    reason that we couldn't come to agreement on the motion in

4    limine was that their position was that you couldn't

5    introduce anything about contraband or any investigation,

6    even around the veto.

7          THE COURT:  All right.  Well, apparently they

8    backed off from that position.

9          MS. McCOWAN:  Okay.

10          THE COURT:  So, and as far as I'm concerned,

11    anything that happened before, let's say, October 1st, 2015

12    or whatever the relevant date is, I'm not excluding anything

13    that happened before.  And I don't think I've been asked to

14    exclude anything that happened before, so to me, that's a

15    pretty bright-line dividing point.

16          You know, if you have something that was

17    immediately afterwards, you know, if it turned out that

18    Investigator Roberts testified or maybe even Warden Pierce

19    said, Yeah, I was told, and then a few days later the

20    investigation came to fruition, that would be one thing.

21    But that's not what we're talking about.

22          MS. McCOWAN:  We understand, Your Honor.

23          THE COURT:  Okay.  All right.  I think those

24    were the only two things in the body of the Pretrial Order

25    that were in dispute.  There is a statement which is true

1    that it's scheduled for a three-day jury trial.

2              How many hours per side should I allot for this?

3    And so to make sure everybody is on the same page, when I

4    ask that question, you know, I'm going to give you a certain

5    amount of time in hours to do your opening statement, your

6    direct examination of witnesses, and your cross-examination

7    of witnesses.  Closing argument is separate.  We'll

8    determine that somewhere down the road during the trial.

9              And from looking at the witness list, which I

10   did, it looked to me like these are all fact witnesses.

11   There's no expert witnesses.

12             Is that right?

13             MS. MUNNINGS:  Yes, Your Honor.

14             THE COURT:  Okay.  So how many hours do you

15   think you need under that formula?

16             MS. MUNNINGS:  Your Honor, how many hours are in

17   a trial day?

18             THE COURT:  That's a reasonable question.  Six.

19   But on the first day, the jury selection, which doesn't

20   count against this time, that will take probably in the

21   vicinity of two hours.  So there will be, you know,

22   somewhere in the neighborhood of three and a half to four

23   hours on the first day, and then six hours on the second

24   day, and six hours on the third day.

25             MS. MUNNINGS:  Your Honor, six to eight hours.

1    Eight hours.

2              THE COURT:  All right.  Mr. Wan, what do you

3    say?

4              MR. WAN:  Eight hours sounds fine, Your Honor.

5              THE COURT:  Well, yeah, yeah.  So I'd prefer you

6    took a different attitude which would be how much do you

7    need?

8              MR. WAN:  Well, Your Honor, based on, I guess,

9    my experience two weeks ago, I forget the time.  I think it

10   was between six or seven.  So maybe it was like maybe a hair

11   less, but that's my recollection from my paralegal,

12   Mr. Buton (phonetic).

13             THE COURT:  All right.  So, Ms. Munnings, how

14   long do you imagine your client testifying on direct

15   examination?

16             MS. MUNNINGS:  An hour and a half.

17             THE COURT:  All right.  And I realize these may

18   be somewhat hypothetical answers at this point, but how long

19   do you imagine an opening statement for your side being?

20             MS. MUNNINGS:  Thirty minutes.

21             THE COURT:  Okay.  I forget, Mr. Wan, in the

22   trial we just had, did we do the closing arguments on day

23   three or day four?

24             MR. WAN:  Day four, Your Honor.  I think we let

25   the jury out early on day three, and then we, on the second

1    half of day three, I think we finalized the jury

2    instructions and the verdict sheet, and then you kind of let

3    us go to prepare closings.

4              THE COURT:  Okay.  So eight honestly seems more

5    than is necessary to me.  You know, I say that.  I give

6    patent cases 12 hours, and the complexity of those is

7    ridiculous.  So I'm going to say six-and-a-half hours a side

8    is what -- and so I'm making these rulings on the assumption

9    that actually some other judge is going to have this.  I'm

10   certainly not binding them to these rulings, but I would

11   expect probably that they will go with whatever I say.  But

12   they may not.

13             But it seems to me like six-and-a-half hours a

14   side is enough and that will also give the reasonable

15   opportunity to possibly do closing arguments on the Friday

16   because it is a short week.  So that's what I'm going to put

17   down for that.

18             All right.  So the motions in limine.  And I

19   believe the first one is the motion in limine that we kind

20   of addressed.  That's the relating to the Plaintiff's State

21   indictment.  So I think that one is resolved, as I've

22   already said.

23             Thereafter, there is defendants -- these are all

24   then after that Defendant's motions, I guess.  So Mr. Wan,

25   Defendant's -- well, actually the way this is is a motion in

 1    limine regarding damages.  And so I understand the

 2    Defendant's position, and I don't know whether the Defendant

 3    has shared with you, as I imagine they might have, that

 4    basically this motion came up in a trial that I had with

 5    Mr. Wan, and Mr. Pierce, and some other people a few weeks

 6    ago.

 7                    Have you heard about that?

 8                    MS. COZEN:  No, Your Honor.

 9                    THE COURT:  Okay.  All right.  Well, so what is

10    your theory as to why you can ask for a specific dollar

11    amount, because I believe in your response you cite a case

12    in which there was testimony about what the damages should

13    be which is not something that's going to be happening in

14    this case.  So I thought the case you cited wasn't really on

15    point.

16                    What's your theory as to what it is you want to

17    do or why you can do it?

18                    MS. COZEN:  Yes, Your Honor.  I've had a chance

19    to relook at the cases, and we do agree that in closing we

20    cannot suggest a specific dollar amount for pain and

21    suffering damages based on the current case law.  We don't

22    agree that we can't suggest a methodology as long as that

23    doesn't include a specific dollar amount, but I do

24    understand Defendant's position and have relooked at the

25    case law and agree a specific dollar amount will not be

1    suggested.

2              THE COURT:  So do you have an idea, because I

3    think you're right, everything you said, and do you have an

4    idea of what sort of methodology suggestion you have in mind

5    or is that still to be determined?

6              MS. COZEN:  Your Honor, that's still to be

7    determined based on our trial strategy.

8              THE COURT:  Okay.  All right.  So I did have to

9    look at this in this last trial with the State, and as I

10   said, I think Ms. Cozen has correctly stated what the law

11   is.

12             I'm sorry, Mr. Wan.  Do you have something you

13   want to say?

14             MR. WAN:  No, I just want to say that's correct.

15   While she can't suggest a specific amount, nor can she have

16   a specific dollar amount in her methodology, she can suggest

17   some kind of methodology like in the other case.

18             THE COURT:  Right.  So for example, in the last

19   case, the Plaintiff's attorney took the number of hours and

20   tried to give the jury some argument as to, you know, the

21   impact that would have on a person, and then suggested they

22   figure out what that impact is and multiply it by the number

23   of hours the person was arguably wrongfully in solitary

24   confinement.  You know, the trick is to make sure that you

25   don't get to some place where all they have to do is math,

1    and they get the answer.

2              You understand?  But in any event, you can think

3    about that, and if you have any concern that you might be

4    passing some line, you can certainly bring it up later.  But

5    I'm sure, in the first instance, you can probably figure

6    this out, as you already have.

7              So that resolves Defendant's motion in limine

8    regarding damages.  Essentially, the motion is granted in

9    light of the Plaintiff's concession.

10             And then the second motion in limine of the

11   Defendant, oh, yeah, was about the time in solitary.  And

12   maybe I would ask the State here, because this was not an

13   issue in my last trial, what is -- you know, there's points

14   in your brief or your motion where you're talking about

15   confusion of the issues, and this, and that.

16             I wasn't entirely convinced that any of this was

17   likely to confuse a jury, but why don't you tell me what

18   your best argument is before I get a response.

19             MR. WAN:  Yes, Your Honor.  I think that there

20   is a danger here because if you look at -- this whole case

21   is basically whatever damages Mr. Szubielski sustained, you

22   know, if there is liability over that one-year period, so

23   we're talking about all these other periods.  And I think

24   there is an issue where they're not looking at just the one

25   year, they're looking at all the other years beforehand and

1    may inappropriately apply that to this case.

2              THE COURT:  But if that were the case, couldn't

3    I just take care of that by saying, you know, Jury, there is

4    no issue about the solitary confinement before the Warden's

5    veto?

6              MR. WAN:  Well, I'm a little nervous, Your

7    Honor, because I think in their response, they mentioned the

8    whole eight or nine years was relevant for damages, and I

9    don't think it is.

10             THE COURT:  Well, so imagine this, you're on

11   Captain Bligh's ship 200 years ago, and you do some offense

12   for which you get 20 lashes.  And then after he's given you

13   the 20 lashes, he puts on ten more that's against the rules.

14             Do you think the fact that you got 20 lashes

15   beforehand impacts how much the last ten lashes hurt?

16             MR. WAN:  No, Your Honor, I think -- I, too,

17   agree, it doesn't.

18             THE COURT:  Actually, I think it does.

19             MR. WAN:  But I guess your analogy, but I think

20   in front of a jury, though, that's what I'm worried about.

21   Correct.  We are only focused on, in your instance, the last

22   ten lashes.  But in front of a jury when they hear that, the

23   State's concern is that now they're going to say, yeah,

24   there's one year, but there's all these other years he was

25   held in there.

1            THE COURT:  And isn't the jury also going to

2    hear -- I mean, they're going to -- isn't Warden Pierce -- I

3    can't remember.  I may have confused this with something

4    else.  Aren't some of the -- I forget.

5            Do some of the documents that the people want to

6    introduce, I mean classification decisions and things, don't

7    they have sort of this history?  I mean, are you suggesting

8    that the jury should essentially not know what he was up to

9    before the Warden denied the reclassification?

10            MR. WAN:  I think it's suffice to say, yeah, he

11   was in maximum security.  The length, I think, is kind of

12   the issue, especially when my worries about the damages

13   part, Your Honor, is really the main concern over this.  I

14   think there could be some confusion as well, but I think

15   Your Honor thinks that that may not be the case.

16            THE COURT:  All right.  Thank you, Mr. Wan.

17            Your side, Ms. Munnings?

18            MS. MUNNINGS:  Yes, Your Honor.  We believe that

19   the issue of confusion can be cured with a jury instruction

20   describing what the damages would be for.

21            THE COURT:  And so I am correct that in terms of

22   mental anguish, and hardship, and the sort of, you know,

23   going crazy perhaps, whatever it is that Mr. Szubielski

24   might say about this last year, is there going to be any

25   other evidence, maybe medical records or, I don't know,

1    something else that's going to, I don't want to say support,

2    but sort of add to the Plaintiff's own testimony about how

3    terrible it is?

4              MS. MUNNINGS:  Yes.

5              THE COURT:  And that would be?

6              MS. MUNNINGS:  There are the -- well, part of

7    the disputed evidence is or exhibits is photographs of the

8    prison cell, and we'd like to, if we can't use those, we'd

9    like to be able to get pictures of the cells.

10             THE COURT:  Okay.  So actually I did see that.

11   The objection to that is that they were produced in the

12   CLASI litigation pursuant to a Protective Order issued by

13   now retired Judge Sleet.

14             MS. MUNNINGS:  Yes, Your Honor.

15             THE COURT:  Okay.  So since he's not around to

16   allow the release of the pictures, I think I can do that in

17   his place.  I feel pretty confident that, in fact, if he

18   were still on the bench, he would do that.  So you're going

19   to be able to use the pictures.  And perhaps -- I would

20   appreciate it if you prepared the shortest possible order

21   that I would sign authorizing you to use these pictures so

22   nobody's, you know, subject to contempt of court orders down

23   the road.

24             Okay?

25             MS. MUNNINGS:  Yes, Your Honor.

1          THE COURT:  So if you could do that and submit

2     it.

3          And I'm sorry, I lost my thread here.  So we

4     were talking about corroboration, so yes, you were talking

5     about the pictures.  True.

6          Anything else that you have in mind right now?

7          MS. MUNNINGS:  There are also medical records

8     from 2015.

9          THE COURT:  Do the medical records give a flavor

10    of, for lack of a better word, a man going crazy?

11         MS. MUNNINGS:  Yes, Your Honor.

12         THE COURT:  I mean, just because I ask a leading

13    question, you don't have to answer it yes.  I mean, is

14    that --

15         MS. MUNNINGS:  Yes.

16         THE COURT:  That is your view?

17         MS. MUNNINGS:  Yes.

18         THE COURT:  Okay.  All right.

19         Well, so I'm going to -- oh, yeah.  Okay.  So

20    the description in the complaint that is a key piece of

21    evidence in your case, isn't Mr. Szubielski going to say

22    that person who's person number 1, 2, 3, 4, 5 or 6,

23    whichever one he was, doesn't that tell you how long he was

24    in solitary confinement?

25         MS. MUNNINGS:  Yes, Your Honor.

1          THE COURT:  What about that?

2          MR. WAN:  Your Honor, Mr. Pierce's testimony is

3     that he never ever saw the complaint, so he wouldn't have

4     identified it any way.

5          THE COURT:  Well, so right, but presumably the

6     complaint is going to come into evidence; right?

7          MR. WAN:  I think from your ruling from the last

8     trial, I think only for state of mind, but -- well,

9     actually, I don't know, Your Honor.  I think he --

10         THE COURT:  So the difference here is the

11    complaint is the main, is one of the Plaintiff's main pieces

12    of evidence of saying that Warden Pierce, you know, could

13    identify Mr. Szubielski as a complainant; right?

14         MR. WAN:  That's -- yeah, that's their theory of

15    the case is my understanding.

16         THE COURT:  And I could tell them, you know, me

17    telling the jury, it only comes in for -- it doesn't come in

18    for the truth of the matter asserted.  I mean, it's going to

19    be pretty hard for the jury to ignore that Mr. Szubielski is

20    going to say, Yeah, the guy that was in solitary for seven

21    years is me and who has whatever psychiatric diagnoses he

22    has.  So I think you're fighting a battle that you kind

23    of -- it seems to me it's pretty close to impossible to

24    actually do.  And what's more is I think it is relevant to

25    damages.

 1                You know, one of the things, you may recall

 2     this, Mr. Wan, the expert was saying in the last case was or

 3     even quoting the U.S. Supreme Court was, you know, sort of

 4     like, you know, the cumulative effect of going crazy.

 5                MR. WAN:  Your Honor, I'm sorry to interrupt.

 6     I'm looking over Plaintiff's exhibit list.  I don't actually

 7     see any medical records postdating the veto.  Maybe I'm

 8     wrong.  I was just looking quickly because I didn't really

 9     recognize which exhibit that was.

10                THE COURT:  Well, I can't -- I see something

11     called Contact Notes for 10/14/15.

12                MR. WAN:  Right, which I think predates the

13     veto.

14                THE COURT:  I forget.  I think that might have

15     been Ms. Munnings.  Maybe it was you, Ms. Cozen, I don't

16     remember.

17                Somebody, do you actually plan to introduce

18     medical records?

19                MS. COZEN:  Your Honor, we do have some medical

20     records that reference Mr. Szubielski's mental health

21     condition, and we think those are relevant sort of to show

22     the negative impact that an extra year in solitary

23     confinement could have on someone with his mental health

24     conditions.

25                THE COURT:  Do you know offhand, looking at the

1    24 exhibits that are listed for your side, which medical

2    record you're talking about?

3              MS. COZEN:  For instance, there is a letter

4    which would be Exhibit 6 that discusses the need for our

5    client to be in --

6              THE COURT:  Right, but that's from 2008.

7              MS. COZEN:  Correct, Your Honor.  I don't think

8    we plan to introduce medical records that postdate the veto

9    regarding Mr. Szubielski's mental health condition; however,

10   he may testify about that on direct.

11             THE COURT:  Sure.  No doubt.

12             MS. COZEN:  And additionally, the doctors who

13   are fact witnesses may testify about his.

14             THE COURT:  Wait.  I'm sorry, which doctors?

15             MS. COZEN:  There are a few doctors that were

16   30(b)(6) witnesses and --

17             MS. MUNNINGS:  Drs. Fink and Maduka-Exeh.

18             THE COURT:  And did they actually testify about

19   Mr. Szubielski specifically as opposed to general policy?

20             MS. MUNNINGS:  Yes, Your Honor.  They talked

21   about his case, and they had reviewed his medical records

22   and the medications that he was on.

23             THE COURT:  Okay.  Actually, that reminds me:

24   In terms of the Rule 30(b)(6) question that you raised

25   earlier and I said, I would take under advisement, it would

 1    be helpful for me if you would get the transcript, which you

 2    presumably have, of Mr. Troxler and the doctor and submit

 3    them to me with a letter highlighting in yellow or some

 4    other color than red or green what portions of the

 5    testimony -- you know, this doesn't have to be your final

 6    decision, so to speak -- but which portions of the testimony

 7    you're trying to get in.  That might help me think about

 8    this.

 9              MS. MUNNINGS:  Yes, Your Honor.

10              THE COURT:  Okay.  All right.

11              So basically I'm going to let in testimony about

12    what I believe are seven years in the Secure Housing Unit,

13    or solitary, or what have you.  And I suggest the Defendant

14    possibly propose a limiting order, a limiting instruction

15    that I could give about the history as to what it is --

16    well, why don't you see what it is.  You know, at a minimum,

17    it will have to say any damages are for the time period from

18    October 24th, 2015, to, I guess, October 11th, 2016.  And

19    that's what I think it should say at a minimum, but maybe

20    you all can think of something better.

21              All right.  I think that was -- okay.  So I

22    think that takes care of the motions in limine.  I did --

23    wait.  Hold on a second.  I did look at the exhibit list

24    which -- yeah.  Well, I see actually, of course, the

25    Pretrial Order for the doctor and Mr. Troxler has the

1    proposed designations.  They seem pretty modest.  That

2    doesn't mean they're admissible, but they do seem like

3    they're maybe 12 pages total between the two of them.

4              So in any event, if you would submit that.  And

5    to the extent that, you know, I need -- it would probably be

6    better to just submit the whole thing so I have any context

7    if I have a question about something.

8              I did wonder on the Plaintiff's -- so I noted, I

9    went through and I noted that you had your Plaintiff's

10   exhibit list, and there were some objections from the

11   Defendant.  And some of them did not seem like the sort of

12   objections I could form any reasonable view of in the

13   abstract.

14             But on the other hand, the objections to

15   Exhibit 16, 17, 18 and 24, they seemed like things that I

16   couldn't come up with a theory as to why those were actually

17   admissible for the Plaintiff.  You know, the Settlement

18   Agreement and exhibits for the lawsuit, the signed

19   Settlement Agreement, the complaint in some case in 2019,

20   and a Delaware online article in 2019.  You know, there seem

21   to be a lot of problems.  You know, relevance and hearsay

22   spring to mind.

23             Do you have a theory that you want to explain to

24   me as to why those things should be admissible?

25             MS. COZEN:  Yes, Your Honor.  I'll start by

1    saying we withdraw Exhibit 24.  We've reconsidered in light

2    of Defendant's objections and agree that we will not

3    introduce that as evidence --

4              THE COURT:  Okay.

5              MS. COZEN:  -- in this case.  Regarding

6    Exhibit 17 and 16, I can discuss those together because

7    they're both --

8              THE COURT:  They're the same thing?

9              MS. COZEN:  Yes, they're both versions of the

10   same thing.  Defendants object to those on relevance

11   grounds.  Now, we feel they're relevant and they show

12   conditions of confinement for prisoners like our client,

13   Mr. Szubielski, who was housed in solitary and the poor

14   mental health treatment he was getting during that year.

15   The Settlement Agreement was signed in 2016, I believe.

16             THE COURT:  August of 2016.

17             MS. COZEN:  August of 2016.  So all of those

18   changes were not yet implemented, and it shows that they

19   could have been.  It shows that there is a feasibility of

20   these different improvements that our client did not benefit

21   from in that one year, and we think that is directly

22   relevant for showing damages and the poor conditions our

23   client was facing from 2015 to 2016.

24             THE COURT:  But your complaint is not that he

25   didn't get good treatment in solitary confinement, it was he

1    was in solitary confinement at all; right?

2              MS. COZEN:  Yes, Your Honor, but I think that

3    goes to damages to show his conditions in solitary will

4    allow the jury to adequately evaluate compensatory damages.

5              THE COURT:  Does the Settlement Agreement say

6    these are the conditions in solitary, or do they say these

7    are the things Defendant agrees to do in the future?

8              MS. COZEN:  Your Honor, it says these are the

9    things Defendant agrees to do in the future which shows the

10   feasibility of being able to do them.

11             THE COURT:  But it doesn't actually show whether

12   or not or to what extent they were being done in the past;

13   right?

14             MS. COZEN:  That is correct, Your Honor.

15             THE COURT:  How would you tie whatever these

16   things are to what Mr. Szubielski actually experienced?

17             MS. COZEN:  Sure, Your Honor.  I think we could

18   look at the Settlement Agreements, and let's say,

19   hypothetically, they now require inmates in the SHU to have

20   two hours of recreation a day, when before it might have

21   been two hours a week.  We could show that and show the

22   contrast that this was the conditions before, this is what

23   they are required to do now.  So clearly, it wasn't good

24   before.

25             THE COURT:  You know, the "clearly it wasn't

1    good before," that sounds like a purpose that's prohibited

2    by Rule 407.

3              MS. COZEN:  I think Your Honor's correct, Your

4    Honor, however, feasibility of making these changes is not

5    prohibited by Rule 407.

6              THE COURT:  That's true, or I think that's true.

7    But there seems to be a gap between -- your only evidence,

8    I'm guessing, that these changes are something that could

9    have happened and didn't.  I mean, I guess you could ask

10   Mr. Szubielski if it says see mental health counselor three

11   times a week, you could ask him:  How often did you see him?

12   Once.  Would you have like to have seen such a person three

13   times a week?  Yes.

14             So all right.  Mr. Wan or --

15             MR. WAN:  Your Honor, I don't think, at the

16   outset, they're at all relevant.  I think it's kind of

17   one -- it's not a deliberate indifference case, it's a

18   retaliation case.  So as far as what could have been done,

19   that's really not an issue here.  You know --

20             THE COURT:  Well, so the only thing that it's

21   related to is possibly damages; right?  Right?

22             MR. WAN:  Sorry?

23             THE COURT:  Sorry.  Ms. Cozen, this is entirely

24   related to damages or to nothing; right?

25             MS. COZEN:  Correct, Your Honor.  We think this

 1    is a damages exhibit.

 2                THE COURT:  All right.

 3                MR. WAN:  Your Honor, this is a subsequent

 4    remedial measure that still can't come in.

 5                THE COURT:  Well, is that a question or an

 6    assertion?

 7                MR. WAN:  Well, I guess, Your Honor, I believe

 8    it's a subsequent remedial measure that does not come into

 9    play here.  And I think the agreement focuses on liability,

10    too, so --

11                THE COURT:  Yeah, I have to -- there might be

12    a -- you know, the Rule 407 ends with the Court may admit

13    this evidence for another purpose, and then it says such as,

14    and it has impeachment or, if disputed, proving ownership,

15    control, or the feasibility of precautionary measures.

16    Assuming feasibility and precautionary measures is an

17    example and not a complete statement of what it might cover,

18    you know, I guess the first question is:  I'm having a hard

19    time -- you know, the disputed part, and maybe, for all I

20    know, it's already in Warden Pierce's testimony, but you

21    know, there is a precondition to admitting it, even for

22    feasibility, which is there has to be an argument about

23    feasibility.  And I don't know whether there will actually

24    even be an argument about feasibility.  Right?

25                MS. COZEN:  Yes, Your Honor, that is the quoting

1    of the rule.

2                  THE COURT:  All right.  Well, why don't we do

3    this:  I'm going to tentatively exclude the Settlement

4    Agreements, but certainly if there is a dispute about

5    feasibility that surfaces, you can bring it up again.  You

6    know, plaintiffs aren't the only ones who can open a door.

7                  Okay.  What about the complaint in the 2019

8    case?  Actually, hold on just a second, Ms. Cozen.

9                  All right.  What about the complaint in 2019?

10   That's Exhibit 18.

11                 MS. COZEN:  Your Honor, I think in light of our

12   discussions, we are going to agree not to present

13   Exhibit 18.

14                 THE COURT:  Okay.  All right.  I think the rest

15   of the objections to your things are probably best decided

16   at some later point because none of them at least --

17   actually, maybe I can actually overrule a couple of the

18   Defendant's objections.

19                 Mr. Wan, the notice of classification assignment

20   is Plaintiff's Exhibit 7.  I take it that's the decision

21   here, that's actually the heart of the case or it's not the

22   Warden's decision, it's the decision of, I don't know, one

23   of the committees that preceded the Warden?

24                 MR. WAN:  Sorry, Your Honor.  Give me one

25   second.

1                    THE COURT:  Sure.

2                    MS. COZEN:  We have a copy of the exhibit if you

3        want it.

4                    MR. WAN:  Yeah, that would be wonderful.  Thank

5        you very much.  You're asking about number seven, Your

6        Honor?

7                    THE COURT:  Number seven, yes, the notice of

8        classification assignment dated September 1st, 2015.

9                    MR. WAN:  Your Honor, the hearsay objection,

10       because we don't know whose writing is actually on there, I

11       think there was a hearsay objection with who actually

12       circled it and you know --

13                   THE COURT:  But this is the prison's record of a

14       classification decision, is it not?

15                   MR. WAN:  It is.

16                   THE COURT:  Is it not a business record?

17                   MR. WAN:  I think the document itself would be a

18       business record, the writing on it would still be hearsay.

19       You can't see who --

20                   THE COURT:  What does the writing say on it that

21       is --

22                   MR. WAN:  It says, it, looks like you've been

23       approved arrow possibly the word don, and then don screw it

24       up.  I don't know.  I don't know what --

25                   THE COURT:  All right.  Do you know what this

 1    handwriting means or have a theory that you're going to

 2    advance?

 3                 MS. COZEN:  Well, Your Honor, I do have extra

 4    copies if you would like one.

 5                 THE COURT:  All right.  Well, why don't you hand

 6    one up.

 7                 MS. COZEN:  These are all the exhibits, both

 8    Plaintiff's and Defendants, tabbed separate by exhibit

 9    number.

10                 THE COURT:  So is there going to be any

11    explanation of what the handwritten language means?

12                 MS. COZEN:  Your Honor, we would offer the

13    handwritten portion just for the effect on the listener

14    which is permissible, not necessarily --

15                 THE COURT:  Why do we care what the listener's

16    effect is?

17                 MS. COZEN:  So our client has been housed in

18    solitary, again, for seven, eight years and he gets this

19    notice that he is now approved to move.  He's naturally

20    going to be excited.  He's going to be looking forward to

21    that.

22                 THE COURT:  Oh, it looks like, You have been

23    approved.  Your client is going to say, Yeah, this was given

24    to me?

25                 MS. COZEN:  Yes.  Correct, Your Honor.

1          THE COURT:  And I think it is cut off.  What it

2     actually says, it looks like, You've been approved.  Do not

3     screw it up.

4          MS. COZEN:  Correct, Your Honor.

5          THE COURT:  What do you have to say about that,

6     Mr. Wan?

7          MR. WAN:  Well, Your Honor, we don't -- if we

8     can't prove who says that, I don't think they come in.  The

9     handwriting is what, I think, kind of bothers me because now

10    it's someone -- if that's what it says, it's telling

11    Mr. Szubielski, Don't screw it up, and I don't want them to

12    require -- you know, I don't think there's any evidence that

13    he said that.

14         THE COURT:  So I take it this document, which

15    has a stamp on it saying Received, actually comes from the

16    files of the prison and not from Mr. Szubielski; right?

17         MS. COZEN:  Yes, Your Honor.  It was Bates

18    stamped from the DOC.

19         MR. WAN:  I think it's still -- I think the

20    document itself --

21         THE COURT:  Well, so --

22         MR. WAN:  There's a summary judgment,

23    Exhibit 20.  So we're not positive if this one was produced

24    by us, Your Honor.  I think the point being whether -- if he

25    got this, the record -- it is a business record.  I think

1   the writing on this is the issue here.

2           THE COURT:  Well, so it's pretty clear that the

3   writing on it comes from somebody contemporaneously with

4   knowledge.

5           MR. WAN:  But it could be Mr. Szubielski

6   himself, we don't know.

7           THE COURT:  So I'm going to let it in because

8   somebody, you know, I assume Mr. Szubielski will say, Not my

9   writing, because I don't usually write notes to myself.  And

10  so I think it's a business record, and I think it's -- I

11  don't actually think there's any prejudice to the defendant.

12  I think it is a logical thing.

13          I think the plaintiff's argument about, you

14  know, it's worse if you're expecting something and you don't

15  get it than if you have no expectations.  And so I think it

16  kind of fits in with the Plaintiff's damages argument.  And

17  I don't think it really matters who in particular wrote it

18  as long as it wasn't Mr. Szubielski.

19          So I'm going to admit that.  Okay.  That is

20  Plaintiff's Exhibit 7.

21          And then the other one that I thought, the

22  reclassification form for males, number 11, Exhibit 11,

23  which certainly looks like more business records.  What's

24  the problem here, Mr. Wan?  You know, I see it has his

25  escape history in the middle of it.  I'm not entirely sure

1    why you're trying to keep this out.

2              MR. WAN:  I guess it comes in, Your Honor.

3              THE COURT:  I mean, but it is some official form

4    that's part of this process.  I mean, it seems -- I mean, it

5    seems like -- in any event, I don't see a relevance.  I

6    mean, this is like the work of some -- I mean, this is part

7    of the process; right?

8              MR. WAN:  Yes, Your Honor.  This is -- this is

9    done as part of -- it is a business record.

10             THE COURT:  Well, no, but I mean, it's not only

11   a business record, but it's a business record relating to

12   the buildup to Warden Pierce vetoing classification.

13             MR. WAN:  Yeah, because this one is dated

14   7/29/2015, so I guess that would be four months before the

15   veto.  Yeah.

16             THE COURT:  Okay.  You know, you may want to do

17   things -- you may want to not confuse the jury.  You may

18   want to redact what the run date is in the top right-hand

19   corner of this or I guess have some explanation, even though

20   it seems pretty clear the thing is dated August 10th, 2015

21   at the end.

22             So in any event, I'm going to overrule that

23   objection.  I think it's quite relevant, and there's, so far

24   as I can see, no unfair prejudice or anything else.

25             All right.  Let me just see the Defendants'

 1    exhibits.  So I did cavalierly tell the Defendants earlier

 2    that all these earlier incident reports are coming in.  But

 3    I do notice that every single defense exhibit is objected

 4    to.

 5              Actually, let's skip the incident reports for a

 6    minute.  Michelle Roberts, is she on the witness list,

 7    Mr. Wan or Ms. McCowan?

 8              MS. McCOWAN:  She is, Your Honor.

 9              THE COURT:  So with the affidavit dated

10    June 31st of 2016, presumably that's not actually going to

11    be something you're offering; right?  She's going to testify

12    firsthand?

13              MS. McCOWAN:  That's correct, Your Honor, but to

14    the extent she can't recall, we want to make sure --

15              THE COURT:  Okay.  Well, in any event, so

16    subject to some proper use, it is not otherwise going to

17    come in just because you have an affidavit.  So I'm going to

18    sustain that objection.

19              All right.  What about the various

20    classification decisions and incident reports that are

21    Exhibits 1 through 7?

22              MS. MUNNINGS:  Your Honor, each of these records

23    have narratives from an officer that talk about what other

24    people did, what people said, and so they're hearsay, and

25    they're also highly prejudicial and confusing.  They're not

 1   going to the veto.  They're he-said-she-said type of

 2   documents included in those incident reports.

 3              THE COURT:  But this is kind of like the backup

 4   for, for lack of a better word, Mr. Szubielski's prison rep;

 5   right?

 6              MS. MUNNINGS:  Yes, Your Honor.

 7              THE COURT:  So let me just see if I've got the

 8   history kind of straight which is for a number of years

 9   before Warden Pierce was the Warden, Mr. Szubielski was, I

10   guess, six years to be exact or five or six kept in solitary

11   confinement, or the Secure Housing Unit, or however you want

12   to call it, based on decisions that are not at issue in this

13   case.

14              But the reason that Warden Pierce gives for

15   vetoing it is, would you say, I knew there was a current

16   investigation going on or something like that?  Okay, got

17   that.

18              Does he have a like part B, you know, he's a

19   really bad guy, or is it really just, no, there was an

20   investigation going on and, you know, intelligence that he's

21   doing smuggling or something like that?

22              MR. WAN:  We have things, I believe, like this

23   and also there are other factors, including Mr. Pierce had

24   an escape attempt as well.  So I think, you know, all of

25   this is relevant to show that, you know, yes, there is an

```
 1   initial classification with the NBC and IBCC.  But then the

 2   Warden knows the, you know, I guess the most sensitive

 3   information, so that's why he can -- there are times where

 4   he does a veto.  And for security purposes, that might not

 5   be privy to the lower people who do the initial

 6   classification.  I think this kind of moves up to that.

 7            THE COURT:  Oh, yeah.  I think I've heard that

 8   testimony recently.

 9            MR. WAN:  Thank you, Your Honor.

10            THE COURT:  How much of the bad stuff that

11   Mr. Szubielski's either done or been accused of doing that's

12   covered in these seven exhibits is also essentially

13   summarized in the reclassification form that immediately led

14   up to the Warden's veto?

15            MR. WAN:  They're not, Your Honor, I think

16   classifications.  And I don't know if you remember from the

17   other trial, but classifications are very bare bones.  They

18   may contain a statement if --

19            THE COURT:  Right.  I do remember that now that

20   you mention it.

21            MR. WAN:  So I think the incident reports are

22   important to show in greater detail exactly what was going

23   on and not just some --

24            THE COURT:  Well, so that's what I'm kind of

25   wondering, the greater detail because we have the
```

1    Plaintiff's Exhibit 11 which, among other things, under

2    Escape History says, Walk off from work release, furlough,

3    courtrooms, police, recovery center within the past three

4    years.  Gives him two points.

5                 MR. WAN:  Yeah, but for example in --

6                 THE COURT:  Oh, wait.  I'm sorry.  I guess it

7    doesn't give him points because the box none is checked.  So

8    those are -- oh, okay.  I get it.  If the box was checked --

9    so escape history, according to this, is none.  You've got

10   age.  There's something that says high severity, all felony

11   escapes.  None.  Disciplinary.

12                So he has 15 or more years remaining to be

13   served.  Active in a worker program.  Meeting.  So I think

14   you've given me a binder that has these seven documents.  I

15   think the best thing to do would be for me to have a look at

16   them without you all staring at me and see.

17                You know, I guess part of what I'm concerned

18   about would be trying to avoid -- trying to be fair in terms

19   of what the jury would hear.  You know, as I've said,

20   they're going to hear that he was in solitary for six years.

21   And as I've said, they're going to be told essentially

22   that's not an issue in this case.

23                But in terms of the Warden's decision, you know,

24   it's hard to completely sanitize why he was in there for six

25   years, you know, why the Warden would even be familiar with

1   it.  Because I think there was testimony or am I confusing

2   this with the last case that the Warden -- yeah, I think

3   part of your theory is the Warden knew who he was.  Why did

4   the Warden know who he was?  Did they go to high school

5   together or, you know, has the Warden been hanging around

6   the Correctional Center for a long time and Mr. Szubielski's

7   the kind of guy who stands out?  I'm guessing it's more or

8   less the latter, and this would all kind of fit in with

9   that.

10          But it strikes me that, as you say,

11   Ms. Munnings, a lot of the details are prejudicial with no

12   probative value.  It's a lot more, you know, that he had

13   incidents in 2000 -- you know, 2009 is a long time ago, but

14   2012, 2013, 2013 again, 2014.

15          Were any of these incidents involving smuggling

16   or contraband?

17          MR. WAN:  Yes, Your Honor.  Sorry.

18          MS. MUNNINGS:  Some are or like someone says

19   someone else is sending something to Mr. Szubielski.  Some

20   are Mr. Szubielski has too much soap, or envelopes, or

21   stamps, and so it's -- they're not really proving -- I

22   guess, I don't know what their theory is, but they're not

23   relevant.  They're not probative and they're prejudicial.

24          THE COURT:  All right.  Well, so it seems to me

25   that things that involve contraband or something else is a

1    lot more relevant than things that might involve, say, an

2    assault or even an escape.  But I think the best thing to do

3    is for me to have a look at these, and I may suggest --

4    well, I don't know what I may suggest, but I am thinking

5    that particularly to the extent -- you know, it might be

6    something where it's possible to stipulate to some prior

7    events concentrating on the contraband ones.  I'm not sure,

8    but I think I need to look at it, and I also think I need to

9    bring this to an end because I have something at

10   one o'clock.

11          So in any event, that's as much as I plan to do

12   with the exhibits today.  And I will just tell you that if I

13   were doing the voir dire, basically Mr. Wan or Ms. McCowan

14   cleverly submitted basically the voir dire that I did in the

15   last case, so I'd be starting from where they are.  The one

16   thing that I thought may be needed to be added to what they

17   submitted was a question which you all had in your voir

18   dire, which was essentially, you know, this isn't the way

19   you worded, I don't think, but does the involvement of the

20   ACLU in this cause you to jump to some conclusion or

21   otherwise not be able to judge the case fairly?  But I

22   thought that as long as we're doing the ACLU, we might as

23   well do the Community Legal Aid, too, even though they're

24   probably a lot less controversial.  So I was going to do

25   some -- I had written down a question which I had imagined

1    as 16(a) in the submission from the State, something like,

2    As I mentioned before, Mr. Szubielski claims Mr. Pierce

3    retaliated because of Mr. Szubielski's involvement in an

4    earlier lawsuit.  That earlier lawsuit was brought by the

5    American Civil Liberties Union or ACLU and the Community

6    Legal Aid Society or CLASI.  Do you have strong feelings,

7    either positive or negative, about either the ACLU or CLASI?

8            You know, a lot of these questions where you

9    have things, it's possible for people to be on either side

10   of an issue, and I don't like to hint that they should be on

11   one side or the other.  So even though you only were

12   interested in the negative, I think it's better to ask about

13   both sides.

14           So in any event, I've written that down.

15   Hopefully, I will be giving this to some other judge, and

16   you can deal with that person.

17           In any event, so that's what I would do if I

18   were keeping this.  And I'm not going to do -- I wouldn't do

19   a jury questionnaire.  For one thing, the proposed jury

20   questionnaire is way more intrusive than I would ever do.

21   And you know, the other thing is I think a questionnaire

22   that's this intrusive sort of discourages people from jury

23   service.  So I'm generally not in favor of that.

24           I'll let you work out with the judge who's

25   handling this exactly how jury selection and things like

1    that will go.  I do, because I have a criminal trial going

2    on, I expect to be using the sixth floor.  So your trial

3    will be on either the fourth floor or the second floor, I'm

4    not sure which.

5              So is there anything else?  I really do have to

6    go very shortly, but is there anything else that either side

7    wants to bring up?

8              MR. WAN:  Your Honor, one thing I'd bring up is

9    regarding the designations for the 30(b)(6) testimony, I

10   think in the other case, we also, I guess, had some counter

11   designations if something comes in.  So do you want them to

12   submit it first and then --

13             THE COURT:  If you've got counter designations,

14   you better go counter designate them this afternoon and tell

15   them what they are because I don't want to get piece meal;

16   right?

17             MR. WAN:  That's fair, Your Honor.

18             THE COURT:  Okay.  Ms. Cozen.

19             MS. COZEN:  Yes, Your Honor.  We have a few more

20   small matters.

21             One is our client is currently housed in Sussex,

22   and we would like him to be moved about a week before the

23   trial to the Howard Young facility so we can meet with him.

24   It's just quite far from Wilmington for us to meet with him

25   on a regular basis to adequately prepare, and we would

 1    request the Court allow that.

 2              THE COURT:  Well, you know, the problem is he's

 3    a State prisoner.  I'm not sure that I can just direct the

 4    Department of Correction to house him, though it would make

 5    a lot of sense.

 6              Mr. Wan, I imagine that the two of you are not

 7    actually the lawyers who give counsel to the Department of

 8    Correction as opposed to represent them in litigation?

 9              MR. WAN:  That is correct, Your Honor.

10              THE COURT:  Do you think there's anything you

11    could do in this regard?

12              MS. McCOWAN:  So Your Honor, they've asked for

13    this.  We've made videoconferencing available for Plaintiff

14    and his counsel to communicate on whatever basis they need

15    to.  Because Mr. Szubielski has had an escape attempt from

16    Howard R. Young, and he is currently facing these new

17    criminal charges, the DOC's position, from what I understand

18    from their counsel, would be that they don't want to give

19    anything certain to Mr. Szubielski or his family given the

20    pending criminal charges and his escape attempt.

21              THE COURT:  Is it the case that for the trial --

22              MS. McCOWAN:  He will be housed up here for the

23    trial and for some period before, but we wouldn't be -- the

24    DOC wouldn't be comfortable --

25              THE COURT:  All right.  So I'm not comfortable.

1   I wouldn't even -- I'm not very comfortable doing this when

2   I'm dealing with the U.S. Marshals in federal prison over

3   which I have some authority, or I don't actually have some

4   authority, but I do have some ability to do something.  I am

5   even more hesitant to do something, particularly since it

6   sounds to me like videoconferencing and the fact that he

7   will be brought up here some time before the trial and will

8   be here at the trial or be local at the trial, I'm not going

9   to do anything more than that.  What the State's doing

10  sounds fine to me.

11              MS. COZEN:  Thank you, Your Honor.

12              THE COURT:  Anything else?

13              MS. COZEN:  Yes, Your Honor.  We also would

14  request that our client be allowed to wear a long-sleeved

15  undershirt to cover any tattoos he has under --

16              THE COURT:  I don't see a problem with that.  I

17  take it you don't have a problem with it.  In fact, I mean,

18  but, yeah, yeah.  I mean, sure.

19              Have you asked somebody if you could do that,

20  and they've said, No?

21              MS. COZEN:  Opposing counsel wouldn't commit to

22  allowing our client to wear street clothes, so we just want

23  to make sure --

24              THE COURT:  Well, I'm not so sure about your

25  client wearing street clothes, but I am perfectly happy to

1    have him cover up tattoos and other things that are

2    prejudicial for no good reason.  You know, the street

3    clothes, what is going to be obvious that he's in prison

4    right now, you know, it's -- but in any event, that's not

5    what we're talking about.  But T-shirts, undershirts, yes,

6    he can wear them.

7            MS. COZEN:  Thank you.  And the last matter to

8    bring to your attention, we were wondering what the method

9    for striking jurors is that this Court uses.

10           THE COURT:  Well, I use something called the

11   struck juror method.  I'll tell you what, I've really got to

12   go.  I expect that the judge to whom this is assigned, which

13   hopefully a magistrate judge will be getting in touch with

14   you very quickly, and things like that which might be done

15   differently by another judge anyhow is better discussed with

16   them.

17           Okay?

18           MS. COZEN:  Thank you, Your Honor.

19           THE COURT:  Okay.  Well, thank you all for your

20   preparation in this.  On the assumption that I won't see you

21   again, Ms. Cline, thank you for taking the representation.

22   And so I will issue some order at least memorializing some

23   of the things that I've said here, and I hope to hear back

24   on the --

25           MS. CLINE:  I'm sorry, Your Honor.

1              THE COURT:  That's okay.  And I hope to hear

2     back on the consent this afternoon.

3              All right.  We'll be in recess.  Thank you.

4              DEPUTY CLERK:  All rise.

5              (Court was recessed at 12:58 p.m.)

6              I hereby certify the foregoing is a true and

7     accurate transcript from my stenographic notes in the

8     proceeding.

9                   /s/ Heather M. Triozzi
                    Certified Merit and Real-Time Reporter
10                   U.S. District Court

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25