13:12:40

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


GERARD SZUBIELSKI,          )
                            )
          Plaintiff,        )
                            ) C.A. No. 15-984(RGA)(JLH)
v.                          )
                            )
WARDEN DAVID PIERCE,        )
et al.,                     )
                            )
          Defendants.       )



                    Wednesday, July 7, 2021
                    9:10 a.m.
                    Jury Trial


                    844 King Street
                    Wilmington, Delaware



BEFORE:  THE HONORABLE JENNIFER L. HALL
         United States District Court Magistrate Judge




APPEARANCES:


              TROUTMAN PEPPER HAMILTON SANDERS LLP
              BY:  JOANNA J. CLINE, ESQ.
              BY:  COURTNEY A. MUNNINGS, ESQ.
              BY:  KARLI E. COZEN, ESQ.
              BY:  LAURENCE Z. SHIEKMAN, ESQ.
              BY:  NICOLE CROSSEY, ESQ.


                    Counsel for the Plaintiff

```
 1        APPEARANCES CONTINUED:
 2
 3                DELAWARE DEPARTMENT OF JUSTICE
                  BY:  KENNETH LEE-KAY WAN, ESQ.
 4                BY:  ALLISON JEAN McCOWAN, ESQ.
                  BY:  REBECCA SONG, ESQ.
 5
                        Counsel for the Defendant
 6
 7                      - - - - - - - -
```

08:43:30  8

09:10:09  9                THE COURT:  Please be seated.  So we are here

09:10:24 10   scheduled for the first day of trial.  Could I have

09:10:26 11   appearances for the record, please?

09:10:29 12                MS. CLINE:  Your Honor, Joanna Cline with

09:10:32 13   Troutman Pepper Hamilton Sanders for the plaintiff, Gerard

09:10:35 14   Szubielski.  With me is Courtney Munnings, Laurence

09:10:39 15   Shiekman, Karli Cozen and Nicole Crossey.

09:10:42 16                THE COURT:  Good morning.

09:10:45 17                MR. WAN:  Good morning, Your Honor.  Kenneth Wan

09:10:49 18   along with my co-counsel Allison McCowan and Rebecca Song

09:10:51 19   for the defendant, David Pierce.

09:10:52 20                THE COURT:  Good morning.  So let's get to the

09:10:56 21   primary concern here which is the letter that I received

09:11:02 22   this morning from the state.

09:11:04 23                So Mr. Wan.

09:11:06 24                MR. WAN:  Good morning, Your Honor.  Kenneth Wan

09:11:09 25   again on behalf of the defendant.  And I think the letter is

09:11:11 1     relatively self explanatory.  At 4:23 this morning I

09:11:16 2     received an e-mail from Mr. Pierce --

09:11:18 3               THE COURT:  You can come to the podium.

09:11:19 4               MR. WAN:  Okay.  I didn't know what the rules

09:11:22 5     were.  I apologize, Your Honor.

09:11:24 6               -- that he was suffering from severe stomach

09:11:27 7     pain and uncontrollable vomiting due to a chronic illness he

09:11:33 8     had.  He still continued to experience the symptoms

09:11:35 9     throughout the morning.  I tried to call him, he didn't pick

09:11:38 10    up.  I don't know, he did mention that whatever the

09:11:42 11    conditions required, whether they required hospitalization,

09:11:45 12    I don't know whether he's in there or not, but, you know,

09:11:47 13    the fact is that I believe a continuance is warranted for a

09:11:52 14    number of reasons.  One, I don't believe Mr. Pierce is in

09:11:55 15    condition to stand trial.  And even if he were to be brought

09:11:59 16    in here, I'm not sure uncontrollable vomiting is something

09:12:02 17    you want to have in the courtroom right now, especially with

09:12:05 18    the whole COVID thing.  And even not, I think it would be

09:12:08 19    distracting for everyone if that was going on, so I think

09:12:12 20    there are concerns here, so I think a continuance is

09:12:14 21    warranted in this case, Your Honor.

09:12:15 22              THE COURT:  Mr. Wan, I should have said you're

09:12:18 23    welcome to take your mask off while you're at the podium.  I

09:12:22 24    know you have represented Mr. Pierce in other cases.  Do you

09:12:24 25    have any more information about the nature of this

09:12:28  1   condition?  And the reason why I'm asking is that I'm trying

09:12:32  2   to get a sense of when you think he's likely to be able to

09:12:36  3   come in and testify.  And just to put it all out on the

09:12:41  4   table, I want to try to salvage getting this trial moving if

09:12:46  5   we can.  We have ninety jurors here that have showed up for

09:12:50  6   service.  I know both sides are interested in getting this

09:12:53  7   case tried and I can think of various scenarios where we

09:12:57  8   could pick a jury today, get started tomorrow or Friday and

09:13:00  9   have him testify Monday.  But I need to have some sense of

09:13:05 10   whether or not that's something that is feasible.

09:13:08 11           MR. WAN:  Your Honor, I guess I don't want to go

09:13:14 12   too much into his medical condition, but I believe --

09:13:17 13           MS. McCOWAN:  I know there may be members of the

09:13:19 14   public in the room, so he has a chronic stomach condition

09:13:23 15   that does lead to hospitalization.  And we do have that

09:13:30 16   consent this morning but we didn't want to put it on the

09:13:33 17   public record if Your Honor is interested in that.  From my

09:13:37 18   understanding from the medical condition it general -- it

09:13:39 19   may require hospitalization.  It will take five days to a

09:13:42 20   week to resolve.

09:13:45 21           THE COURT:  Could I see a copy of the letter?

09:13:47 22   Do you have a copy by any chance for opposing counsel?

09:13:51 23           MR. WAN:  The letter or the e-mail?

09:13:52 24           THE COURT:  The e-mail.

09:13:55 25           MR. WAN:  The sum of it is attorney/client

09:13:57 1    privilege, but I'll show it to them.

09:13:59 2              THE COURT:  If you don't want to waive

09:14:01 3    privilege, I completely understand if it has to do with --

09:14:05 4              MR. WAN:  I guess the e-mail itself, it is in

09:14:08 5    response to the e-mail I sent him.

09:14:10 6              THE COURT:  Let's do this.  Why don't we take a

09:14:13 7    side-bar and to the extent there is details about medical

09:14:17 8    condition you want read in open court, but are you still

09:14:20 9    able to tell us what you can tell us at side-bar, so why

09:14:25 10   don't we -- I don't have a mask.  I can represent that I

09:14:27 11   have been fully vaccinated.  Does anyone have any objection

09:14:30 12   to discussing anything with me at side-bar?

09:14:32 13             MR. WAN:  No.

09:14:33 14             (Side-bar discussion.)

09:25:41 15             THE COURT:  Do you have any objection to Mr. Wan

09:25:41 16   having his mask off?

09:25:41 17             MS. CLINE:  Not to that.

09:25:41 18             THE COURT:  If you could just give us some more

09:25:41 19   detail.

09:25:41 20             MS. McCOWAN:  He has Crones disease and so --

09:25:41 21   and Irritable Bowel Syndrome, so if he's experiencing a

09:25:41 22   Crones flair up, he may likely require hospitalization.  I

09:25:41 23   know this is based on prior cases that we have represented

09:25:41 24   Mr. Pierce with.

09:25:41 25             THE COURT:  Have you had to continue a trial

09:25:41 1    before in any other case?

09:25:41 2              MS. McCOWAN:  No, not in those cases.

09:25:41 3              THE COURT:  And I'm just thinking off of my head

09:25:41 4    here.  It seems to me that this is something that might be

09:25:41 5    exacerbated by the stress caused by a trial.  If this could

09:25:41 6    happen again, so I'm wondering again is it more -- are we in

09:25:41 7    a better chance of getting him on the stand on Monday or a

09:25:41 8    month from now, or is it the same?

09:25:41 9              MS. McCOWAN:  We had a four-day trial at the

09:25:41 10   start of June and had no issues and that was a much more

09:25:41 11   contentious trial with more claims.  To my knowledge we

09:25:41 12   haven't had an issue with it being exacerbated.

09:25:41 13             MR. WAN:  I was in trial with Mr. Pierce with

09:25:41 14   Judge Andrews from June 10th to June 12th with Mr. Pierce

09:25:41 15   there.  He didn't have that issue there.  I would think it

09:25:41 16   would be less of a -- I'm sure the stress doesn't help it

09:25:41 17   right now, but if I had to guess, I think it would be more

09:25:41 18   that once he recovers, he'll be okay.  But like I said, I do

09:25:41 19   apologize, it takes a lot --

09:25:41 20             THE COURT:  Let me ask you this.  Your letter

09:25:41 21   has said that it could last for days.  You mentioned here a

09:25:41 22   week.  Do you have a sense from him whether it's days or

09:25:41 23   whether it's a week?

09:25:41 24             MR. WAN:  It says a few days, so -- I'm sorry, a

09:25:41 25   couple of days, so.

09:25:41 1          MS. SONG:  Your Honor, we got this e-mail at

09:25:42 2     4:23 this morning and unfortunately at this time we don't

09:25:42 3     have enough information to relay to the Court how much time

09:25:42 4     he will need to recover.  We don't want to suggest Monday

09:25:42 5     and then come back and say it's not right.

09:25:42 6          THE COURT:  I also don't want to send ninety

09:25:42 7     people home and plaintiff's counsel has already incurred the

09:25:42 8     charge for the jury consultant as well.

09:25:42 9          Let's hear from counsel.

09:25:42 10         MS. CLINE:  So respectfully this case was filed

09:25:42 11    in 2015.  Our client has waiting for his day in court since

09:25:42 12    then.  We got to the summary judgment stage in 2020.  The

09:25:42 13    hearing was postponed at the state's request because of the

09:25:42 14    COVID hardship with then counsel's representing statement

09:25:42 15    and the trial date was pushed for COVID.  Now we're here.

09:25:42 16    Our client has been transferred from Sussex.  Without going

09:25:42 17    into details or waiving privilege, I can represent that he

09:25:42 18    has mental illness and it was a huge deal for him to be

09:25:42 19    moved.  And this whole trial process and preparation process

09:25:42 20    has been a big deal.  My colleagues prepped him over the

09:25:42 21    holiday weekend.  The jury is here.  We have people that

09:25:42 22    traveled from Philadelphia, Princeton.

09:25:42 23         We did a quick look at the case law this

09:25:42 24    morning.  Our understanding is that Mr. Pierce has no

09:25:42 25    constitutional right to be present, Arrington v. Robinson,

Third Circuit 1940, he can be represented in person or by counsel.  I think he's ably represented here by counsel.

His counsel told us yesterday that Mr. Pierce didn't plan to be present on Friday for the trial which is presumably the day the jury is going to render the verdict. Respectfully with no disrespect to our colleagues with respect to the illness, we have no good showing, we have no note from the doctor.  If this illness was chronic, he would have known about it and taken precautionary measures.  We have no idea if this will happen again if it's continued.

And just to reiterate, to do this to Jerry is sort of reminiscent of the reason we're here to begin with Warden Pierce, he was declassified so he could come out of solitary.  Our contention is the warden vetoed that.  And now we're here to have our day in court and the warden is vetoing that again.  And we object to the continuance.

THE COURT:  While we're still at side-bar, let's see if there are any other questions from plaintiff's counsel that pertain to matters that need to be held at side-bar, then we can move back into open court.  Is there any other information?

MR. WAN:  This is the e-mail if you want to look at it.

THE COURT:  I'm disinclined to look at it if you think there might be privileged communications there,

09:25:43 1    because I don't want to see it if you can't show it to the

09:25:43 2    other side.  But if there is any other information in there

09:25:43 3    that relates to his prognosis or how long he is not likely

09:25:43 4    to attend trial, that would be helpful.

09:25:43 5            MR. WAN:  Your Honor, I can try giving him a

09:25:43 6    call again just to give you more information.  I understand

09:25:43 7    the position here.  It's tough to get a doctor's note

09:25:43 8    between 4:00 a.m. and 7:00 a.m.

09:25:43 9            THE COURT:  Understood.

09:25:43 10           MR. WAN:  He was in trial just last month, so

09:25:43 11   it's hard for me to say it would happen again, because he

09:25:43 12   was just in trial for three or four days.

09:25:43 13           THE COURT:  Let's move to open court and we'll

09:25:43 14   continue the discussion.

09:25:43 15           (End of side-bar.)

09:25:43 16           THE COURT:  So here is what I think we should do

09:25:43 17   and then I want to take a recess and we're going to look at

09:25:43 18   if we can get this accomplished.  What I propose that we do

09:25:43 19   is that we pick the jury today.  I propose we tell the jury

09:25:42 20   that you will come back Friday or Monday for their first day

09:25:42 21   of testimony.  I don't know what order the parties intend to

09:25:42 22   present their case.  I don't know if plaintiff intended to

09:25:42 23   call Warden Pierce live.  I don't know if plaintiff has an

09:25:42 24   objection to going out of order if we need to hear from one

09:25:42 25   of defendant's first witnesses before we hear from Warden

09:25:43 1    Pierce.  I don't know if plaintiff would be satisfied with

09:25:43 2    some combination of deposition and live testimony or if the

09:25:43 3    defendant objects to that.

09:25:43 4            What I do know is that we did have a prior

09:25:43 5    request from Warden Pierce to come and go during the trial,

09:25:43 6    and so to the extent that the state is still satisfied with

09:25:43 7    not having him there for the entire trial period, that's

09:25:43 8    something that I would like to explore whether or not we can

09:25:43 9    have him come in to do his testimony next week.

09:25:43 10           It's Wednesday morning now, and so Thursday,

09:25:43 11   Friday, Saturday, Sunday, Monday, that's five days from now

09:25:43 12   if he testifies Monday.  It's six days if he testifies

09:25:44 13   Tuesday.  I don't know what the parties' schedules are, but

09:25:44 14   I do know that plaintiff is prepared for trial.  I know

09:25:44 15   defense counsel wants to go to trial.  I know the parties

09:25:44 16   have expended a great deal of time and expense getting

09:25:44 17   ready.  And I know that we've got seventy-five people

09:25:44 18   downstairs, some of whom have driven more than an hour to

09:25:44 19   get here.  And so I think we need to try to work this out.

09:25:44 20           So what we're going to do is we're going to take

09:25:44 21   a brief recess.  The state is going to make all attempts to

09:25:44 22   try to contact Mr. Pierce and see if we can get more details

09:25:44 23   on whether or not he can come in to testify.  And the

09:25:44 24   parties are going to work together in the meantime to try to

09:25:44 25   figure out a plan for how we can get this case tried.  Okay?

09:25:44 1              Go ahead, Ms. Cline.

09:25:44 2              MS. CLINE:  May I be heard?

09:25:44 3              Just so everybody has the information, we were

09:25:44 4    intending today to proceed with jury selection, openings,

09:25:44 5    and then we were going to put Jerry on as our first witness.

09:25:44 6    We were then going to do either Mr. Scarborough or

09:25:44 7    deposition testimony.  So from our perspective, all of that

09:25:44 8    has got to take all day.  And we would like to just

09:25:44 9    continue, and then tonight we can assess whether we would

09:25:44 10   agree to perhaps using Warden Pierce's dep testimony in lieu

09:25:44 11   of live testimony and see whether he's able to come in

09:25:44 12   tomorrow.

09:25:44 13             THE COURT:  So the only thing I would say about

09:25:44 14   that is this, and maybe after the parties have had a chance

09:25:44 15   to talk together about what their preferences are, then we

09:25:44 16   can see if the Court needs to make a ruling about anything.

09:25:44 17             What I would like to do if we could and if it

09:25:44 18   makes sense is pick the jury today and then wait until

09:25:44 19   tomorrow, that way by tomorrow for whatever reason we have

09:25:44 20   more information, and if it turns out we do need to

09:25:44 21   reschedule that we wouldn't have gone through a whole day of

09:25:44 22   testimony and put everybody through that.  But if that's not

09:25:44 23   what you prefer, talk to each other about that and then I

09:25:44 24   can resolve any disputes.

09:25:44 25             Any questions about what I'm asking folks to do

09:25:44  1    during the recess?

09:25:45  2              MR. WAN:  Not from the state, Your Honor.

09:25:45  3              MS. CLINE:  Not from us.

09:25:45  4              THE COURT:  Ms. Garfinkel, do we have everyone's

09:25:45  5    contact information or do you know how to get in touch with

09:25:45  6    Ms. Garfinkel?  Please let us know.  We'll check back in

09:25:45  7    with you in about twenty, thirty minutes and just see how

09:25:45  8    things are progressing, and then we'll go from there.  But

09:25:45  9    we do have a number of folks that are waiting around

09:25:45 10    upstairs.  So if you could move rapidly, I would appreciate

09:25:45 11    it.

09:25:45 12              MR. WAN:  Of course, Your Honor.

09:25:45 13              THE COURT:  We'll be in recess.

09:25:45 14              (A brief recess was taken.)

09:55:55 15              THE COURT:  Please be seated.

09:56:02 16              So who wants to talk first?

09:56:05 17              MR. WAN:  I got it.

09:56:07 18              Good morning, again, Judge Hall.  Kenneth Wan.

09:56:12 19              So we've kind of come to an agreement, but just

09:56:16 20    to update with Mr. Pierce, I was able to speak to him and he

09:56:20 21    was on the upswing now and he's confident he can come in

09:56:24 22    tomorrow.

09:56:24 23              We also learned that Mr. Szubielski was not

09:56:28 24    transferred over today and we're not exactly sure how

09:56:30 25    quickly he can get here, today, tomorrow, Friday.  So our

09:56:34 1   proposed plan is to maybe pick a jury today.  And I believe

09:56:40 2   that plaintiffs said that Mr. Szubielski didn't need to be

09:56:44 3   present for it.  If he can get here this afternoon -- maybe

09:56:47 4   pick one this afternoon if he can get here hopefully and

09:56:51 5   then proceed starting tomorrow with openings and evidence.

09:56:56 6   But I don't know what the position, depending on whether or

09:57:00 7   not Mr. Szubielski can be transported here, but I think the

09:57:03 8   tentative plan is to pick a jury this morning or this

09:57:07 9   afternoon and start tomorrow.  And I'll let plaintiff's

09:57:10 10  counsel continue from there.

09:57:12 11        THE COURT:  Okay.  Ms. Cline, please feel free

09:57:15 12  to take your mask off if you're comfortable.  You're welcome

09:57:18 13  to keep it on.

09:57:20 14        MS. CLINE:  Thank you.  I appreciate that.  I

09:57:23 15  agree with what Mr. Wan is saying.  We would like to move

09:57:26 16  for an oral motion for a writ if that's at all possible to

09:57:30 17  get Mr. Szubielski here.  We don't know how long that would

09:57:34 18  take.  The state has been nice enough to grease the skids on

09:57:37 19  the state's side.  I know there is coordination with the

09:57:42 20  wardens.  If it is possible to get Mr. Szubielski here for

09:57:45 21  jury selection, we would like to wait until this afternoon.

09:57:48 22  If there is no chance of getting transported today, we're

09:57:51 23  okay with picking the jury now and proceeding tomorrow.  We

09:57:55 24  think he would like to be here, but if the downside is not

09:57:58 25  proceeding, we would like to proceed and get his day in

court.

THE COURT:  There is two things that come to mind, so I'll throw it out there and you can see where we're at.  The first is that in my experience it's exceedingly unlikely to get somebody here on the same day if you didn't get a writ over.  And that's not only because it's an issue getting them released from state custody, but more a matter of having the marshals have a plan for what happens once the prisoner gets to the courthouse.  And so I don't pretend to understand all of their operations, but I do know that they're complicated and that's to keep everyone in the courtroom safe as well as make sure that the prisoner is brought over according to regulations.  So there is that to keep in mind.

The second thing to keep in mind is that we had discussed at the pretrial conference whether or not he would even be back during the voir dire process.  I don't know if you had come to a conclusion about that.

MS. CLINE:  Well, so maybe I am misunderstanding the process.  We were thinking he would be in the courtroom, but to the extent there needed to be a dialogue in closed quarters, we were okay not doing that knowing the --

THE COURT:  I'll tell you how it would normally go.  It's little bit different because of COVID.  We're going to have twenty-eight folks brought up and they are

09:59:18  1  going to be placed in each one of those green dots you see

09:59:21  2  in the gallery there.  The first fourteen are going to be on

09:59:24  3  my left and the last fourteen are going to be on my right.

09:59:27  4  We're going to read all the voir dire on the Court's

09:59:32  5  approved voir dire we had objections to, otherwise no

09:59:38  6  objections, and each of the members of the venire are going

09:59:44  7  to have a pen and circle what they had yes answers to.

09:59:48  8          At that point in time, we're all going to move

09:59:50  9  back to Judge Burke's jury room and Ms. Garfinkel is going

09:59:54  10  to proceed amongst the venire and ask them if they had yes

09:59:59  11  answers.  And if they do, they're going to be brought back

10:00:02  12  there.

10:00:02  13          So to the extent that weighs in on how much your

10:00:04  14  client wants to be present, I think what he would be missing

10:00:09  15  is us reading the proposed instructions, and then he

10:00:16  16  obviously wasn't going to be back in chambers for that part

10:00:19  17  anyway unless we got some sort of a plan worked out.  And

10:00:24  18  then once we come back into the courtroom, the preemptory

10:00:29  19  challenge process is a process of Ms. Garfinkel going back

10:00:33  20  and forth from counsel table with a clipboard when you

10:00:36  21  strike whoever you want to strike.  That's what it is.

10:00:39  22          I don't know if you need a few minutes to

10:00:41  23  discuss with co-counsel, but in the meantime while you're

10:00:44  24  doing that, I'm going to talk to Ms. Garfinkel about the

10:00:48  25  logistics of getting somebody writed over.

10:00:52 1          MR. WAN:  I understand traditionally plaintiffs

10:00:54 2   are over on this side and defendants are over there when you

10:00:59 3   have an incarcerated person come over.  I don't know what

10:01:04 4   the Court's preference is.

10:01:05 5          THE COURT:  That's one of those things that

10:01:06 6   we'll ask the marshals once we know we got a guy coming over

10:01:10 7   for trial, which I don't think they did.  But we'll keep

10:01:14 8   that in mind.

10:01:16 9          Let me just consult with Ms. Garfinkel.

10:02:34 10          (Pause.)

10:02:34 11          Ms. Cline.

10:02:37 12          MS. CLINE:  So let me try to answer the Court's

10:02:40 13   question.  In light of the logistics and the way it's going

10:02:42 14   to work including with the CO hovering over Jerry, we waive

10:02:47 15   the right to have him back when we're questioning the

10:02:50 16   jurors.

10:02:50 17          And I guess the remaining question mark is

10:02:52 18   neither side has been able to obtain a list of prospective

10:02:56 19   jurors from jury administration.  If the Court could

10:02:59 20   facilitate that, we would like to get a look at the list.

10:03:02 21          THE COURT:  Absolutely.  Okay.  So we have got a

10:03:02 22   few things we're working on here.  So the first thing is

10:03:03 23   that your oral motion for a writ is granted.  We'll make

10:03:12 24   that out and fill it out.  We'll get it sent over.  It's not

10:03:12 25   entirely clear to me that we could get him here even

10:03:20 1    tomorrow morning, and so we're going to take a brief recess

10:03:24 2    and figure out if that's even possible to get him here

10:03:28 3    tomorrow.  If not, we'll plan to move forward on Friday.

10:03:35 4            And then we're going to get an answer, because I

10:03:38 5    would like to have an answer of when the jurors need to

10:03:41 6    appear for opening statements and the reason why, part of

10:03:46 7    the voir dire is going to be asking them about their

10:03:48 8    availability.  And if we got folks that are leaving

10:03:51 9    Wednesday for their beach vacation, we need to know that so

10:03:54 10   we can make sure we don't call someone, we need to know when

10:03:58 11   we're going to start, basically.

10:04:01 12           Anything else we need to address right this

10:04:04 13   second before we take a brief recess to get an answer to

10:04:08 14   when we can get him over here?

10:04:10 15           MR. WAN:  Not from the defense.

10:04:12 16           MS. CLINE:  Not from us, either.

10:04:13 17           THE COURT:  Very good.  We'll be in a brief

10:04:17 18   recess.

10:04:17 19           (A brief recess was taken.)

10:45:06 20           THE COURT:  Please be seated.

10:46:21 21           Okay.  So it sounds like we got some of the

10:46:33 22   issues worked out.  So my understanding how we're going to

10:46:38 23   proceed is we're going to go ahead and try to pick a jury

10:46:42 24   today before lunch.  And then depending on what time it is,

10:46:47 25   we can either let the jury go to lunch and come back and

10:46:50 1    read the preliminary jury instructions or we can ask them if

10:46:54 2    they want to just plow through and do the preliminary jury

10:46:58 3    instructions and then we'll cut them loose.

10:47:00 4          I do understand there is some possibility of

10:47:02 5    getting the plaintiff here today.  I am disinclined to get

10:47:08 6    started today for a couple of reasons.  One is that it's

10:47:11 7    already getting to be late in the morning, so the chances of

10:47:14 8    getting a big chunk of testimony in today are rapidly

10:47:18 9    diminishing because we still do have to read the preliminary

10:47:23 10   jury instructions.

10:47:24 11         And the other thing is that I'm worried about if

10:47:27 12   there is another snafu that we don't have the jury sitting

10:47:31 13   around waiting.  So I would like to cut them loose if there

10:47:34 14   is a possibility to cut them loose.  I don't think it's

10:47:36 15   right given that we've had them here waiting all morning.

10:47:41 16         Does anyone have anything they want to say for

10:47:43 17   the record about anything I have said so far?

10:47:48 18               MS. CLINE:  We're okay with that, Your Honor.

10:47:50 19               THE COURT:  Thank you.

10:47:50 20               MR. WAN:  We have no objection to that, Your

10:47:52 21   Honor.

10:47:52 22               THE COURT:  Very good.  There is only one other

10:47:55 23   housekeeping matter I want to talk to you about before I

10:47:52 24   bring the jury in.  I'm not sure if Judge Andrews discussed

10:48:02 25   with you at the first pretrial conference that we had sent

out a COVID questionnaire to this venire and it has a number of questions, including whether or not the juror has been vaccinated and whether they have any health concerns about themselves or their family members related to this COVID 19 pandemic.

We took a look at those questionnaires and we did excuse a couple of jurors before today. They're not going to be on the list that you have in front of you right now because they have already been excused, but I can tell you that we've excused jurors if they said that they had symptoms in the last two weeks. We excused jurors who indicated that they had family members that were high risk or needed to be supervised at home. We also excused one potential juror because that juror indicated that they were not vaccinated and did not intend to wear a mask. And given some concerns that have been raised by other jurors that were selected about that they didn't have an issue unless there were unvaccinated people without masks, we thought the best was to excuse that juror.

Does anyone have any questions?

MR. WAN: Not from the defense.

MS. CLINE: Not from us.

THE COURT: Okay. So we'll hear about any further COVID concerns today when we bring the jury back for the follow-up voir dire questioning and we -- before if

10:49:44 1    there are no objections we're going to move forward with the

10:49:47 2    way that we've discussed.

10:49:51 3            With that, I'll ask Ms. Garfinkel to bring in

10:49:56 4    the venire.

10:49:57 5            Any questions, Mr. Wan?

10:49:58 6            MR. WAN:  Your Honor, I had two kind of quick

10:50:01 7    housekeeping matters for Mr. Pierce.  One thing was we were

10:50:04 8    trying to get him in one day.  I think the plaintiffs may be

10:50:09 9    able to accommodate that.  One question I had was to

10:50:12 10   facilitate getting him in and out in one day, would it be

10:50:16 11   okay after they finished their direct when we call him in

10:50:20 12   our case in chief I just do my questions with him?

10:50:25 13           THE COURT:  If there is no objection from the

10:50:26 14   other side.

10:50:32 15           MS. CLINE:  No objection.

10:50:33 16           THE COURT:  Okay.  And what I am going to say is

10:50:38 17   that I'll reserve ruling on that.  Let's get the jury

10:50:44 18   selected and then after we cut them loose for today, then we

10:50:47 19   can deal with any other matters that we need to deal with

10:50:50 20   before the testimony begins.

10:50:52 21           Is there anything else we need to deal with

10:50:54 22   today that has to do with the jury selection process?

10:50:58 23           MS. CLINE:  Well, one question which may or may

10:51:00 24   not directly relate.  There is some confusion around where

10:51:02 25   we're supposed to sit.  Obviously we would like to sit near

10:51:07 1   the jury.  Obviously there is some concern with the marshals

10:51:10 2   need to be over there.  I don't know if it would be weird

10:51:14 3   for the jury if we switched between today and tomorrow.

10:51:16 4            THE COURT:  That's a good question.

10:51:18 5   Unfortunately I don't have a sense right now given the way

10:51:21 6   things have played out this morning about what the logistics

10:51:25 7   are going to be.  Are you inclined to want to switch now if

10:51:30 8   you're going to switch?

10:51:35 9            MS. CLINE:  I think we would rather stay here

10:51:37 10  for now.

10:51:37 11           THE COURT:  All right.  I can tell them that

10:51:40 12  maybe -- I could give them tomorrow if it turns out we do

10:51:44 13  need to switch, you all can agree on what I am going to say

10:51:48 14  to them if you like.

10:51:50 15           MS. CLINE:  Thank you, Your Honor.

10:51:50 16           THE COURT:  With that I'll ask Ms. Garfinkel to

10:51:54 17  bring in the venire.

10:52:26 18           So one thing I should say about the voir dire is

10:52:29 19  I modified it very slightly to indicate that we expect to be

10:52:32 20  here no later than Monday afternoon as opposed to Friday

10:52:32 21  afternoon.  Any objection to that change?

10:52:38 22           MS. CLINE:  Not from us.

10:52:40 23           MR. WAN:  I would say no, Your Honor.

10:52:42 24           Can we swing our chairs around so the venire is

10:52:45 25  going to be behind us?  How would the Court like us to

10:52:49 1    proceed?

10:52:49 2              THE COURT:  Most of this is going to be me

10:52:51 3    reading from the sheet, so it's fine if you want to face

10:52:55 4    them when it's your turn to introduce yourself, I think it

10:52:59 5    would be fine to spin around.

10:53:09 6              The other thing I would say while we're waiting

10:53:12 7    for prospective jurors to get here, it might make sense if

10:53:16 8    you just want to lower your mask when you introduce yourself

10:53:20 9    or when we get to the part where I'm introducing you so they

10:53:25 10   can see your face and see if you're somebody that they

10:53:27 11   recognize.  We can discuss the logistics of mask wearing

10:53:31 12   this afternoon after we get the jurors sworn in and we can

10:53:34 13   talk about what makes the most sense because I think it

10:53:39 14   might depend on who is part of the panel.

11:03:45 15             (Jury panel entered the courtroom at 11:03 a.m.)

11:04:07 16             THE COURT:  Good morning, everyone.  A special

11:04:43 17   welcome to the members of our jury pool.  I am Judge Hall.

11:04:48 18   I am a judge here in the United States District Court for

11:04:51 19   the District of Delaware.  I want to begin by thanking all

11:04:52 20   of you for taking time from the schedule and from your lives

11:04:52 21   to be here and to be available to do the important service

11:05:07 22   that we all share as citizens, possibly serving on a jury.

11:05:11 23   I want to apologize for the delay in getting you up here

11:05:14 24   today.

11:05:15 25             I will explain to you in a moment in some detail

11:05:17 1    how we're going to select the jury for the case that I am

11:05:20 2    presiding over.  With your cooperation, we expect this

11:05:24 3    process to be done before lunchtime.  And I will explain

11:05:28 4    further in just a moment, but the next step is for my

11:05:32 5    courtroom deputy, Ms. Garfinkel, to administer an oath.

11:05:36 6                    Please proceed.

11:05:38 7                    COURTROOM DEPUTY:  Members of the jury panel,

11:05:41 8    will you please rise and raise your right hand.  You and

11:05:48 9    each of you do solemnly swear, those of you who swear, and

11:05:52 10   you and each of you do affirm, those of you who affirm, that

11:05:55 11   you will true answer make to such questions as may be asked

11:05:58 12   you touching the matter now before the Court, so help you

11:06:02 13   God, those of you who swear, and you do so affirm, those of

11:06:05 14   you who affirm.

11:06:07 15                    The proper response is I do.

11:06:09 16                    JURY PANEL:  I do.

11:06:10 17                    COURTROOM DEPUTY:  Thank you.  You may be

11:06:13 18   seated.

11:06:13 19                    THE COURT:  So I think you should have all been

11:06:15 20   handed a copy of the document entitled Voir Dire.  I am

11:06:19 21   going to read that document now.  If you like, you can just

11:06:22 22   listen to me read it or if you want, you can follow along,

11:06:27 23   whichever way you learn best.

11:06:29 24                    Good morning, ladies and gentlemen.  I am Judge

11:06:31 25   Hall.  We are going to select a jury in a civil case called

11:06:35 1    Gerald Szubielski versus David Pierce.

11:06:39 2            This is a case arising under the First Amendment

11:06:42 3    of the Constitution of the United States alleging that

11:06:47 4    Defendant David Pierce retaliated against Plaintiff Gerard

11:06:51 5    Szubielski for participating in a lawsuit against James T.

11:06:57 6    Vaughn Correctional Center while Plaintiff Szubielski was an

11:06:58 7    inmate there and Defendant Pierce was the Warden.

11:07:02 8            Those of you selected to serve as jurors will

11:07:06 9    receive more detailed instructions once you are sworn in as

11:07:10 10   jurors and again at the conclusion of the trial.

11:07:13 11           The trial will begin tomorrow morning and is

11:07:15 12   expected to take up to two-and-a-half business days to try,

11:07:19 13   meaning we expect to be completed no later than Monday

11:07:22 14   afternoon.  Jury deliberations could extend your service

11:07:26 15   beyond that.  The schedule that I expect to keep over the

11:07:30 16   days of evidence presentation will include a morning break

11:07:33 17   of fifteen minutes, a lunch break of one hour, and an

11:07:37 18   afternoon break of fifteen minutes.  We will start at

11:07:40 19   9:30 a.m. and finish no later than 5:00 p.m. each day.

11:07:51 20           In light of this brief summary, I will ask you

11:07:52 21   certain questions, the purpose of which is to (1) enable the

11:08:02 22   Court to determine whether or not any prospective juror

11:08:06 23   should be excused for cause; and (2) enable counsel for the

11:08:12 24   parties to exercise their individual judgment with respect

11:08:17 25   to preemptory challenges, that is, challenges for which no

11:08:22 1    reason need be given by counsel.

11:08:24 2          All of the questions I am about to read to you

11:08:27 3    are stated in a "yes/no" format.  It is not necessary at

11:08:33 4    this time for you to respond to my questions in any way as I

11:08:36 5    read them.  If you have a "yes" answer to any of my

11:08:41 6    questions, I ask that you either remember for which

11:08:44 7    questions you have a "yes" answer or use the pen provided to

11:08:48 8    keep track.

11:08:50 9          At that point I will move to the jury room,

11:08:54 10   along with some of the lawyers and the court reporter.

11:08:57 11   Meanwhile, my deputy will move among the prospective jurors

11:09:02 12   in the courtroom and ask them if they had a "yes" answer to

11:09:07 13   any of my questions.  A juror may be brought into the jury

11:09:11 14   room to talk to me and the lawyers.  After we speak with

11:09:15 15   you, my deputy or I will then tell you whether to go back to

11:09:19 16   the benches.  Once we are done speaking to as many jurors as

11:09:25 17   necessary, I will explain the remaining steps of the jury

11:09:28 18   selection process.

11:09:28 19         The questions are as follows:

11:09:30 20         1.  Does the length of this trial or the

11:09:34 21   schedule contemplated by the court present a special problem

11:09:37 22   for you?

11:09:38 23         2.  Do you have any special disability or

11:09:42 24   problem that would make serving as a member of the jury

11:09:45 25   difficult or impossible?

11:09:46  1              3.   Have you or any member of your immediate

11:09:51  2     family (spouse, child, parent or sibling) ever been employed

11:10:00  3     by the Delaware Department of Correction?

11:10:02  4              4.   Have you or any member of your immediate

11:10:04  5     family ever been incarcerated at the James T. Vaughn

11:10:12  6     Correctional Center?

11:10:12  7              5.   Do you have any prior experience as a

11:10:16  8     correctional officer or working in a prison?

11:10:19  9              6.   Have you had any experience with the

11:10:21 10     Delaware Department of Correction or any relationships with

11:10:25 11     Delaware Department of Correction employees or inmates that

11:10:28 12     would make it difficult for you to be a fair and impartial

11:10:32 13     juror in this case?

11:10:34 14              7.   Do you or any member of your immediate

11:10:37 15     family have experience as a law enforcement officer?

11:10:41 16              8.   I'll now ask the lawyers to stand and face

11:10:45 17     the venire while I tell you who the lawyers are and who they

11:10:50 18     are associated with.

11:10:51 19              For plaintiff we have:

11:10:54 20              Courtney A. Munnings - Troutman Pepper Hamilton

11:11:02 21     Sanders LLP.

11:11:02 22              Karli E. Cozen - Troutman Pepper Hamilton

11:11:10 23     Sanders LLP.

11:11:12 24              Also representing plaintiff are Nicole Crossey,

11:11:17 25     Joanna Cline, and Laurence Shiekman of Troutman Pepper

11:11:25 1    Hamilton Sanders LLP, who will be assisting at trial, and

11:11:28 2    Michael Biek who will be assisting today.

11:11:31 3              For defendant we have:

11:11:33 4              Kenneth Wan - Department of Justice for the

11:11:37 5    State of Delaware.

11:11:38 6              Allison McCowan - Department of Justice for the

11:11:43 7    State of Delaware.

11:11:45 8              Rebecca Song - Department of Justice for the

11:11:49 9    State of Delaware.

11:11:50 10             Do you or any of your immediate family know of

11:11:54 11   any of the attorneys or the law firm that has just been

11:11:59 12   named, or, have you or your immediate family had any

11:12:02 13   business dealings with, or been employed by, any of these

11:12:06 14   attorneys or their law firms or the Delaware Department of

11:12:11 15   Justice?

11:12:11 16             9.   Have you heard or read anything about this

11:12:13 17   case?

11:12:19 18             10.  Do you know Mr. Szubielski or Mr. Pierce?

11:12:24 19             11.  Even if you do not personally know

11:12:28 20   Mr. Szubielski or Mr. Pierce, have you heard anything about

11:12:31 21   them that might make it difficult for you to be a fair and

11:12:35 22   impartial juror in this case?

11:12:37 23             12.  The potential witnesses in this case are:

11:12:41 24             Gerard Szubielski.

11:12:42 25             David Pierce.

11:12:45 1                     Carla Miller.

11:12:47 2                     James Scarborough.

11:12:49 3                     Shane Troxler.

11:12:52 4                     Awele Maduka-Ezeh.

11:12:56 5                     Aileen Fink.

11:12:58 6                     Michelle Roberts.

11:13:00 7                     Philip Parker.

11:13:02 8                     Are you familiar with any of these potential

11:13:05 9      witnesses?

11:13:06 10             13.  As I mentioned before, Mr. Szubielski

11:13:09 11     claims that Mr. Pierce retaliated against him because of

11:13:13 12     Mr. Szubielski's involvement in an earlier lawsuit brought

11:13:18 13     by the American Civil Liberties Union (ACLU) and the

11:13:23 14     Delaware Community Legal Aid Society (CLASI).  Do you have a

11:13:31 15     strong opinion, positive or negative, about the ACLU or

11:13:36 16     CLASI?

11:13:38 17             14.  If you find that Mr. Pierce violated

11:13:41 18     Mr. Szubielski's constitutional rights, would you have any

11:13:44 19     difficulty in awarding money damages to compensate

11:13:48 20     Mr. Szubielski?

11:13:50 21             15.  Have you ever served as a juror in a case

11:13:52 22     within the last fifteen years or so?

11:13:57 23             16.  Do you have any prior experience with

11:14:00 24     litigation that might make it difficult for you to be a fair

11:14:04 25     and impartial juror in this case?

11:14:07 1           17.  If you are selected to sit as a juror in

11:14:11 2  this case, are you aware of any reason why you would be

11:14:15 3  unable to render a verdict based solely on the evidence

11:14:19 4  presented at trial?

11:14:21 5           18.  If you are selected to sit as a juror in

11:14:25 6  this case, are you aware of any reason why you would not be

11:14:29 7  able to follow the law as I give it to you?

11:14:34 8         This is the last question.

11:14:38 9           19.  Is there anything else, including something

11:14:41 10  you have remembered in connection with one of the earlier

11:14:45 11  questions, that you think you would like to tell me in

11:14:51 12  connection with your service as a juror in this case?

11:14:56 13         Those are all the questions.  As I mentioned, at

11:15:10 14  this time I am going to move into the jury room with some of

11:15:14 15  the attorneys for the case and we may ask some of you to

11:15:20 16  come back into the jury room to talk to you about your

11:15:23 17  answers to the questions.

11:15:33 18         COURTROOM DEPUTY:  All rise.

12:43:35 19       (Jury room voir dire questioning:)

12:43:35 20         THE COURT:  So we're now in the jury room ready

12:43:35 21  to do the follow-up voir dire questioning.  So the way this

12:43:35 22  is going to work again is that Ms. Garfinkel is going to

12:43:35 23  bring in the jurors one at a time.  They're going to stand

12:43:35 24  out in the hall while she comes in and tells us the name of

12:43:35 25  the juror we have and which question they answered yes to.

12:43:35  1    Is that how we're going to do it?

12:43:35  2                COURTROOM DEPUTY:  Yes.

12:43:35  3                THE COURT:  Let's do it that way and then if

12:43:35  4    there is also an issue that may have come up on their Covid

12:43:35  5    questionnaire we can catch, we'll deal with that as well.

12:43:35  6                COURTROOM DEPUTY:  Your Honor, we have juror

12:43:35  7    number 2, Matthew Presley.  Answered yes to questions 1, 4

12:43:35  8    and 8.

12:43:35  9                THE COURT:  Ms. Garfinkel, did we lose juror

12:43:35 10    number 1?

12:43:35 11                COURTROOM DEPUTY:  She didn't have any yes

12:43:35 12    responses and there was nothing on the questionnaire that I

12:43:35 13    noticed.

12:43:35 14                THE COURT:  Should we let who them know juror

12:43:35 15    number 1 is at this point?

12:43:35 16                COURTROOM DEPUTY:  I can.

12:43:35 17                THE COURT:  I think we should.

12:43:35 18                COURTROOM DEPUTY:  Juror number 1 is Carla

12:43:35 19    Cubbage.

12:43:35 20                THE COURT:  Okay.  Are we ready to bring in

12:43:35 21    juror number 2?

12:43:35 22                (Juror entering the room.)

12:43:35 23                THE COURT:  We'll have you stand outside just

12:43:35 24    for a second, sir.  I apologize.

12:43:35 25                MS. MUNNINGS:  So I have a question about

12:43:36 1    whether we -- when there are no yeses, whether we follow-up

12:43:36 2    about any --

12:43:36 3                    THE COURT:  So if we have no yes answers to the

12:43:36 4    voir dire, that's going to be the first member of our group

12:43:36 5    of 14.  So we have Ms. Cubbage as juror number 1, so once we

12:43:36 6    get to 14 that either have no yes answers or that have yes

12:43:36 7    answers but are not excused for cause, then we'll stop.

12:43:36 8                    MS. MUNNINGS:  So occupations are empty on here.

12:43:36 9    Do we get to talk to them about that, or no?

12:43:36 10                   THE COURT:  That's not traditionally how we do

12:43:36 11   it.

12:43:36 12                   MS. MUNNINGS:  Okay.  Thank you, Your Honor.

12:43:36 13                   (Juror entering the room.)

12:43:36 14                   THE COURT:  Thanks for your patience.

12:43:36 15                   A JUROR:  No problem.

12:43:36 16                   THE COURT:  You are juror number 2?

12:43:36 17                   A JUROR:  Correct.

12:43:36 18                   THE COURT:  That makes you Mr. Presley.

12:43:36 19                   A JUROR:  Yes, I am.

12:43:36 20                   THE COURT:  Thank you for coming in today, sir.

12:43:36 21   I understand that you answered yes to question number one

12:43:36 22   which ask about the length of the trial, that's going to be

12:43:36 23   a special problem for you.  Could you tell us a little more

12:43:36 24   about that.

12:43:36 25                   A JUROR:  It has to do with my work.  I'm the

12:43:36 1    only one capable of my job at work.  I work at the DuPont

12:43:36 2    administration.

12:43:36 3              THE COURT:  Does your employer know you are here

12:43:36 4    today?

12:43:36 5              A JUROR:  Yes.

12:43:36 6              THE COURT:  Have they expressed a reluctance to

12:43:36 7    let you serve as a juror?

12:43:36 8              A JUROR:  No, they said go, provide proof that

12:43:36 9    you did it, that's all.

12:43:36 10             THE COURT:  So is it going to be a hardship for

12:43:36 11   you or for your employer to be here?

12:43:36 12             A JUROR:  Both.

12:43:36 13             THE COURT:  Why would it be a hardship for you,

12:43:36 14   sir?

12:43:36 15             A JUROR:  I work nights, I have been up since

12:43:36 16   11 o'clock last night and I'm fading pretty hard just to be

12:43:36 17   honest with you.

12:43:36 18             THE COURT:  I'm going to ask to you step

12:43:36 19   outside.

12:43:36 20             (Juror left the jury room.)

12:43:36 21             THE COURT:  So folks, I am inclined to let this

12:43:36 22   juror go for cause.  I tend to not seat jurors who work

12:43:36 23   nights.  I think it is challenging for them to listen to the

12:43:36 24   testimony.

12:43:36 25             Is there any objection to that from the

12:43:36 1    plaintiff?

12:43:36 2                    MS. MUNNINGS:  No.

12:43:36 3                    THE COURT:  Any objection?

12:43:36 4                    MR. WAN:  No, Your Honor.

12:43:36 5                    THE COURT:  Juror number 2 may be excused for

12:43:36 6    cause.

12:43:36 7                    COURTROOM DEPUTY:  Your Honor, may I have him

12:43:36 8    leave the courtroom?

12:43:36 9                    THE COURT:  Yes.  Let him out the back way.

12:43:36 10   Thank you.  So normally you would know which jurors had no

12:43:36 11   yeses because you would have seen them all get drawn, but

12:43:36 12   because we're doing this a little bit different today with

12:43:36 13   the random number generator, we'll let you know which jurors

12:43:36 14   don't have the yes answers so you can know where we are in

12:43:36 15   terms of filling out the box.

12:43:36 16                   COURTROOM DEPUTY:  Ready for the next juror?

12:43:37 17                   THE COURT:  Yes.

12:43:37 18           I can tell you the next person she's talking to

12:43:37 19   is juror number 3, Amy Tracy.

12:43:37 20                   COURTROOM DEPUTY:  We have juror number 3, Amy

12:43:37 21   Tracy, responded yes to questions 3 and 6.

12:43:37 22                   (Juror entering the room.)

12:43:37 23                   THE COURT:  Please have a seat.  You're juror

12:43:37 24   number 3, is that right?

12:43:37 25                   A JUROR:  Yes.

12:43:37 1                         THE COURT:  That makes you Amy Tracy; is that

12:43:37 2       right?

12:43:37 3                         A JUROR:  Yes.

12:43:37 4                         THE COURT:  I understand you answered yes to

12:43:37 5       question number 3 which ask have you or any member of your

12:43:37 6       immediate family ever been employed by the Delaware

12:43:37 7       Department of Corrections.  Can you tell us about that?

12:43:37 8                         A JUROR:  I answered 6 because 6 related to, I

12:43:37 9       have a brother-in-law and nephew who both work for the

12:43:37 10      Department of Corrections.

12:43:37 11                        THE COURT:  Do they both work at the prison?

12:43:37 12                        A JUROR:  One works up here and the other works

12:43:37 13      in Smyrna, not inside, he was outside, and --

12:43:37 14                        THE COURT:  Okay.  So the brother-in-law that

12:43:37 15      works in Smyrna doesn't work with any of the prisoners who

12:43:37 16      are in the secured facility?

12:43:37 17                        A JUROR:  No.

12:43:37 18                        THE COURT:  Do you have a relationship with your

12:43:37 19      family members who work for the Department of Correction and

12:43:37 20      in your view affect your ability to be a fair and impartial

12:43:37 21      juror in this case?

12:43:37 22                        A JUROR:  I'm not sure.

12:43:37 23                        THE COURT:  What do you mean by that?

12:43:37 24                        A JUROR:  I mean, I don't think so.

12:43:37 25                        THE COURT:  You don't think so?

12:43:37  1                    A JUROR:  No.

12:43:37  2                    THE COURT:  Okay.  Let me have questions from

12:43:37  3     counsel for the plaintiff, if you have any.

12:43:37  4                    MS. COZEN:  Do either of your relatives interact

12:43:37  5     with prison administration at all?

12:43:37  6                    A JUROR:  I don't know.

12:43:37  7                    MS. COZEN:  Or inmates at all?

12:43:37  8                    A JUROR:  I believe so.

12:43:37  9                    MS. COZEN:  Do they feel positively about their

12:43:37 10     jobs?

12:43:37 11                    A JUROR:  Yes, they don't really talk about

12:43:37 12     their jobs.

12:43:37 13                    MS. COZEN:  Would it be difficult for you to

12:43:37 14     find a verdict against the DOC or someone who works at the

12:43:37 15     DOC?

12:43:37 16                    A JUROR:  If the evidence shows that that's what

12:43:37 17     it would be.

12:43:37 18                    MS. COZEN:  No other questions, Your Honor.

12:43:37 19                    THE COURT:  Okay.

12:43:37 20                    MR. WAN:  Good morning, Ms. Tracy.  I know you

12:43:37 21     say you don't talk much, but do they tell you, your

12:43:37 22     brother-in-law or nephew, do they tell you any stories about

12:43:37 23     their work or anything like that?

12:43:37 24                    A JUROR:  No.

12:43:37 25                    MR. WAN:  Would they ever speak with any

12:43:37 1    specific inmates or anything like that?

12:43:37 2                    A JUROR:  No.

12:43:37 3                    MR. WAN:  Okay.

12:43:37 4                    THE COURT:  We'll have you step outside for a

12:43:37 5    minute, ma'am.

12:43:37 6                    (Juror leaving the room.)

12:43:37 7                    THE COURT:  Any applications?

12:43:37 8                    MS. COZEN:  No, Your Honor.

12:43:38 9                    MR. WAN:  No, Your Honor.

12:43:38 10                   MS. COZEN:  Your Honor, would Amy Tracy be

12:43:38 11   number 2?

12:43:38 12                   THE COURT:  Number 2.  And we'll go until we get

12:43:38 13   to number 14.

12:43:38 14                   COURTROOM DEPUTY:  Your Honor, I have juror

12:43:38 15   number 4, Michael Whittaker.  Possible yes answer to 1, 7,

12:43:38 16   and 15.

12:43:38 17                   THE COURT:  Okay.

12:43:38 18                   (Juror entering the room.)

12:43:38 19                   THE COURT:  Please have a seat, sir.  You are

12:43:38 20   juror number 4; is that right.

12:43:38 21                   A JUROR:  That's right.

12:43:38 22                   THE COURT:  That would make you Mr. Whittaker?

12:43:38 23                   A JUROR:  Yes, ma'am.

12:43:38 24                   THE COURT:  I understand you had a yes answer to

12:43:38 25   question number 1 which asked if the length of the trial or

12:43:38 1    the schedule presented a special problem for you.

12:43:38 2                   A JUROR:  I said that was a possible yes, yes.

12:43:38 3                   THE COURT:  Can you tell us about that.

12:43:38 4                   A JUROR:  Sure.  I have a lot going on at work.

12:43:38 5    My children -- I have been divorced about a year.  My

12:43:38 6    children come back to me Friday morning which normally

12:43:38 7    wouldn't be an issue, but my son, who is sixteen, would

12:43:38 8    normally be there to watch her, but his birthday is Thursday

12:43:38 9    so he's going to be golfing, so I have a ten-year old that I

12:43:38 10   need child care for.  My normal baby-sitter is unfortunately

12:43:38 11   in the hospital.  Just a lot.

12:43:38 12                  THE COURT:  Sorry to hear that.  So if we went

12:43:38 13   on Friday, that would be an issue.

12:43:38 14                  Let's talk to you about question number 7 which

12:43:38 15   asked if you or any member of your immediate family have

12:43:38 16   experiences with law enforcement officer.

12:43:38 17                  A JUROR:  My sister is an FBI agent.

12:43:38 18                  THE COURT:  Is that here in Delaware.

12:43:38 19                  A JUROR:  No, she lives in Miami now.  Well,

12:43:38 20   north of Miami.

12:43:38 21                  THE COURT:  Does your relationship with your

12:43:38 22   sister as a law enforcement agent in your mind make it so

12:43:38 23   that you would be unable to render a fair and impartial

12:43:38 24   verdict in the case?

12:43:38 25                  A JUROR:  No, not at all.

12:43:38  1                    THE COURT:  Okay.  And let me ask you about

12:43:38  2     question number 15.  Have you ever served as a juror in a

12:43:38  3     case within the last fifteen years or so?

12:43:38  4                    A JUROR:  Yeah, I think that's technically

12:43:38  5     correct.  I was selected as a juror.  It's probably been

12:43:38  6     three years, state court.  And we sat as a jury but the

12:43:38  7     first morning of trial they settled.  It was done at that

12:43:38  8     point.  We were sworn in and everything.

12:43:38  9                    THE COURT:  You didn't actually deliberate in

12:43:38 10     that case?

12:43:38 11                    A JUROR:  Right.

12:43:38 12                    THE COURT:  I'm going to ask you to step outside

12:43:38 13     for just a minute and if we have some more questions we'll

12:43:38 14     bring you back in.

12:43:38 15                        (Juror leaving the room.)

12:43:38 16                    THE COURT:  So I am inclined to excuse this

12:43:39 17     juror because of his child care issues, but if you like or

12:43:39 18     if someone objects, we can bring him back to question him

12:43:39 19     further.  I'll give you a minute.

12:43:39 20                    MS. MUNNINGS:  We would object.

12:43:39 21                    THE COURT:  You do object?

12:43:39 22                    MR. WAN:  We didn't.

12:43:39 23                    THE COURT:  Let's bring him back for some

12:43:39 24     further questions.  Thank you.

12:43:39 25                        (Juror entering the room.)

12:43:39 1      I'm going to give the parties a chance to ask

12:43:39 2 you some further questions.  We'll start with counsel for

12:43:39 3 plaintiff.

12:43:39 4      MS. MUNNINGS:  So was the child care issue, is

12:43:39 5 it likely that you would be able to find someone?

12:43:39 6      A JUROR:  I can certainly ask my ex-wife if she

12:43:39 7 can keep my daughter on Friday.  I prefer not to do that,

12:43:39 8 but if I have to do that, I can do that.

12:43:39 9      THE COURT:  Any other questions?

12:43:39 10      MS. MUNNINGS:  No.

12:43:39 11      THE COURT:  Any questions from counsel for the

12:43:39 12 defendant?

12:43:39 13      MR. WAN:  No.

12:43:39 14      THE COURT:  We'll have you step outside for one

12:43:39 15 more minute, sir.  Thank you.

12:43:39 16      (Juror leaving the room.)

12:43:39 17      THE COURT:  Any applications?

12:43:39 18      We'll seat this as juror number 3 since he did

12:43:39 19 indicate in follow-up questioning that it would be possible

12:43:32 20 for him to serve.

12:43:32 21      The next juror on the list that I believe

12:43:32 22 Ms. Garfinkel will be talking to is Michelle D. Crocker.

12:43:32 23      COURTROOM DEPUTY:  The next juror is juror

12:43:32 24 number 6.  First name Venkatesan, last name Ranganathan.

12:43:32 25      THE COURT:  Just for purposes of the record,

12:43:39 1    juror number 5 was Michelle D. Crocker; is that right?

12:43:39 2              COURTROOM DEPUTY:  Yes.

12:43:39 3              THE COURT:  And there were no yes answers?

12:43:39 4              COURTROOM DEPUTY:  Yes.

12:43:39 5              MR. WAN:  Who is number 6 again?

12:43:39 6              COURTROOM DEPUTY:  Last name Ranganathan,

12:43:39 7    R-A-N-G-A-N-A-T-H-A-N.

12:43:39 8              MR. WAN:  Got you.  Thank you.

12:43:39 9              COURTROOM DEPUTY:  And responded yes to question

12:43:39 10   1?

12:43:39 11             THE COURT:  One.

12:43:39 12             (Juror entering the room.)

12:43:39 13             THE COURT:  Please have a seat.  You are juror

12:43:39 14   number 6; is that right?

12:43:39 15             A JUROR:  Yes.

12:43:39 16             THE COURT:  That would make you Mr. Ranganathan?

12:43:39 17             A JUROR:  Right.

12:43:39 18             THE COURT:  Did I say that right?

12:43:39 19             A JUROR:  Close.

12:43:39 20             THE COURT:  You answered yes to question 1; is

12:43:39 21   that right?

12:43:39 22             A JUROR:  Yes.

12:43:39 23             THE COURT:  And that ask if the length of the

12:43:39 24   trial or the schedule presented a special problem for you.

12:43:39 25   Could you tell us about that.

12:43:39  1          A JUROR:  Yes.  So the deliberation part, the

12:43:39  2     length of trial is fine, I can do that, but I got a couple

12:43:39  3     of things, the work schedule will not allow me for extended

12:43:40  4     periods of time.  I have a family coming the week after

12:43:40  5     next.  And then the third aspect is I have been found I am a

12:43:40  6     match for a stem cell donor, so that potentially the testing

12:43:40  7     will start next week for that.  I was wondering if the

12:43:40  8     deliberations are going to take more than a couple of hours

12:43:40  9     or something like that, or more than a couple of days, that

12:43:40 10     might get pushed out, and if they found the donor, it's

12:43:41 11     actually very important.  So it's really not the length of

12:43:41 12     trial itself, up to Monday is fine, but the deliberations

12:43:41 13     will probably be a problem.

12:43:41 14          THE COURT:  So do you have a sense of when you

12:43:41 15     might get called for the donation?

12:43:41 16          A JUROR:  We have a meeting today, this evening,

12:43:41 17     I would know more about that, but potentially sometime next

12:43:41 18     week, midweek.

12:43:41 19          THE COURT:  Midweek.  And would they let you

12:43:42 20     know the night before or could you be potentially called in

12:43:42 21     the middle to rush over?

12:43:42 22          A JUROR:  I think they would probably let me

12:43:42 23     know the day earlier.

12:43:42 24          THE COURT:  And then you had family coming the

12:43:42 25     week after next week; is that right?

12:43:40 1                  A JUROR:  Yes.

12:43:40 2                  THE COURT:  And you also mentioned a work issue?

12:43:40 3                  A JUROR:  Yes.

12:43:40 4                  THE COURT:  What do you do for a living?

12:43:40 5                  A JUROR:  I work for TD Bank in their computer

12:43:40 6  department, so getting out for extended periods is a

12:43:40 7  problem.

12:43:40 8                  THE COURT:  It wouldn't be good for your

12:43:40 9  employer?

12:43:40 10                 A JUROR:  Yes.

12:43:40 11                 THE COURT:  Any questions from counsel for

12:43:40 12  plaintiff?

12:43:40 13                 MS. COZEN:  Does your employer know you're here

12:43:40 14  today?

12:43:40 15                 A JUROR:  Yes.

12:43:40 16                 MS. COZEN:  And they're okay with it?

12:43:40 17                 No additional questions from plaintiff.

12:43:40 18                 THE COURT:  Any questions from the defendant?

12:43:40 19                 MR. WAN:  No, Your Honor.

12:43:40 20                 THE COURT:  We're going to ask you, sir, just to

12:43:40 21  stand out in the hall just for a minute.

12:43:40 22                 A JUROR:  Sure.

12:43:40 23                 THE COURT:  Thank you.

12:43:40 24                 (Juror leaving the room.)

12:43:40 25                 THE COURT:  Any applications?

12:43:40 1     MS. COZEN:  No, Your Honor.

12:43:40 2     MR. WAN:  No, Your Honor.

12:43:40 3     THE COURT:  So this juror expressed a concern if

12:43:40 4 the deliberations would be lengthy.  It sounds like he's

12:43:40 5 worried if they were to go for more than a day or so, which

12:43:40 6 I don't think we're anticipating happening.  I also think if

12:43:40 7 we lost him, we would still have a full panel.  So I am

12:43:40 8 inclined to not excuse this juror.  I didn't see any undue

12:43:40 9 hardship here within the meaning of the rule.  So we'll have

12:43:40 10 that juror put as number 5.

12:43:40 11     The next person I have on my list is Vera Brown.

12:43:40 12 It should be juror number 7.

12:43:40 13     COURTROOM DEPUTY:  Your Honor, juror number 7,

12:43:40 14 Vera Brown has no yes responses.

12:43:40 15     Juror number 8, Tyler, I'll spell the last name,

12:43:41 16 P-H-O-M-M-A-C-H-A-N-H, also had all no responses.

12:43:41 17     And juror number 9, Catherine Fridell, no

12:43:41 18 responses.

12:43:41 19     MS. COZEN:  I'm sorry, could you repeat that

12:43:41 20 name?

12:43:41 21     COURTROOM DEPUTY:  Catherine Fridell,

12:43:41 22 F-R-I-D-E-L-L.

12:43:41 23     MS. COZEN:  Thank you.

12:43:41 24     THE COURT:  By my count, that makes eight so

12:43:41 25 far.

12:43:41  1                    COURTROOM DEPUTY:  Correct, Your Honor.

12:43:41  2            We have juror number 10 outside, Valerie Hogan.

12:43:41  3  Yes responses to questions 2, 4, 17, and there are also some

12:43:41  4  concerns on her Covid questionnaire.

12:43:41  5                    THE COURT:  Do you have a copy of that?

12:43:41  6                    COURTROOM DEPUTY:  Yes, I do.

12:43:41  7                    THE COURT:  So I'll let the attorneys know that

12:43:41  8  we did receive a Covid questionnaire from this juror.  She

12:43:41  9  hasn't been exposed.  She doesn't have any symptoms.  She

12:43:41 10  has received her Covid vaccination.  But she does have a

12:43:41 11  concern about being around others who may not be vaccinated

12:43:41 12  but do not wear a mask.  And I think that's a concern that

12:43:41 13  many still share.  That's not an unreasonable concern.  She

12:43:41 14  also indicates that she has an elderly father and doesn't

12:43:41 15  want to take chances on giving him anything, so if you have

12:43:41 16  any questions about that, I can explore with her a bit if

12:43:41 17  she has issues about not wearing masks if everyone around

12:43:41 18  her is vaccinated.

12:43:41 19                    COURTROOM DEPUTY:  May I bring her in, Your

12:43:41 20  Honor?

12:43:41 21                    THE COURT:  Yes.

12:43:41 22                    (Juror entering the room.)

12:43:41 23                    THE COURT:  You are juror number 10; is that

12:43:41 24  right?

12:43:41 25                    A JUROR:  Yes.

12:43:41 1                    THE COURT:  That would make you Ms. Hogan.

12:43:41 2                    A JUROR:  Yes.

12:43:41 3                    THE COURT:  Ma'am, I am vaccinated just so you

12:43:41 4      know and I have been for a long time.

12:43:41 5                    A JUROR:  Okay.

12:43:41 6                    THE COURT:  And I'll stay away as well.

12:43:41 7             So you answered yes to question number 2 that

12:43:41 8      asked if you had a special disability or problem that would

12:43:41 9      make serving as a member of the jury difficult or

12:43:41 10     impossible.

12:43:41 11                   A JUROR:  Yeah.  It's not a disability, but it

12:43:41 12     is a problem.  I have been working graveyard shift for

12:43:41 13     almost twenty years now, and I don't function well during

12:43:41 14     the day.

12:43:41 15                   THE COURT:  Yes.

12:43:41 16                   A JUROR:  You know, I just really don't.  I

12:43:41 17     don't feel that I would be able to, you know, be able to

12:43:41 18     concentrate on what's going on.

12:43:41 19                   THE COURT:  Yeah.  Did you have to work last

12:43:41 20     night?

12:43:41 21                   A JUROR:  No, I didn't.  But I couldn't sleep

12:43:41 22     last night.

12:43:41 23                   THE COURT:  Right.

12:43:41 24                   A JUROR:  I went to bed like 4 o'clock.

12:43:41 25                   THE COURT:  When is your next shift scheduled to

12:43:41 1    occur?

12:43:41 2              A JUROR:  Actually if I get out before 12:00

12:43:42 3    today, I have to go in tonight.

12:43:42 4              THE COURT:  Okay.  I'm going to ask you to step

12:43:42 5    outside just for a minute.  Thank you.

12:43:42 6              A JUROR:  Okay.

12:43:42 7              (Juror leaving the room.)

12:43:42 8              THE COURT:  Similar to the juror we excused

12:43:42 9    before, I am inclined to excuse jurors for cause who work

12:43:42 10   nightshift.  Is there any objection to that or do we want to

12:43:42 11   have more follow-up questions?

12:43:42 12             MS. MUNNINGS:  No objection.

12:43:42 13             MR. WAN:  No, Your Honor.

12:43:42 14             THE COURT:  This juror can be excused for cause.

12:43:42 15   Thank you.

12:43:42 16             COURTROOM DEPUTY:  Your Honor, I have juror

12:43:42 17   number 11, Griffin John, yes response to question number 6.

12:43:42 18             THE COURT:  Okay.

12:43:42 19             (Juror entering the room.)

12:43:42 20             THE COURT:  Please have a seat, sir.  You're

12:43:42 21   juror 11; is that right?

12:43:42 22             A JUROR:  Yes.

12:43:42 23             THE COURT:  And that makes you Mr. John; is that

12:43:42 24   right?

12:43:42 25             A JUROR:  Yes.

12:43:42 1          THE COURT:  Okay.  So I understand from

12:43:42 2   Ms. Garfinkel that you answered yes to question number 6

12:43:42 3   which asked whether or not you have had any experiences with

12:43:42 4   the Delaware Department of Correction or any relationships

12:43:42 5   with Delaware Department of Correction employees or inmates

12:43:42 6   that would make it difficult for you to be a fair and

12:43:42 7   impartial juror in this case.

12:43:42 8          Can you tell us a little bit more?

12:43:42 9          A JUROR:  Yes.  So I work in Delaware Air

12:43:42 10  National Guard from 2009 to 2015 of which two of the

12:43:42 11  coworkers work in Delaware Correctional Center, and they

12:43:42 12  told me stories about the inmates there.  It's just that --

12:43:42 13  I'm just letting you know that I heard stories about it.  So

12:43:42 14  unless I hear the case, I won't be making any judgment on

12:43:42 15  that, but I'm just letting you know.

12:43:42 16         THE COURT:  Do you know which prison your

12:43:42 17  coworkers worked at?

12:43:42 18         A JUROR:  It's been a while, I don't remember,

12:43:42 19  but I know they worked in the correction center.

12:43:42 20         THE COURT:  Do you think if I instructed you to

12:43:42 21  put aside those stories and just render a verdict based on

12:43:42 22  the evidence in this case that you would be able to do that?

12:43:42 23         A JUROR:  I sure do.

12:43:42 24         THE COURT:  All right.  Questions?

12:43:42 25         MS. COZEN:  Did the stories portray the inmates

12:43:42 1    in a negative light?

12:43:42 2              A JUROR:  It did.

12:43:42 3              MS. COZEN:  And has that impacted your view of

12:43:42 4    inmates or prisoners in Delaware?

12:43:42 5              A JUROR:  I never been to the correction center,

12:43:42 6    so the things I heard is from my coworkers telling about it,

12:43:42 7    so that's my viewpoint about it.  But I never been to any

12:43:42 8    correction center myself to hear any other stories.

12:43:42 9              MS. COZEN:  So that's all you have to base your

12:43:42 10   view?

12:43:42 11             A JUROR:  Yes, that's all.

12:43:42 12             MS. COZEN:  Okay.

12:43:42 13             THE COURT:  Anymore questions?

12:43:42 14             MS. COZEN:  No further questions.

12:43:42 15             THE COURT:  Any questions?

12:43:42 16             MR. WAN:  What stories did they tell you?

12:43:42 17             A JUROR:  About them trying to escape and trying

12:43:42 18   to attack them while they're trying to escape.

12:43:42 19             MR. WAN:  And that doesn't affect your ability

12:43:42 20   to be impartial in this case?

12:43:42 21             A JUROR:  I hope not.

12:43:42 22             MR. WAN:  Okay.

12:43:42 23             THE COURT:  We'll have you stand outside for

12:43:42 24   just a minute.

12:43:42 25             A JUROR:  All right.

12:43:43  1                  (Juror leaving the room.)

12:43:43  2                  THE COURT:  My application.

12:43:43  3                  MS. COZEN:  Your Honor, we would move to strike

12:43:43  4     for cause.  This juror said that the only impressions he has

12:43:43  5     about the Delaware Department of Corrections are what he

12:43:43  6     heard from his friends and the fact that he hopes for it not

12:43:43  7     to affect of his opinion is not sufficient for us to have

12:43:43  8     him.  We think that would be bias against our client and

12:43:43  9     very prejudicial.

12:43:43 10                  THE COURT:  Mr. Wan?

12:43:43 11                  MR. WAN:  He said he could be impartial.  When

12:43:43 12     you asked him what you asked him, he said it won't affect

12:43:43 13     his ability to render a fair verdict.  I think he is okay.

12:43:43 14                  THE COURT:  He did indicate he thought he could

12:43:43 15     be impartial, but I am troubled by the fact that he answered

12:43:43 16     yes to a question that it would be difficult for him to be

12:43:43 17     fair and impartial.  Based on that, we're going to strike

12:43:43 18     juror number 11 for cause.

12:43:43 19                  MR. WAN:  Your Honor, when they're seated, do

12:43:42 20     they change juror numbers or they're wearing the one that

12:43:42 21     was initially assigned?

12:43:42 22                  THE COURT:  They are wearing the one they were

12:43:42 23     initially assigned.  We're going to keep these juror numbers

12:43:42 24     and then we will renumber them once we get to our eight, if

12:43:42 25     that makes sense.

12:43:43  1                    MR. WAN:  Got you.

12:43:43  2                    THE COURT:  I have next to my list James Robert

12:43:43  3    Matthews.

12:43:43  4                    MR. WAN:  Number 12, Your Honor?

12:43:43  5                    THE COURT:  Yes.

12:43:43  6                    COURTROOM DEPUTY:  Your Honor, I have juror

12:43:43  7    number 12, James Matthews, responded yes to questions 1, 2

12:43:43  8    and 7.

12:43:43  9                    THE COURT:  Okay.  Thank you.

12:43:43 10                    (Juror entering the room.)

12:43:43 11                    THE COURT:  Good morning, sir.

12:43:43 12                    A JUROR:  Good morning.

12:43:43 13                    THE COURT:  Please have a seat right here.  You

12:43:43 14    are Juror 12; is that right?

12:43:43 15                    A JUROR:  Yes.

12:43:43 16                    THE COURT:  And that would make you

12:43:43 17    Mr. Matthews; is that right?

12:43:43 18                    A JUROR:  Yes.

12:43:43 19                    THE COURT:  I understand, sir, you answered yes

12:43:42 20    to question number 1 which ask if the length of the trial or

12:43:42 21    the schedule would be a problem for you.  Can you tell us a

12:43:42 22    little bit about that?

12:43:42 23                    A JUROR:  I work for the hospital, Christiana.

12:43:42 24    Right now we're short staffed and I work third shift.

12:43:42 25                    THE COURT:  What hours is third shift?

| | | |
|---|---|---|
| 12:43:43 | 1 | A JUROR:  10 o'clock to 7:00. |
| 12:43:43 | 2 | THE COURT:  You worked last night, sir? |
| 12:43:43 | 3 | A JUROR:  I worked last night and tonight, too. |
| 12:43:43 | 4 | THE COURT:  Very good.  I'm going to ask you to |
| 12:43:43 | 5 | stand outside for a minute while I talk to the attorneys. |
| 12:43:43 | 6 | (Juror leaving the room.) |
| 12:43:43 | 7 | THE COURT:  I am inclined to excuse this juror |
| 12:43:43 | 8 | for cause based on the fact that he worked third shift.  Any |
| 12:43:44 | 9 | objections? |
| 12:43:44 | 10 | MR. WAN:  No, Your Honor. |
| 12:43:44 | 11 | MS. MUNNINGS:  No, Your Honor. |
| 12:43:44 | 12 | THE COURT:  Thank you. |
| 12:43:44 | 13 | The next I have on my list is Juan Carlos |
| 12:43:44 | 14 | Cabrera. |
| 12:43:44 | 15 | COURTROOM DEPUTY:  Juror number 13, Juan |
| 12:43:44 | 16 | Cabrera.  No responses. |
| 12:43:44 | 17 | THE COURT:  So that would make him nine on our |
| 12:43:44 | 18 | running total of fourteen. |
| 12:43:44 | 19 | COURTROOM DEPUTY:  Correct, Your Honor. |
| 12:43:44 | 20 | And outside we have juror number 14, Tammy |
| 12:43:44 | 21 | Brown, responded yes to question number 4. |
| 12:43:44 | 22 | (Juror entering the room.) |
| 12:43:44 | 23 | THE COURT:  Hi.  Please have a seat.  You are |
| 12:43:44 | 24 | juror number 14; is that right? |
| 12:43:44 | 25 | A JUROR:  Yes. |

12:43:44 1              THE COURT:  That would make you Ms. Brown.

12:43:44 2              A JUROR:  Yes.

12:43:44 3              THE COURT:  I understand that you responded yes

12:43:44 4      to question number 4 which asked if you or any member of

12:43:44 5      your immediate family has ever been incarcerated at James T.

12:43:44 6      Vaughn Correctional Center.

12:43:44 7              A JUROR:  Yes.

12:43:44 8              THE COURT:  Can you tell us.

12:43:44 9              A JUROR:  I have two half brothers.  I haven't

12:43:44 10     spoke to him since my mother passed.  Same mother, different

12:43:44 11     fathers.  They both have been incarcerated many times.  I

12:43:44 12     don't know if they have been at Vaughn.  I am going to

12:43:44 13     assume they were since it's been so many times.

12:43:44 14             THE COURT:  Does the fact that your half

12:43:44 15     brothers have been incarcerated in Delaware, do you think

12:43:44 16     that would make it difficult for you to be a fair and

12:43:44 17     impartial juror in this case?

12:43:44 18             A JUROR:  No.  No.

12:43:44 19             THE COURT:  Any questions from counsel for

12:43:44 20     plaintiff?

12:43:44 21             MS. MUNNINGS:  No, Your Honor.

12:43:44 22             THE COURT:  Any questions?

12:43:44 23             MR. WAN:  Ms. Brown, do you speak to your half

12:43:44 24     brothers often?

12:43:44 25             A JUROR:  No, my mother has been gone seven

12:43:44 1     years.  I did have an incident with my brother and I had to

12:43:44 2     come here and produce a victim statement.  That was my last

12:43:44 3     contact with him.  And he was incarcerated due to his

12:43:44 4     threats.

12:43:44 5                MR. WAN:  Did they tell you about any of their

12:43:44 6     experiences while being incarcerated?

12:43:44 7                A JUROR:  No, I don't talk to them.

12:43:44 8                THE COURT:  We're going to have you stand

12:43:44 9     outside for just a moment.  Thanks so much.

12:43:44 10                A JUROR:  Thank you.

12:43:44 11                (Juror leaving the room.)

12:43:44 12                THE COURT:  Any applications?

12:43:44 13                MS. MUNNINGS:  No, Your Honor.

12:43:44 14                MR. WAN:  No, Your Honor.

12:43:44 15                THE COURT:  Okay.  That makes ten so far.

12:43:44 16                COURTROOM DEPUTY:  Judge, I have juror number

12:43:44 17     15, Yuan Liu and has yes answers to 1 and 19.

12:43:44 18                THE COURT:  Thank you.

12:43:44 19                (Juror entering the room.)

12:43:44 20                THE COURT:  Please have a seat.  You are juror

12:43:44 21     number 15, sir, is that right?

12:43:44 22                A JUROR:  Yes.

12:43:44 23                THE COURT:  That makes you Mr. Liu.

12:43:44 24                A JUROR:  Yes.

12:43:44 25                THE COURT:  I understand that you answered yes

12:43:45 1    to question number 1 about the length of the trial or the

12:43:45 2    schedule presenting a problem for you.

12:43:45 3              A JUROR:  Yes.

12:43:45 4              THE COURT:  Could you tell us a little more

12:43:45 5    about that?

12:43:45 6              A JUROR:  I wasn't sure about the wording on

12:43:45 7    special problems, but I'm attending the University of

12:43:45 8    Delaware summer classes and we have a final on Friday, so it

12:43:45 9    would be two to two-and-a-half business days, it's a

12:43:45 10   synchronous final, but I haven't gotten a response from my

12:43:45 11   professor yet, I don't know if he can reschedule it.

12:43:45 12             THE COURT:  And I imagine that the term

12:43:45 13   synchronous final is a term that's unique to Covid and that

12:43:45 14   means you need to take it when everybody else takes it; is

12:43:45 15   that right?

12:43:45 16             A JUROR:  I e-mailed him about a makeup, but he

12:43:45 17   hasn't gotten back to me.

12:43:45 18             THE COURT:  Thank you.  Sir, I'm going to ask

12:43:45 19   you to stand out in the hall for a minute.

12:43:45 20             (Juror leaving the room.)

12:43:42 21             THE COURT:  I think in the jury plan we may

12:43:42 22   usually excuse students.  I don't know how this one slipped

12:43:42 23   through, but does anyone have any objection if I excuse this

12:43:42 24   juror for cause?

12:43:42 25             MS. MUNNINGS:  No, Your Honor.

12:43:45 1                    MR. WAN:  No.

12:43:45 2                    THE COURT:  Okay.  We'll excuse Mr. Liu for

12:43:45 3      cause.  Thank you.

12:43:45 4                    The next one I have on my list is Luigi

12:43:45 5      Schiavoni.

12:43:45 6                    MS. COZEN:  Schiavoni.

12:43:45 7                    THE COURT:  S-C-H.

12:43:45 8                    MS. COZEN:  Thank you.

12:43:45 9                    COURTROOM DEPUTY:  Your Honor, we have juror

12:43:45 10     number 16, Luigi Schiavoni.  And he doesn't necessarily have

12:43:45 11     a yes, just has a question that's related to his job.

12:43:45 12                   (Juror entering the room.)

12:43:45 13                   THE COURT:  Good afternoon, sir.

12:43:45 14                   A JUROR:  Hello there.

12:43:45 15                   THE COURT:  Please have a seat.  You're juror

12:43:45 16     number 16, is that right?

12:43:45 17                   A JUROR:  Yes.

12:43:45 18                   THE COURT:  That makes you Mr. Schiavoni.

12:43:45 19                   A JUROR:  Yes.

12:43:4 20                    THE COURT:  I understand you had a concern

12:43:4 21     related to your employment?

12:43:4 22                    A JUROR:  Yes.  Everybody of course thinks

12:43:4 23     they're the most important person at their job.  A couple

12:43:4 24     months ago the boss in front of me just quit, so then --

12:43:4 25     which is good, that gave me a lot of responsibilities and

stuff at work and I have a manager above me.  Well, since

then about two weeks ago he got diagnosed with some heavy

medical stuff that he's getting to go to, that means I would

be the guy to ask.

THE COURT:  What do you do?

A JUROR:  I'm a mechanic.  I'm foreman at Bay

Shore Ford.

THE COURT:  What hours do you work?

A JUROR:  I work in the morning from 6:00 in the

morning to 2:30 in the afternoon.

THE COURT:  If your supervisor above you is out,

what would you be called on to do?

A JUROR:  Either make a decision or go over to

the other shop because there is one or two shops to see what

is going on.  Like this morning before I came here I went

and got a couple of guys started on their job, that's where

I went this morning before I came here, so I figured I would

ask.  I got no problem with making a statement, whatever I

can do.

THE COURT:  Is it a union shop, sir?

A JUROR:  No.

THE COURT:  So if your supervisor in front of

you is gone, you would just take over for him?

A JUROR:  Not really take over.  I can't say I

have that much authority, like I couldn't fire anybody or

12:43:46 1    that stuff.  You know what I mean?

12:43:46 2              THE COURT:  Do you have any reason to think that

12:43:46 3    he'll be out?

12:43:46 4              A JUROR:  He has got cancer and it's pretty

12:43:46 5    aggressive.  He started his first dose of chemo today.

12:43:46 6              THE COURT:  Okay.  Does your employer know

12:43:46 7    you're here today?

12:43:46 8              A JUROR:  Yes.

12:43:46 9              THE COURT:  Did they express any concern with

12:43:4 10   you --

12:43:4 11             A JUROR:  She said Lou, we need you back as soon

12:43:4 12   as you can.  I said, I got you.  I'm with you guys.  Would

12:43:4 13   the place close up tomorrow without me?  No, just like every

12:43:4 14   place.

12:43:4 15             THE COURT:  Any questions, counsel for the

12:43:4 16   plaintiff?

12:43:4 17             MS. MUNNINGS:  No, Your Honor.

12:43:4 18             THE COURT:  Any questions for counsel for the

12:43:4 19   defendant?

12:43:4 20             MR. WAN:  No.

12:43:4 21             THE COURT:  Thank you, sir.  We're going to have

12:43:4 22   you stand out in the hall for just a minute.

12:43:4 23             A JUROR:  Thank you.

12:43:4 24             (Juror leaving the room.)

12:43:4 25             THE COURT:  Any application?

12:43:46 1                      MS. MUNNINGS:  No, Your Honor.

12:43:46 2                      MR. WAN:  No, Your Honor.

12:43:46 3                      THE COURT:  Okay.  We'll have that be number 11.

12:43:46 4                      COURTROOM DEPUTY:  Your Honor, juror number 17,

12:43:46 5      Christopher Aitken, a yes response to one, and a possible

12:43:46 6      yes to seven.

12:43:46 7                      THE COURT:  Thank you.

12:43:46 8                          (Juror entering the room.)

12:43:46 9                      THE COURT:  Good afternoon, sir.  Please have a

12:43:46 10     seat right here.

12:43:46 11                     A JUROR:  Sure.

12:43:46 12                     THE COURT:  You are juror number 17; is that

12:43:46 13     right?

12:43:46 14                     A JUROR:  That is correct.

12:43:46 15                     THE COURT:  That would make you Mr. Aitken?

12:43:46 16                     A JUROR:  Yes.

12:43:46 17                     THE COURT:  You answered yes to question number

12:43:46 18     1, which asked if the length of the trial or the schedule

12:43:46 19     presented a problem for you.

12:43:46 20                     A JUROR:  Yes.

12:43:46 21                     THE COURT:  Can you tell us a little bit about

12:43:46 22     that.

12:43:46 23                     A JUROR:  For the summer I'm a stay-at-home

12:43:46 24     father of three young kids and so the thirteen-year old, but

12:43:46 25     more importantly two eleven-year old twins and one of them

12:43:47 1   has severe autism, so finding child care for the extended

12:43:47 2   amount of time is pretty difficult.  During the school year

12:43:47 3   he goes to school, so that's not necessarily an issue during

12:43:47 4   the school year, but for the summer, I'm taking off this

12:43:47 5   summer and kind of at home with them.

12:43:47 6              THE COURT:  Who is watching them right now?

12:43:47 7              A JUROR:  So my wife took off today.  So she is

12:43:47 8   a business owner.  So she is off until probably 2:00,

12:43:47 9   3 o'clock or so today, then she'll go into her office.

12:43:47 10             THE COURT:  Any questions from counsel?

12:43:47 11             MS. MUNNINGS:  No, Your Honor.

12:43:47 12             THE COURT:  Any questions from counsel for the

12:43:47 13  defendant?

12:43:47 14             MR. WAN:  No, Your Honor.

12:43:47 15             THE COURT:  We'll have you stand out in the

12:43:47 16  hall.

12:43:47 17             A JUROR:  I did have probable number six.

12:43:47 18             THE COURT:  Why don't you tell us about that.

12:43:47 19             A JUROR:  So in regards to knowing, I don't know

12:43:47 20  anyone from the Vaughn Correctional Facility, but I do

12:43:47 21  coach.  One of my close friends just retired from Ferris, so

12:43:47 22  just being a coach and sharing stories about his day and

12:43:47 23  stuff, I'm not sure in this case if it would kind of skew my

12:43:47 24  view on anything to do with the correctional facility or

12:43:47 25  people involved with the correctional facility.

12:43:47 1          THE COURT:  Thank you, sir.  We'll have you step

12:43:47 2    outside just for a minute.

12:43:47 3                (Juror leaving the room.)

12:43:47 4          THE COURT:  So I am inclined to excuse this

12:43:47 5    juror for hardship given that he has indicated he has a

12:43:47 6    child with special needs and I can tell you based on my

12:43:47 7    understanding with child care situation this summer in light

12:43:47 8    of the pandemic, in light of the nursing care that's

12:43:47 9    available to folks with children with special needs, I think

12:43:47 10   that is an undue hardship, we can bring him back in for

12:43:47 11   further questioning if you like, but if there is no

12:43:47 12   objection, we can excuse him.

12:43:47 13         MS. MUNNINGS:  No objection.

12:43:47 14         MR. WAN:  No objection.

12:43:47 15         THE COURT:  We'll excuse that juror.

12:43:47 16         COURTROOM DEPUTY:  Your Honor, we have juror

12:43:47 17   number 18, Denise Macleish, responded yes to question 7.

12:43:47 18         THE COURT:  Okay.  Just give us one minute so

12:43:47 19   everyone can look up that juror.  Thank you.

12:43:47 20                (Juror entering the room.)

12:43:47 21         THE COURT:  Please have a seat, ma'am.  I

12:43:47 22   understand that you are juror number 18; is that right?

12:43:47 23         A JUROR:  That's correct.

12:43:47 24         THE COURT:  That would make you Ms. Macleish.

12:43:47 25         A JUROR:  Yes.

12:43:47 1          THE COURT:  And Ms. Garfinkel has indicated that

12:43:47 2   you had a yes answer to question 7 which is do you or any

12:43:47 3   member of your immediate family have experience of a law

12:43:48 4   enforcement officer?

12:43:48 5          A JUROR:  Correct.

12:43:48 6          THE COURT:  Could you tell us a little more

12:43:48 7   about that?

12:43:48 8          A JUROR:  Sure.  My older brother was the former

12:43:48 9   state police manager, Thomas Macleish.

12:43:48 10         THE COURT:  Was that here in Delaware?

12:43:48 11         A JUROR:  Yes, it was.

12:43:48 12         THE COURT:  And does your relationship with your

12:43:48 13  older brother or the fact that he was a former law

12:43:48 14  enforcement officer in your view make it difficult for you

12:43:48 15  to render a verdict based solely on the evidence in this

12:43:48 16  case?

12:43:48 17         A JUROR:  No, it doesn't.  But I have grown up

12:43:48 18  with him in law enforcement all my life.

12:43:48 19         THE COURT:  Do you think you could be fair and

12:43:48 20  impartial if I instructed you to render a verdict just based

12:43:48 21  on the evidence in this case?

12:43:48 22         A JUROR:  Absolutely.

12:43:48 23         THE COURT:  Any questions from counsel for

12:43:48 24  plaintiff?

12:43:48 25         MS. COZEN:  Yes.  When listening to witness

12:43:48 1    testimony, do you think your relationship with your brother

12:43:48 2    would make you more likely to find a corrections officer or

12:43:48 3    someone who works in corrections credible over an inmate?

12:43:48 4              A JUROR:  No, but probably my life and

12:43:48 5    experience might.  I was a 38-year federal employee, but I

12:43:48 6    have worked for the federal government.

12:43:48 7              MS. COZEN:  What did you do for the federal

12:43:48 8    government?

12:43:48 9              A JUROR:  I worked for the Department of

12:43:48 10   Agriculture and I ran a program that we did funding in

12:43:48 11   Delaware and Maryland for rural communities.

12:43:48 12             MS. COZEN:  And through this program, did you

12:43:48 13   ever interact with inmates?

12:43:48 14             A JUROR:  No.  No.

12:43:48 15             MS. COZEN:  Prison administrators?

12:43:48 16             A JUROR:  No.

12:43:48 17             MS. MUNNINGS:  So can you explain more why you

12:43:48 18   believe that you have a bias --

12:43:48 19             A JUROR:  I don't know that it would be a bias

12:43:48 20   as much as it would be just my experience in working over

12:43:48 21   the years and working with a variety of different people.

12:43:48 22             MS. MUNNINGS:  And that would make you more

12:43:48 23   likely to trust people working with the government?

12:43:48 24             A JUROR:  I don't know if it's trust working

12:43:48 25   with government, it was just that's my life experience,

12:43:48 1    that's what I have done is worked within the government, and

12:43:48 2    following government rules and regulations, things along

12:43:48 3    that line.

12:43:48 4              MS. COZEN:  And would it be more difficult for

12:43:48 5    you to find against a federal employee because of your

12:43:48 6    experience?

12:43:48 7              A JUROR:  No.

12:43:48 8              MS. COZEN:  But you would be more likely or

12:43:48 9    would you be more likely to take the federal employee's word

12:43:48 10   because of their position?

12:43:48 11             THE COURT:  No, I don't think so.

12:43:48 12             MS. COZEN:  No further questions.

12:43:48 13             THE COURT:  All right.

12:43:48 14             MR. WAN:  Nope.

12:43:48 15             THE COURT:  Thank you.  We'll have you stand out

12:43:48 16   in the hall for just a minute.

12:43:48 17             A JUROR:  Okay.  Sure.

12:43:48 18             (Juror leaving the room.)

12:43:48 19             THE COURT:  Any application?

12:43:42 20             MS. COZEN:  Yes, Your Honor, we would move to

12:43:42 21   strike this juror for cause.  She was just very

12:43:42 22   contradictory in terms of whether her experience in life

12:43:42 23   would affect her judgment or whether she would be able to be

12:43:42 24   impartial in this case and we found that concerning.

12:43:42 25             THE COURT:  Mr. Wan.

12:43:49 1          MR. WAN:  I don't think so.  She said she won't

12:43:49 2     be bias.  She said it was her life experience which I think

12:43:49 3     generally following jury instructions you use your life

12:43:49 4     experience when coming to a verdict.  She said there is no

12:43:49 5     bias and I think as far as life experience that makes her a

12:43:49 6     fine juror.

12:43:49 7          THE COURT:  I tend to agree with Mr. Wan on this

12:43:49 8     one.  I listened very closely to her answers and I don't

12:43:49 9     think she was contradictory.  You asked her two separate

12:43:49 10    lines of questions, one had to do with whether or not she

12:43:49 11    could put aside any bias and render a verdict based on the

12:43:49 12    instructions and the evidence at trial, she was very clear

12:43:49 13    in her responses that she could do that.  You also asked her

12:43:49 14    a separate line of questions that had to do with whether or

12:43:49 15    not she would use her life experience to credit certain

12:43:49 16    witness's testimony and I agree with Mr. Wan that that is

12:43:49 17    something that we have in the jury instructions that a juror

12:43:49 18    is permitted to do.  I can't find that this juror won't be

12:43:49 19    impartial or disruptive.  And so we're going to have this

12:43:49 20    juror as number 12 on our list of 14.

12:43:49 21         COURTROOM DEPUTY:  Your Honor, we have juror

12:43:49 22    number 19, Katherine Spangler, a yes response to question 6.

12:43:49 23         THE COURT:  Okay.

12:43:49 24         (Juror entering the room.)

12:43:49 25         THE COURT:  Hi.  We'll flip you around here.

12:43:49 1    Please have a seat.  You're juror number 19; is that right?

12:43:49 2              A JUROR:  Yes.

12:43:49 3              THE COURT:  And that makes you Ms. Spangler; is

12:43:49 4    that right?

12:43:49 5              A JUROR:  Yes.

12:43:49 6              THE COURT:  And you answered yes to question 6

12:43:49 7    which asked if you had any experiences with the Delaware

12:43:49 8    Department of Correction or any relationship with the

12:43:49 9    employees or inmates that would make it difficult for you to

12:43:49 10   be a fair and impartial juror in this case.  Can we hear a

12:43:49 11   little more about that?

12:43:49 12             A JUROR:  My ex-husband spent approximately five

12:43:49 13   years at Sussex Correctional Institution, so we had minor

12:43:49 14   experiences going in and out of the facility visiting him.

12:43:49 15   He met a lot of the security guards.  I heard a lot of

12:43:49 16   stories while he was in there.

12:43:49 17             THE COURT:  Did you recognize any of the

12:43:49 18   names --

12:43:49 19             A JUROR:  No.

12:43:42 20             THE COURT:  -- in the trial as someone you had

12:43:42 21   heard stories about?

12:43:42 22             A JUROR:  No.  No.

12:43:42 23             THE COURT:  Do you think if I instructed you to

12:43:42 24   render a verdict based solely on the evidence presented in

12:43:42 25   this case that you would be able to do that?

12:43:49  1          A JUROR:  I think I could, yes.

12:43:50  2          THE COURT:  And is it true that you would -- so

12:43:50  3  you answered yes to question 6, which asked if it would be

12:43:50  4  difficult to be fair and impartial.  Do you think you could

12:43:50  5  be fair and impartial?

12:43:50  6          A JUROR:  It just made me -- I wasn't sure

12:43:50  7  whether or not I would or not, I never served on a jury

12:43:50  8  before, so I didn't know what you do when you come back

12:43:50  9  here, so I wanted to tell you.

12:43:50 10          THE COURT:  All right.  So you wanted to let us

12:43:50 11  know that you had an experience with an inmate, but you

12:43:50 12  don't necessarily think it would be difficult for you to be

12:43:50 13  fair and impartial.  Is that fair to say?

12:43:50 14          A JUROR:  Yes.

12:43:50 15          THE COURT:  Let's see if there are any questions

12:43:50 16  from counsel for the plaintiff.

12:43:50 17          MS. COZEN:  What types of stories would your

12:43:50 18  husband tell you about his experience?

12:43:50 19          A JUROR:  Just the goings on inside.

12:43:50 20          MS. COZEN:  Was it about other inmates or

12:43:50 21  guards?

12:43:50 22          A JUROR:  Yeah, other inmates.  He became

12:43:50 23  friends with some of the security guards, you know, that

12:43:50 24  were in there, so we knew a couple of them.  Friendly basis

12:43:50 25  kind of thing.

12:43:50 1          MS. COZEN:  And would that affect your ability

12:43:50 2   to judge the credibility of a witness who might be connected

12:43:50 3   to the prison or an inmate in some way?

12:43:50 4          A JUROR:  I don't know.  I'm not sure.  I'm not

12:43:50 5   sure if it would or not, because I had, you know, some good

12:43:50 6   things that I heard and some bad things.  So I kind of think

12:43:50 7   it might possibly.  I'm not sure.

12:43:50 8          MS. COZEN:  No further questions, Your Honor.

12:43:50 9          A JUROR:  I mean, just only because I was on the

12:43:50 10  other side and I got to hear some of the stories.  I don't

12:43:50 11  know -- I don't know what this case is about.

12:43:50 12         THE COURT:  Yes.  What prison was he at?

12:43:50 13         A JUROR:  In Georgetown, SCI, and then he was in

12:43:50 14  the one at Dover as well, the one that -- it was a lease

12:43:50 15  type thing from home.

12:43:50 16         THE COURT:  Mr. Wan.

12:43:50 17         MR. WAN:  So did the stories your ex-husband

12:43:50 18  tell you, you said that might be able to affect your ability

12:43:50 19  to be unbiased or it would, I'm sorry, I missed that.

12:43:50 20         A JUROR:  I think it would, yeah, I think it

12:43:50 21  would.

12:43:50 22         MR. WAN:  No other questions, Your Honor.

12:43:50 23         THE COURT:  All right.  We'll have you step out

12:43:50 24  in the hall for just a minute.

12:43:50 25         A JUROR:  Thank you.

12:43:50 1                    (Juror leaving the room.)

12:43:50 2              THE COURT:  Any application?

12:43:50 3              MS. COZEN:  Yes, Your Honor, we would move to

12:43:50 4      strike this juror for cause.  She did express a bias and

12:43:50 5      said she was not going to be able to remain impartial, and

12:43:51 6      that is appropriate for this trial.

12:43:51 7              THE COURT:  Mr. Wan.

12:43:51 8              MR. WAN:  I think in response to my question,

12:43:51 9      she couldn't be unbiased.

12:43:51 10             THE COURT:  The parties are in agreement that

12:43:51 11     juror will be stricken for cause.

12:43:51 12             The next on my list is John Ditomo.  No, I'm

12:43:51 13     sorry, Robert Campbell is the next.  And the next after that

12:43:51 14     is John Ditomo.

12:43:51 15             COURTROOM DEPUTY:  Your Honor, Juror number 20,

12:43:51 16     Robert Campbell, no responses.

12:43:51 17             THE COURT:  Okay.  And that makes number 13.

12:43:51 18             COURTROOM DEPUTY:  Correct, Your Honor.

12:43:51 19             THE COURT:  Okay.

12:43:51 20             COURTROOM DEPUTY:  We have juror number 21, John

12:43:51 21     Ditomo, yes responses to 1, 7, 8, and the last question.

12:43:51 22             THE COURT:  Okay.  Give me one second.  So it's

12:43:51 23     1, 7, 8 and 19.

12:43:51 24                    (Juror entering the room.)

12:43:51 25             THE COURT:  Sir, please have a seat right here.

12:43:51 1    So you are juror number 21; is that right?

12:43:51 2              A JUROR:  I am.

12:43:51 3              THE COURT:  And that makes you Mr. Ditomo.

12:43:51 4              A JUROR:  Yes.

12:43:51 5              THE COURT:  I understand that you have answered

12:43:51 6    yes to question number 1; is that right?

12:43:51 7              A JUROR:  I did.

12:43:51 8              THE COURT:  Can you tell us a little more about

12:43:51 9    that?

12:43:51 10             A JUROR:  So I am presently on summer vacation

12:43:51 11   which in itself isn't the problem, my house is in Maryland.

12:43:51 12   A two-and-a-half day trial is going to create some problems

12:43:51 13   for me getting my parents and my sister and four nephews

12:43:51 14   from Maryland to the airport, so I was one of two cars.  So

12:43:51 15   that was the situation that came up when you noted the

12:43:51 16   length of the trial.  Two-and-a-half days.

12:43:51 17             THE COURT:  Okay.  So you're on vacation now,

12:43:51 18   you come in here today for jury duty while you're on

12:43:51 19   vacation?

12:43:51 20             A JUROR:  Yes.

12:43:51 21             THE COURT:  You also answered yes to number

12:43:51 22   seven which is whether you or a member of your immediate

12:43:51 23   family has experience as a law enforcement officer.

12:43:51 24             A JUROR:  Does my mother-in-law count as

12:43:51 25   immediate family?

12:43:51 1          THE COURT:  Why don't you tell us about that.

12:43:51 2          A JUROR:  She is a state trooper for New Jersey

12:43:51 3  State Police.  She works in the lab.  But I wasn't sure if

12:43:51 4  that was counted as immediate family member.

12:43:51 5          THE COURT:  And then we got a yes answer to

12:43:52 6  number 8 where you stated you may know some of the folks

12:43:52 7  that are presenting at the trial; is that right?

12:43:52 8          A JUROR:  So I used to work for Pepper Hamilton

12:43:52 9  before its merger, and I know Joanna Cline through work.

12:43:52 10  I'm an attorney.  I know her through work.  I also went to

12:43:52 11  high school with her and Doug Hermann who is I believe

12:43:52 12  Delaware counsel, he is not on the list, but I recognize

12:43:52 13  him, he and I worked very closely on the Board of Bar

12:43:52 14  Examiners.

12:43:52 15          THE COURT:  Is it also the case that you and I

12:43:52 16  took the bar together?

12:43:52 17          A JUROR:  It is, Your Honor, yes.  That was the

12:43:52 18  answer to the last question, Your Honor, I know the judge

12:43:52 19  presiding in this matter.

12:43:52 20          THE COURT:  Is it also the case that we went out

12:43:52 21  for drinks after finishing the bar exam?

12:43:52 22          A JUROR:  We did.  From what I remember.

12:43:52 23          THE COURT:  Yeah, it's a little fuzzy for me,

12:43:52 24  too.  Why don't I ask you to step out into the hall for a

12:43:52 25  minute, sir.

12:43:52 1                      A JUROR:  Okay.

12:43:52 2                      THE COURT:  Thanks.

12:43:52 3                      (Juror leaving the room.)

12:43:52 4                      THE COURT:  So Mr. Ditomo was on vacation.  I

12:43:52 5      think he could have asked to be delayed in light of the fact

12:43:52 6      that we have now extended this into the next week, I am

12:43:52 7      inclined to release people for vacation plans which it

12:43:52 8      sounds like he has.  If there is an objection, we can bring

12:43:52 9      him back in here and ask him the rest of the questions, but

12:43:52 10     I think that's a reason in and of itself to excuse him from

12:43:52 11     the panel.  Any objections to that?

12:43:52 12                     MS. MUNNINGS:  No, Your Honor.

12:43:52 13                     MR. WAN:  No.

12:43:52 14                     THE COURT:  All right.  We'll go ahead and

12:43:52 15     excuse Mr. Ditomo.

12:43:52 16                     COURTROOM DEPUTY:  Your Honor, juror number 22,

12:43:52 17     William Roca.

12:43:52 18                     THE COURT:  Okay.

12:43:52 19                     COURTROOM DEPUTY:  Yes responses to questions 1,

12:43:52 20     6, and 14.

12:43:52 21                     THE COURT:  Okay.

12:43:52 22                     (Juror entering the room.)

12:43:52 23                     THE COURT:  Please have a seat here, sir.  You

12:43:52 24     are juror number 22; is that right?

12:43:52 25                     A JUROR:  Yes.

12:43:52  1          THE COURT:  That makes you Mr. Roca; is that

12:43:52  2   right?

12:43:52  3          A JUROR:  Yes.

12:43:52  4          THE COURT:  You answered yes to my question

12:43:52  5   about whether or not the length of the trial or the schedule

12:43:52  6   presents a problem for you.

12:43:52  7          A JUROR:  So special, I live down in Rehoboth

12:43:52  8   and I work two jobs, one of which is during the day, one is

12:43:52  9   at night which is a restaurant, which I'm sure everyone

12:43:52 10   knows the restaurants are short staffed now, so if it does

12:43:52 11   run to we said 5:00 here, it takes me three hours to get

12:43:52 12   back because of traffic, I won't be able to work at the

12:43:53 13   restaurant, which might pose a problem for them because of

12:43:53 14   the short staffing, and might have to close, so on and so

12:43:53 15   forth.  It will be a ripple effect.

12:43:53 16          THE COURT:  Is it a restaurant that's open late

12:43:53 17   into the evening?

12:43:53 18          A JUROR:  It's open until about 10 o'clock.

12:43:53 19          THE COURT:  And you normally at that time going

12:43:53 20   to bed and get back up for your job at what time?

12:43:53 21          A JUROR:  5:00 a.m.

12:43:53 22          THE COURT:  Let me ask you about question number

12:43:53 23   6, which asked if you had any experiences with the Delaware

12:43:53 24   Department of Correction or relationships with Delaware

12:43:53 25   Department of Correction employees or inmates that would

12:43:53 1    make it difficult for you to be fair and impartial in this

12:43:53 2    case.

12:43:53 3            A JUROR:  So I am a Delaware veteran, Army

12:43:53 4    National Guard, 198 out of Georgetown.  I deployed in 2013

12:43:53 5    and a few of my comrades were correctional officers for

12:43:53 6    Delaware.

12:43:53 7            THE COURT:  Okay.  And so what about your

12:43:53 8    relationship with them, if anything, you think might make it

12:43:53 9    difficult for you to be fair and impartial?

12:43:53 10           A JUROR:  Just based on their, some of their

12:43:53 11   stories that they have told, the environment they were in

12:43:53 12   might make me go one way or the other, just based on that

12:43:53 13   knowledge.

12:43:53 14           THE COURT:  Do you think if I instructed you to

12:43:53 15   render a verdict based solely on the evidence in this case

12:43:53 16   that you would be able to do that?

12:43:53 17           A JUROR:  Yes.

12:43:53 18           THE COURT:  Let me ask you about question number

12:43:53 19   14, where it ask if you find that Mr. Pierce violated

12:43:52 20   Mr. Szubielski's constitutional rights would you have any

12:43:52 21   difficulty in awarding money damages to compensate

12:43:52 22   Mr. Szubielski, why don't you tell me your answer to that?

12:43:52 23           A JUROR:  I said yes without really knowing what

12:43:52 24   the case is about.  If it didn't impede the plaintiff to

12:43:52 25   make more money or lost money because of whatever happened,

12:43:53 1   then I don't think money should be awarded.

12:43:53 2                    THE COURT:  Okay.  Do you think if I instructed

12:43:53 3   you on how you would award damages in the case that you

12:43:53 4   would be able to follow those instructions?

12:43:53 5                    A JUROR:  If it didn't involve a monetary value,

12:43:53 6   yes.

12:43:53 7                    THE COURT:  Let me make sure I understand your

12:43:53 8   answer.  So if I told you that you could and should award

12:43:53 9   the plaintiff damages, even if he didn't lose any money in

12:43:55 10  the case, he just suffered injury, would you be able to

12:43:55 11  follow that instruction?

12:43:55 12                   A JUROR:  I don't think so.

12:43:55 13                   THE COURT:  Okay.  Any questions from counsel

12:43:55 14  for plaintiff?

12:43:55 15                   MS. COZEN:  No, Your Honor.

12:43:55 16                   THE COURT:  Any questions for counsel from

12:43:55 17  defendant?

12:43:55 18                   MR. WAN:  No, Your Honor.

12:43:55 19                   THE COURT:  We're going to have you step out

12:43:55 20  into the hall for a minute.

12:43:55 21                   (Juror leaving the room.)

12:43:55 22                   THE COURT:  Any applications?

12:43:55 23                   MS. COZEN:  Yes, Your Honor, we would move to

12:43:55 24  strike this juror for cause.  He openly said he would not be

12:43:55 25  able to apply the law as you instructed him.  He also

12:43:54 1    admitted that he has heard stories that might affect his

12:43:54 2    ability to be fair and impartial.  We don't think that's

12:43:54 3    appropriate.

12:43:54 4            MR. WAN:  I think his question about the

12:43:54 5    compensatory damage might be an issue.

12:43:54 6            THE COURT:  So the parties are in agreement that

12:43:54 7    the juror should be stricken and I agree as well.

12:43:54 8            COURTROOM DEPUTY:  Your Honor, juror number 23,

12:43:54 9    Jeffrey Lowden, yes answers to 1, 6, 14, and 17.

12:43:54 10           THE COURT:  Thank you.

12:43:54 11               (Juror entering the room.)

12:43:54 12           THE COURT:  Hello, sir.  You are juror number

12:43:54 13   23; is that right?

12:43:54 14           A JUROR:  Yes.

12:43:54 15           THE COURT:  That makes you Mr. Louden?

12:43:54 16           A JUROR:  Yes.

12:43:54 17           THE COURT:  So you answered yes to question

12:43:54 18   number 1 that asked about the length of the trial and the

12:43:54 19   schedule presenting a special problem for you.

12:43:52 20           A JUROR:  Yeah, I mean, I have a sales

12:43:52 21   commission job where I don't get paid if I'm not working, so

12:43:52 22   time off is really detrimental.

12:43:52 23           THE COURT:  Okay.  I understand.  Let me ask you

12:43:52 24   about number 6 which ask if you had any experiences with

12:43:52 25   Delaware Department of Correction or any relationships with

12:43:54 1    employees or inmates that would make it difficult for you to

12:43:54 2    be fair and impartial, why don't you tell us about that.

12:43:54 3              A JUROR:  My wife's cousin worked for the

12:43:54 4    Department of Corrections, so just, you know, that's the

12:43:54 5    relationship I have with one of the employees.

12:43:54 6              THE COURT:  Do you think your relationship with

12:43:54 7    your wife's cousin would make it hard for you to be fair and

12:43:54 8    impartial.

12:43:54 9              A JUROR:  I mean, I have heard stories and so

12:43:54 10   yes, short answer.

12:43:54 11             THE COURT:  Okay.  And let me ask you about

12:43:54 12   question number 14, which asked if you find that Mr. Pierce

12:43:54 13   violated Mr. Szubielski's constitutional rights would you

12:43:54 14   have any difficulty awarding money damages.  You answered

12:43:54 15   yes.

12:43:54 16             A JUROR:  Yeah.  I mean, again, I need to hear

12:43:54 17   the details, but hearing, you know, about people getting

12:43:54 18   free money is something that bothers me.

12:43:54 19             THE COURT:  Do you think if I instructed you

12:43:54 20   that you are to award damages if you find that damages are

12:43:54 21   appropriate in this case based the evidence that you would

12:43:54 22   be able to do that?

12:43:54 23             A JUROR:  Maybe.  I mean, again, I just feel a

12:43:54 24   certain way about people getting free money.

12:43:54 25             THE COURT:  Okay.  And you answered yes to

12:43:54 1    question number 17 which ask if you're selected to sit as a

12:43:55 2    juror, are you aware of any reason that you would be unable

12:43:55 3    to the render a verdict based on the evidence presented at

12:43:55 4    trial.

12:43:55 5              A JUROR:  Yeah.  I mean, again, with knowing my

12:43:55 6    relative that was in working for the Department of

12:43:55 7    Corrections and, you know, possibly looking to gain

12:43:55 8    financial compensation for the -- you know, out of the case,

12:43:55 9    I don't know, those things are just something that could

12:43:55 10   possibly make me unable to render a verdict based on the

12:43:55 11   evidence.

12:43:55 12             THE COURT:  Okay.  Any questions from counsel

12:43:55 13   for plaintiff?

12:43:55 14             MS. COZEN:  No, Your Honor.

12:43:55 15             THE COURT:  Any questions from counsel for

12:43:55 16   defendant?

12:43:55 17             MR. WAN:  No, Your Honor.

12:43:55 18             THE COURT:  We're going to have you step outside

12:43:55 19   for a minute.

12:43:55 20             A JUROR:  Thanks.

12:43:55 21             (Juror leaving the room.)

12:43:55 22             THE COURT:  Any application?

12:43:55 23             MS. MUNNINGS:  Yes.

12:43:55 24             MS. COZEN:  Yes, Your Honor.  We would move to

12:43:55 25   strike this juror for cause.  He openly admitted he was not

12:43:55 1    going to be fair and impartial based on stories he heard

12:43:55 2    from his wife's cousin and he stated he could not apply the

12:43:55 3    law or render a verdict based on the law that you are

12:43:55 4    instructing him on.

12:43:55 5              THE COURT:  All right.  Mr. Wan.

12:43:55 6              MR. WAN:  Yeah.

12:43:55 7              THE COURT:  All right.  I agree.  We will excuse

12:43:55 8    this juror.

12:43:55 9              COURTROOM DEPUTY:  Old neighbor to boot.

12:43:55 10             THE COURT:  The next one I have on my list by

12:43:55 11   the way is Ronald Simon -- wait, sorry, who did we just talk

12:43:55 12   to?

12:43:55 13             MS. McCOWAN:  Mr. Louden.

12:43:55 14             THE COURT:  The next one I have is Peter Slaton

12:43:55 15   and then Ronald Simmons.

12:43:55 16             COURTROOM DEPUTY:  Your Honor, juror number 24,

12:43:55 17   Peter Slaton.  No responses.  And that will make juror

12:43:55 18   number 14 on our list.

12:43:55 19             THE COURT:  We have number 14.  Do we want to

12:43:55 20   run through those now, Ms. Garfinkel, or what makes the most

12:43:55 21   sense?

12:43:55 22             COURTROOM DEPUTY:  I have our administrator

12:43:55 23   seating them in that order from the left side if you're

12:43:55 24   looking them from the bench.  Do you want to read their name

12:43:55 25   as well?

12:43:55 1          THE COURT:  Let's do that just for the record

12:43:55 2     and make sure we're all on the same page here.

12:43:55 3          COURTROOM DEPUTY:  Juror number 1, Carla

12:43:55 4     Cubbage.  Juror number 3, Amy Tracy.  Juror number 4,

12:43:55 5     Michael Whittaker.  Juror number 5, Michelle Crocker.  6,

12:43:55 6     Venkatesan Ranganathan.  Juror number 7, Vera Brown.  8,

12:43:55 7     Tyler Phommachanh.  Juror number 9, Catherine Fridell.

12:43:56 8     Juror 13, Juan Cabrera.  14, Tammy Brown.  16, Luigi

12:43:56 9     Schiavoni.  18, Denise Macleish.  20, Robert Campbell.  And

12:43:56 10    24, Peter Slaton.

12:43:56 11         THE COURT:  Okay.  So the way we're going to

12:43:56 12    proceed is this, we're going to go back into the courtroom

12:43:56 13    and I am going to announce to the venire that we're now

12:43:56 14    going to start the preemptory challenge process.  Each side

12:43:56 15    is going to get three preemptory challenges.  Ms. Garfinkel

12:43:56 16    is going to go back and forth with a clipboard.  Once we're

12:43:56 17    done with that, we're going to seat the eight who have not

12:43:56 18    been stricken in order in the jury box 1 through 8.

12:43:56 19         At that point in time, I'll bring counsel to

12:43:56 20    side-bar and ask you if there are any objections to how

12:43:56 21    we've conducted the jury selection process.  Once we're done

12:43:56 22    with that, we will excuse the remaining jurors in the

12:43:56 23    courtroom.  We'll have our eight.  We'll swear them in and

12:43:56 24    then we'll take a break.

12:43:56 25         Any questions about how we're going to proceed?

12:43:56  1          MS. COZEN:  Your Honor, would it be possible to

12:43:56  2  have a ten-minute break to consult among ourselves and with

12:43:56  3  our co-counsel?

12:43:56  4          THE COURT:  Ten minutes is fine, but I'll just

12:43:56  5  ask to hurry it up only because we've had the jurors here

12:43:56  6  for an extended period of time today and I want to cut them

12:43:56  7  loose to go to lunch before we get hungry jurors.

12:43:56  8          So we'll see you back in the courtroom in ten

12:43:56  9  minutes.

12:56:35 10          (A brief recess was taken.)

12:56:39 11          THE COURT:  Please be seated.

12:56:41 12          All right.  Ladies and gentlemen, now we're

12:56:42 13  going to move on to our preemptory challenge process.  Those

12:56:49 14  are challenges for which counsel can strike members from the

12:56:53 15  jury for no reason.

12:56:55 16          Ms. Garfinkel, can you begin the preemptory

12:57:00 17  challenge.

12:57:04 18          COURTROOM DEPUTY:  Yes.

12:57:09 19          MS. CLINE:  May I ask a clarifying question?  I

12:57:11 20  want to make sure there is a number written next to each

12:57:14 21  name, that's the juror's number?

12:57:30 22          COURTROOM DEPUTY:  That's the juror's number.

12:57:34 23          MS. CLINE:  Okay.  Thank you.

13:01:39 24          COURTROOM DEPUTY:  When I call your juror

13:01:42 25  number, please come forward.

13:01:48 1                    Juror number 1.  Ma'am, you're going to be in

13:01:52 2      the first row, first seat.  You can enter right here.  You

13:01:56 3      can go behind counsel, right up there.

13:02:00 4                    Juror number 4.  Sir, you'll be the first row,

13:02:15 5      the third seat.

13:02:16 6                    Juror number 6.  You'll also be in the first

13:02:39 7      row.

13:02:43 8                    Juror number 7.  Ma'am, you'll also be in the

13:02:55 9      first row.

13:02:55 10                   Juror number 9.  Ma'am, you will be in the

13:03:09 11     second row, first seat.

13:03:11 12                   Juror number 13.

13:03:44 13                   Juror number 16.

13:04:05 14                   And juror number 20.

13:04:31 15                   THE COURT:  Thank you, Ms. Garfinkel.  At this

13:04:33 16     time I would like to see counsel at side-bar.

13:13:44 17                        (Side-bar discussion.)

13:13:44 18                   THE COURT:  So for the record at this point we

13:13:44 19     have eight jurors seated in the box.  Do we have any

13:13:44 20     objections as to how the juror selection process was

13:13:44 21     conducted today?

13:13:44 22                   MS. CLINE:  Not from plaintiff.

13:13:44 23                   THE COURT:  No objection?

13:13:44 24                   MR. WAN:  No.

13:13:44 25                   THE COURT:  So what I intend to do at this point

13:13:44 1    is excuse the remaining jurors, we'll swear these jurors in

13:13:44 2    and we'll let them go for lunch and then we'll come back and

13:13:44 3    do preliminary jury instructions.

13:13:44 4              (End of side-bar.)

13:13:44 5              For those of you who are not needed in the jury

13:13:44 6    box, I want to thank you all for being here today and being

13:13:44 7    so patient and making yourselves available to serve.  You

13:13:44 8    will not be on the jury today.  You are free to collect your

13:13:44 9    things and go on about your day.  Again, thank you very

13:13:44 10   much.

13:13:44 11             For those of you seated in the jury box, the

13:13:44 12   first order of business is that we have another oath for to

13:13:45 13   you today.

13:13:45 14             COURTROOM DEPUTY:  Please stand and raise your

13:13:45 15   right hand.  You and each of you do solemnly swear, those of

13:13:45 16   you who swear, and you and each of you do affirm, those of

13:13:45 17   you who affirm, that you will well and truly try the issue

13:13:45 18   joined wherein Gerard Szubielski is plaintiff and David

13:13:45 19   Pierce is defendant, and that you will a true verdict render

13:13:45 20   according to the evidence, so help you God, those of you who

13:13:45 21   swear, and you do so affirm, those of you who affirm.  The

13:13:45 22   proper response is do.

13:13:45 23             THE JURY:  I do.

13:13:45 24             COURTROOM DEPUTY:  Thank you.  You may be

13:13:45 25   seated.

THE COURT:  So ladies and gentlemen of the jury, I am going to briefly tell you a few things right now and I will let you go off for lunch.  Ms. Garfinkel in a moment is going to show you our jury room.  It's right back here. We're actually in Judge Burke's courtroom right now because my courtroom is currently being constructed.  So if you're looking to come back tomorrow, remember that it's not going to be Judge Hall's courtroom because I am in a closet upstairs, it's going to be Judge Burke's courtroom here. The room is going to be yours to use throughout the course of the trial.  There are restrooms back there.  There is a telephone.  Ms. Garfinkel will explain all that to you and explain how to get in and out of chambers.  You will be released to find some lunch and we will expect you back here in about an hour.  It's 1:07 right now, so approximately at 2:15.

When you come back, I'm going to have some preliminary instructions for you and then we're going to let you go for the day.  But in those instructions I will tell you more about your duties as jurors in this case.

Then tomorrow we'll come back, start bright and early at 9:00 a.m. for opening statements and we'll go from there.  As I'll explain to you in a minute, every day you will be done no later than 5:00 p.m., some days you may be done sooner.  There will be a break in morning, a lunch

13:13:45 1    break, and a break in the afternoon.

13:13:45 2            A couple quick things before I let you go.

13:13:45 3    There should be no talking about the case until all the

13:13:45 4    evidence is concluded and you're deliberating, so among

13:13:45 5    yourselves and with your family or with anyone else, you

13:13:46 6    shall not talk about the case until I tell you that it's

13:13:46 7    okay to talk about the case.  Also, Ms. Garfinkel will

13:13:46 8    explain to you, please keep your juror stickers for

13:13:46 9    identification on when you're out and about.  This is

13:13:46 10   Wilmington so we have lawyers around and it's a small town,

13:13:46 11   we need to make sure you're identifying yourself when you're

13:13:46 12   out grabbing your lunch.  None of us involved in this case

13:13:46 13   are allowed to talk to you until the case is over.

13:13:46 14           So if you see anybody in the elevator going to

13:13:46 15   lunch or coming back and they don't say anything to you,

13:13:46 16   it's not because they're being rude, it's because they're

13:13:46 17   not permitted to.

13:13:46 18           With that, we'll have Ms. Garfinkel take you out

13:13:46 19   and we'll have you back at 2:15 for preliminary jury

13:13:46 20   instructions.  I'm sorry.  I need to ask one thing, which is

13:13:46 21   we're still at the tail end of the Covid-19 pandemic.  I can

13:13:46 22   tell you that I know for sure that some of you have been

13:13:46 23   vaccinated, I don't know about the rest of you.  I don't

13:13:46 24   know for sure that any of you have not been vaccinated, so

13:13:46 25   it's quite possible that you all or possible that one or

13:13:46 1   more of you are not.  When up get back to the jury room, you

13:13:46 2   should make a decision about whether or not you would like

13:13:46 3   to wear your masks for trial.  And the way that we're going

13:13:46 4   to do this is this, in this courtroom, if all of you agree

13:13:46 5   that you don't want to wear masks, we're going to have none

13:13:46 6   of you wear masks.  If one of you have agrees, or wants to

13:13:46 7   wear a mask, then everybody is going to wear a mask.  That's

13:13:46 8   how we're going to operate going forward.  I know that the

13:13:46 9   guidance is rapidly changing, but you have all come in

13:13:46 10  during a time in our country where we have dealt with some

13:13:46 11  challenges and I want everyone to feel comfortable rendering

13:13:46 12  their service as jurors.  We have had juries in the last

13:13:46 13  couple of weeks and no one has worn a mask.  We'll do our

13:13:47 14  best to keep you separated by at least three feet.  There

13:13:47 15  should be room in the jury room to keep you separated by at

13:13:47 16  least three feet.

13:13:47 17          If you prefer to eat your lunch elsewhere,

13:13:47 18  that's totally fine.  You can also eat your lunch in the

13:13:47 19  jury room.  But if there is no one on the jury panel that

13:13:47 20  would like us to wear masks, then that's what we're going to

13:13:47 21  do.  So let my courtroom deputy know how you intend to

13:13:47 22  proceed when you go back there as well.  With that, we'll

13:13:47 23  let you go back to the jury room.

13:13:47 24          (Jury the courtroom at 1:04 p.m.)

13:13:47 25          THE COURT:  Okay.  So we are going to let the

13:13:47 1    jurors go to lunch.  Why don't we do this, why don't we all

13:13:47 2    come back at 2 o'clock and then we can talk about anymore

13:13:47 3    information we have with respect to the jurors masking

13:13:47 4    status and decide what we want to do.  I can tell you what I

13:13:47 5    am inclined to do which is anyone who is at the podium

13:13:47 6    asking questions can take their mask off.  Anyone who is on

13:13:47 7    the witness stand can take their mask off.  If the jurors

13:13:47 8    determine they don't want to wear masks and are okay without

13:13:47 9    wearing masks, I'll put it to you to take them off if you

13:13:47 10   are vaccinated.  If you are not vaccinated, I would prefer

13:13:47 11   you to keep them on in the courtroom, notwithstanding any

13:13:47 12   other federal or state guidance.

13:13:47 13            Does anyone have any questions or statements

13:13:47 14   they want to put on the record about how they proceed with

13:13:47 15   masks?

13:13:47 16            MS. CLINE:  Not from us.

13:13:47 17            THE COURT:  Do you know from your client if he's

13:13:47 18   vaccinated?  If you want to say it on the record you don't

13:13:47 19   have to, but I'm not sure that that's going to be an issue

13:13:47 20   for your side.

13:13:47 21            MS. CLINE:  Our understanding is he's been

13:13:47 22   vaccinated.

13:13:47 23            THE COURT:  Mr. Wan, do you happen to know if he

13:13:47 24   has a preference for mask or not mask?

13:13:47 25            MR. WAN:  He wore his mask for the other trial,

13:13:47 1    but I think he's fine for the other way.

13:13:47 2               THE COURT:  I'll leave it for his option.  If he

13:13:47 3    wants to keep it on while's at the table or while he's on

13:13:47 4    the stand, that's his option.  I won't force anyone to take

13:13:47 5    their mask off if they don't want to.

13:13:47 6               Any other questions?  All right.  Very good.

13:13:47 7    We'll be in recess until 2:00.

14:02:55 8               (A lunch recess was taken.)

14:02:55 9               THE COURT:  Please be seated.  So I know for

14:03:10 10   sure there are a couple of things that we can address and

14:03:13 11   get out of the way in the few minutes that we got before we

14:03:16 12   bring the jury back in for preliminary instructions.  The

14:03:19 13   first is that it's my understanding that the jury has agreed

14:03:25 14   to go maskless.  I see Mr. Wan's position already.  Let the

14:03:36 15   record reflect, Mr. Wan is unmasked as he was permitted to

14:03:42 16   do and the other side has as well.  It's up to you to do

14:03:47 17   what you want.  If you want to keep it on, that's perfectly

14:03:52 18   appropriate.  I don't have a view either way.

14:03:54 19               Anyone have anything else they want to say about

14:03:57 20   concerns about witnesses wearing masks or not wearing masks

14:04:00 21   or how they want to proceed?

14:04:02 22               MS. CLINE:  We have no concerns.

14:04:02 23               MR. WAN:  No, Your Honor.

14:04:02 24               THE COURT:  Okay.  Well, unless anyone objects,

14:04:02 25   I am going to have the courtroom staff go maskless if they

choose to as well.  I can say for the record that all of my folks, including myself, have been vaccinated, so I don't have any concerns about that.

The second thing I wanted to get addressed was we had a concern from Mr. Wan about which side of the courtroom the plaintiff should be seated on.  So I took that under advertisement and we do need to have plaintiff sit on the other side of the courtroom.  And there is a number of reasons for that.  He will get brought in and out through this doorway right here that's right on the side.

We don't have to decide now if you want me to say something to the jury, but what I would ask is after we conclude today, you talk to each other and think about if there is something you do want me to say.  They may not even notice that you were on opposite sides especially since you haven't said anything to them yet or addressed them in any way.  If you just want to switch, it may call attention to it if we make a comment, but I'll let you discuss that among yourselves and see if you can agree.  And if you can't, we can take that up tomorrow morning before we start.

The other thing I had on my list was I had a question about the deposition read ins, and I'll just ask before the day that those are going to get read in that you let me know that those are coming.  I was wondering whether or not you want a deposition instruction read before those

14:05:48  1    read ins.  It seems it would be appropriate to do so

14:05:51  2    otherwise it may be confusing for the jury.

14:05:54  3              Does anyone have any thoughts about that?

14:05:56  4              MS. CLINE:  I think we agree with the Court that

14:05:58  5    we prefer the instructions to be read.

14:06:00  6              MR. WAN:  I think that makes sense.

14:06:01  7              THE COURT:  So I'll plan to do that.  It's going

14:06:03  8    to be the same one that we have in the final jury

14:06:06  9    instruction, but the only thing I might change is the tense

14:06:09 10    of the verb.  I can't remember exactly what it says.

14:06:16 11              Another thing I had on my list pertains to

14:06:19 12    business records.  As you saw in our final pretrial order

14:06:25 13    after the pretrial conference that we made some decisions

14:06:28 14    about exhibits.  Those were made based on the understanding

14:06:33 15    that there was no objection to any of the documents on the

14:06:36 16    basis that they failed to qualify as a business record.

14:06:39 17              If that's not the case, though, you should let

14:06:42 18    me know so that we can make sure to have the party who is

14:06:46 19    offering the record lay the foundation for them to be a

14:06:49 20    business record.  Does that make sense the way I had

14:06:52 21    expressed it?

14:06:54 22              I don't think anyone was objecting to those

14:06:57 23    documents on the basis that they didn't meet one of the

14:06:58 24    elements of the record.  I think there were other objections

14:07:01 25    including whether or not it was hearsay within hearsay and

14:07:04 1   whether or not they were prejudicial under Rule 403, but I

14:07:08 2   didn't hear anything say this form was a form that was

14:07:11 3   regularly kept by a prison and, therefore, it can't be a

14:07:14 4   business record.  Am I misunderstanding what these receipts

14:07:18 5   were about?

14:07:18 6             MS. MUNNINGS:  No, Your Honor.

14:07:19 7             THE COURT:  Work with each other and make sure

14:07:21 8   you let me know ahead of time whether or not there is going

14:07:23 9   to be an objection on that basis so that we can make sure

14:07:27 10  the other side lays a foundation and we didn't have to deal

14:07:30 11  with it at trial.

14:07:31 12            MS. SONG:  Your Honor, Rebecca Song for the

14:07:34 13  record.

14:07:34 14            Just so I understand, if a party tries to the

14:07:38 15  admit what we -- what may be a business record, we still

14:07:43 16  need to lay a foundation and if we don't, then it's

14:07:46 17  objectionable.

14:07:46 18            THE COURT:  If the other side agrees that there

14:07:48 19  is no objection, then you can just admit it without laying a

14:07:51 20  foundation.  But I had assumed there was no objection on

14:07:55 21  that basis, but I also didn't ask, so I just wanted to let

14:07:55 22  you know that I hadn't made a ruling that those are business

14:08:02 23  records.  They looked to me like they were.  See if you can

14:08:02 24  get it worked out among yourselves, otherwise we take it up

14:08:02 25  on the day of.

14:08:11  1          MS. SONG:  Thank you, Your Honor.

14:08:12  2          THE COURT:  That's everything I had on my list

14:08:13  3   for today.  Anything anybody else wants to take up right now

14:08:16  4   before we bring them in?

14:08:19  5          MS. CLINE:  A couple of housekeeping items for

14:08:21  6   us, just to be triple checked to make sure nothing on our

14:08:25  7   end requires to get Mr. Szubielski here.

14:08:28  8          THE COURT:  I believe we are issuing a writ, a

14:08:34  9   habeas corpus today.  Is that something that the state, you

14:08:37 10   know, Mr. Wan, can just take and have the plaintiff produced

14:08:44 11   tomorrow, do you happen to know?

14:08:47 12          MS. McCOWAN:  I'm happy to speak because I was

14:08:49 13   the liaison.  I know that myself and DOC's counsel which is

14:08:55 14   within DOJ had communicated with the prison and we're all on

14:08:59 15   the same page that he will be transported tomorrow.  I seen

14:09:03 16   an e-mail that confirms that.  I don't know or haven't been

14:09:06 17   told that there is anything else that we need to do.

14:09:09 18          The last I heard was that there was something

14:09:15 19   with the marshal's office and it seems on this e-mail that

14:09:12 20   that has happened, but I don't have 100 percent clarity that

14:09:22 21   everything tomorrow will go smoothly.

14:09:25 22          THE COURT:  I do know when there is prisoners,

14:09:28 23   there has to be coordination.  It's my understanding based

14:09:30 24   on some of the discussions that were had today that, in

14:09:35 25   fact, he doesn't get transferred into marshal's custody but

14:09:39 1  remains in state's custody, but there still has to be

14:09:42 2  coordination by the marshal's office, so that's the holdup

14:09:46 3  with making sure all that can happen.

14:09:48 4          Do you happen known what time they're able to

14:09:50 5  bring him over?  Will he be able to be here at 8:30?

14:09:56 6          MS. McCOWAN:  I am not aware.  We can make the

14:09:58 7  request.  We did provide the number that the marshal service

14:10:01 8  gave us to facilitate the transfer and we did make it clear

14:10:05 9  that the trial was supposed to last three business days so

14:10:09 10  that he should be available here Thursday, Friday, and

14:10:12 11  Monday.  So if 8:30 is the time, I'm happy to convey that

14:10:17 12  information.

14:10:17 13          THE COURT:  Ms. Cline, anything you want to say

14:10:19 14  about that?

14:10:20 15          MS. CLINE:  That would be great.

14:10:21 16          THE COURT:  Thank you so much.  Anything else?

14:10:25 17          MS. CLINE:  Two more quick ones.  We're having a

14:10:29 18  little struggle with the Court's WiFi.  Is there a member of

14:10:32 19  your staff who we may connect with after the jury leaves?

14:10:36 20          THE COURT:  Absolutely.  I will connect you with

14:10:38 21  Ms. Garfinkel after we excuse the jury for today, and she

14:10:42 22  should be able to get you in touch with the court's IT

14:10:45 23  staff.  I don't know if it's a password issue or a signal

14:10:48 24  issue, but we can try to get that through for you.

14:10:52 25          MS. CLINE:  Perfect.

14:10:52  1          We were wondering whether we could get a list of

14:10:55  2   the jurors as impaneled.

14:10:58  3          THE COURT:  Yes, we can do.  Do you have the

14:11:09  4   list in alphabetical?

14:11:11  5          MS. CLINE:  We have the alphabetical, but not

14:11:14  6   the one that is assigned juror numbers.

14:11:16  7          THE COURT:  I'm going to direct you to my law

14:11:19  8   clerk afterwards and she can walk you through it.  I have

14:11:23  9   got a list as well.

14:11:24 10          MS. CLINE:  Thank you.

14:11:25 11          THE COURT:  Mr. Wan.

14:11:26 12          MR. WAN:  Your Honor, two things.  Really, one.

14:11:28 13   I think we said the jury, are we going to start evidence at

14:11:31 14   9:00 and have us be here at 8:30 or were we going to be here

14:11:36 15   at 9:00 and start at 9:00?

14:11:38 16          THE COURT:  Yeah, because they were inconsistent

14:11:40 17   in the voir dire and preliminary jury instructions, weren't

14:11:44 18   they?  Let's have us all come at 8:30 tomorrow morning and

14:11:48 19   then we'll get started with opening statements at 9:00.

14:11:52 20          MR. WAN:  And the last thing I had was I was

14:11:55 21   going to -- I generally use a podium to address the jury in

14:11:58 22   openings.  Is there like another one, a mini one that comes

14:12:02 23   in, or we'll just try to use this.

14:12:06 24          THE COURT:  So we thought about this.  The fact

14:12:06 25   that the jury has now agreed to remove their masks does make

14:12:13 1    a difference to me.  I prefer that parties stay in a box

14:12:19 2    that goes no farther away from the podium than where the

14:12:24 3    court reporter is sitting.  So you're free to walk around

14:12:28 4    here.  If you want to bring in your own podium, that's fine

14:12:32 5    as well.

14:12:32 6             MR. WAN:  I didn't know -- in state court they

14:12:35 7    have a separate small one you see.  I don't know if it's

14:12:38 8    called a lectern.  I didn't know if the court had one.

14:12:42 9             THE COURT:  I know that the U.S. attorneys'

14:12:45 10   office has a podium that they take out of the closet and

14:12:48 11   bring over, it's not one you want.

14:12:51 12            MR. WAN:  Thank you, Your Honor.

14:12:54 13            THE COURT:  So you're welcome to walk here.  I

14:12:57 14   ask that you not get too close -- you're going to be seated

14:13:01 15   on opposite sides, but I ask that you not get too close to

14:13:05 16   the other side's counsel table.  There is a little room to

14:13:08 17   move.  I don't want anyone getting to close to jury.

14:13:12 18            MR. WAN:  I can stand at the side just so I'm

14:13:15 19   facing them, Your Honor.

14:13:16 20            THE COURT:  Any other questions?  I believe that

14:13:21 21   Ms. Garfinkel is waiting back in chambers to let all the

14:13:25 22   jurors in, and she's going to bring them out.  I'm going to

14:13:30 23   stay here at the bench but you should feel free to do what

14:13:34 24   you need to do.

14:24:12 25            (A brief recess was taken.)

14:24:14  1          THE COURT:  Ms. Garfinkel is going to bring in

14:24:17  2   the jury.

14:24:18  3          (Jury entering the courtroom at 2:24 p.m.)

14:25:37  4          THE COURT:  Please be seated.  Welcome back,

14:25:48  5   ladies and gentlemen of the jury.  Ms. Garfinkel, my deputy,

14:25:51  6   is going to hand each of you a copy of a document called

14:25:55  7   preliminary jury instructions and the first thing we're

14:25:58  8   going to do in this trial is I am going to read this

14:26:02  9   document to you.

14:26:09 10          So you each have your own copy and that will be

14:26:13 11   yours to keep throughout the trial.  You're free to follow

14:26:17 12   along and read from the paper or you can put it down and

14:26:20 13   listen if you prefer, whatever you like.

14:26:23 14          Ladies and gentlemen, now that you have been

14:26:28 15   sworn, I have the following preliminary instructions for

14:26:32 16   your guidance as jurors in this case.  You will hear the

14:26:36 17   evidence, decide what the facts are, and then apply those

14:26:40 18   facts to the law that I will give you.  You, and only you,

14:26:44 19   will be the judges of the facts.  You will have to decide

14:26:48 20   what happens.  I play no part in judging the facts.  You

14:26:52 21   should not take anything I may say or do during the trial as

14:26:56 22   indicating what I think of the evidence or what your verdict

14:27:02 23   should be.  My role is to be the judge of the law.  I make

14:27:02 24   whatever legal decisions have to be made during the course

14:27:07 25   of the trial and I will explain to you the legal principles

that must guide you in your decision.  You must follow that law whether you agree with it or not.

I will now give you a brief overview of who the parties are and what each contends.  The plaintiff is Gerard Szubielski who had been incarcerated at the James T. Vaughn Correctional Center in Smyrna, Delaware during the relevant time period.  During the trial you may hear Mr. Szubielski referred to by his name, or as plaintiff.  You may also hear the James T. Vaughn Correctional Center referred to as Vaughn or JTVCC.  The defendant is David Pierce who was a warden at the James T. Vaughn Correctional Center during the relevant time period.  During the trial, you may hear Mr. Pierce referred to by his name or defendant.

Mr. Szubielski alleges a violation of his constitutional rights under the First Amendment of the United States Constitution.  Specifically, Mr. Szubielski brings a claim under Title 42, United States Code Section 1983, which I may refer to as Section 1983, alleging that Mr. Pierce violated Mr. Szubielski's First Amendment rights by retaliating against him.

Mr. Szubielski alleges that he participated as an exemplar in a lawsuit against the Delaware Department of Corrections, challenging the use of solitary confinement to house prisoners suffering from mental disease.  An exemplar means that the court papers in that case described

Mr. Szubielski's time classified in the most restrictive
maximum security housing unit, the solitary housing unit,
the SHU, and his mental health treatment throughout that
period.

     Mr. Szubielski claims that as a result of
Mr. Szubielski serving as an exemplar, Mr. Pierce retaliated
against him by ignoring the recommendation of prison staff
to reclassify Mr. Szubielski to medium security by vetoing
his reclassification issue.  Mr. Pierce contends that he did
not retaliate against Mr. Szubielski for his participation
as an exemplar in a lawsuit, nor for any other First
Amendment reasons.

     Mr. Pierce contends that at the time he vetoed
Mr. Szubielski's reclassification, he was unaware of
Mr. Szubielski's participation in a lawsuit as
Mr. Szubielski was not identified by name in the lawsuit,
and Mr. Pierce had not seen a copy of the lawsuit at the
time of the veto.  Mr. Pierce contends that he vetoed
Mr. Szubielski's reclassification to medium security for
other reasons.

     I will give you detailed instructions on the law
at the end of the case and those instructions will control
your deliberations and decision.  But, in order to help you
follow the evidence, I will now give you a brief summary of
the elements which plaintiff must prove to make its case.

Mr. Szubielski is suing under Section 1983, a civil rights law passed by congress that provides the remedy to persons who have been deprived of their federal constitutional rights under color of state law.  To prevail, Mr. Szubielski must prove that while acting under the color of state law, Mr. Pierce deprived Mr. Szubielski of a federal constitutional right.

To succeed under this claim, under section 1983, Mr. Szubielski must prove the following by a preponderance of the evidence.  First, Mr. Szubielski must prove that he engaged in constitutionally protected conduct, a person's right to sue.  Lawsuit is conduct that is protected by the constitution.

Second, Mr. Szubielski must demonstrate that he suffered as adverse action.  An adverse action is an action that deters an ordinary person from engaging in constitutionally protected conduct.

Third, Mr. Szubielski must show that the protected conduct was a substantial or motivating factor in the prison official's decision to take an adverse action.

Again, I will give you detailed instructions on the law at the end of the case.

Now, a few words about your conduct as jurors. First, I instruct you that during the trial and until you have heard all of the evidence and retired to the jury room

14:32:14 1    to deliberate, you are not to discuss the case with anyone,

14:32:17 2    not even amongst yourselves.  If anyone should try to talk

14:32:22 3    to you about the case, including a fellow juror, bring it to

14:32:25 4    my attention promptly.  There are good reasons for this ban

14:32:28 5    on discussion, the most important being the need for you to

14:32:31 6    keep an open mind through the presentation of evidence.

14:32:35 7          I know that many of you use cell phones, smart

14:32:39 8    phones and other portable electronic devices, laptop, tablet

14:32:45 9    and other computers both portable and fixed and other groups

14:32:48 10   of technologies to access the internet and communicate with

14:32:52 11   others.  You must not talk to anyone about this case or use

14:32:55 12   a tool to communicate electronically about this case.  This

14:33:00 13   includes your family and friends.  You may not communicate

14:33:03 14   orally about the case on your cell phone, smartphone or

14:33:06 15   portable or fixed computer or device of any kind or use

14:33:10 16   these devices to communicate electronically by messages or

14:33:15 17   postings at any time, including e-mail, instant message,

14:33:19 18   text, services such as Twitter or through any blog, website,

14:33:24 19   internet chatroom or by way of any other social networking

14:33:28 20   site or services including Facebook, LinkedIn, SnapChat,

14:33:34 21   YouTube.  If any lawyer, party, or witness does not speak to

14:33:38 22   you when you pass in the hall, ride the elevator or the

14:33:41 23   like, remember, it is because he or she is not supposed to

14:33:42 24   talk or visit with you, either.  That is why you are asked

14:33:42 25   to wear your juror tag, it shows that you are someone who is

14:33:54 1    not to be approached in any way.

14:33:56 2            Second, do not read or listen to anything

14:33:58 3    related to this case that is not admitted into evidence.  By

14:34:04 4    that I mean if there is a newspaper article or radio or

14:34:07 5    television report related to this case, do not read the

14:34:11 6    article or watch or listen to the report.  In addition, do

14:34:15 7    not try to do anything independently or do an investigation

14:34:19 8    on your own on matters related to the case, the parties in

14:34:22 9    this case or the type of case.  Do not use party or

14:34:28 10   witnesses involved with this case.  You are to decide the

14:34:32 11   case upon the evidence produced at trial.  In other words,

14:34:36 12   you should not consult dictionaries or reference materials,

14:34:39 13   search the internet, websites, blogs, or use any other

14:34:43 14   electronic tools to obtain information about this case, or

14:34:47 15   to help you decide the case.  Please do not try to find out

14:34:51 16   information from any source outside the confines of this

14:34:54 17   courtroom.  Again, do not reach any conclusion on the

14:35:00 18   plaintiff or the defendant until all of the evidence is in.

14:35:03 19   Keep an open mind until you start your deliberations at the

14:35:06 20   end of the case.

14:35:08 21           Finally, if any member of the jury has a friend

14:35:11 22   or family member who is in attendance at this public trial,

14:35:16 23   that visitor must first register with my Court because of

14:35:21 24   special rules.  You may not discuss any aspect of this trial

14:35:25 25   with a visitor nor may I permit the visitor to discuss it

with you.

I will also inform you as to those general rules that will govern the discharge of your duties as jurors in this case.  It will be your duty to find from the evidence what the facts are.  You, and you alone, will be the judges of the facts.  You will then have to apply those facts to the law as I will give it to you both during these preliminary instructions and at the close of the evidence. You must follow that law whether you agree with it or not. Again, of course, you are bound by your oath as jurors to follow these and all the instructions that I give you, even if you personally disagree with them.  All the instructions are important and you should consider them together as a whole.  Perform these duties fairly.  Do not let bias, sympathy, or prejudice that you may feel toward one side or the other influence your decision in any way.

Also, do not let anything that I may say or do during the course of the trial influence you.  Nothing that I may say or do is intended to indicate, or should be taken by you as indicating what your verdict should be.

During the trial it may be necessary for me to talk with the lawyers out of your hearing by having a bench conference.  If that happens, please be patient.  We are not trying to keep important information from you.  These conferences are necessary for me to fulfill my

responsibility which is to be sure that evidence is presented to me correctly under the law.

We will, of course, do what we can to keep the number and length of these conferences to a minimum.  I may not always grant an attorney's request for a conference.  Do not consider my granting or denying my granting of a conference as my opinion of the case or what your verdict should be.

The evidence from which you are to find the facts consist of the following:

1.  The testimony of the witnesses or reference transcript;

2.  Documents or other things such as exhibits;

3.  Any facts that are stipulated, that is formally agreed to by the parties; and

4.  Any facts that are traditionally noticed, that is facts I say you must accept as true even without other evidence.

The following things are not evidence:

1.  Statements, arguments and questions of the lawyers to the parties in this case;

2.  Objections by lawyers;

3.  Any testimony I tell you to disregard; and

4.  Anything you may see or hear about this case outside of the courtroom.

You must make your decision based only on the evidence that you see and hear in court.  Do not let rumor, suspicions or anything else you may see or hear from outside of court influence your decision in any way.  You should use your common sense in weighing the evidence.  Consider it in light of your every day experience with people and events and give it whatever weight you believe it deserves.  If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

There are rules that control what can be received into evidence.  When a lawyer ask a question or offers an exhibit into evidence and the lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object.  This simply means that the lawyer is asking I make a decision on a particular rule of evidence.  You should not be influenced by the fact that an objection is made.  Objections to question are not evidence.  Lawyers have an obligation to their clients to make objections when they believe that evidence being offered is improper under the rules of evidence.

You should not be influenced by the objections or by the Court's ruling on it.  If the objection is sustained, ignore the question.  If it is overruled, if you are instructed that some item of evidence is received for a

limited purpose only, you must follow that instruction.
Also, certain testimony or other evidence may be ordered
struck from the record and you will be instructed to
disregard this evidence.  Do not consider any testimony or
other evidence that gets struck or excluded.  Do not
speculate about what a witness might have said or what an
exhibit might have shown.

Do not be concerned about whether evidence is
direct evidence or circumstantial evidence.  You should
consider and weigh all of the evidence that is presented to
you.  If your experience tells you that certain evidence
reasonably leads to a conclusion, you are free to reach that
conclusion.

In deciding what the facts are, you may have to
decide what testimony you believe and what testimony you do
not believe.  You are the sole judges of the credibility of
the witnesses.  You may believe everything a witness says,
only part of it, or none of it.  In deciding what to
believe, you may consider a number of factors including the
following:

1.  The opportunity and ability of the witness
to see, hear, or know the things that the witness testifies
to;

2.  The quality of the witness' understanding or
memory;

3.   The witness' manner while testifying;

4.   Whether the witness has an interest in the outcome of the case or any motive, bias or prejudice;

5.   Whether the witness is contradicted by anything the witness said or wrote before trial or by other evidence;

6.   How reasonable the witness's testimony is when considered in the light of other evidence that you believe; and

7.   Any other factors that bear on believability.

A deposition is the sworn testimony of a witness taken for trial.  The witness is placed under oath and swears to tell the truth, and lawyers for each party may ask questions.  A court reporter is present and records the questions and answers.  Deposition testimony is entitled to the same consideration and is to be judged insofar as possible in the same way as if the witness had been present and testified.  Do not place any significance on the behavior or tone of voice of any person reading the questions and answers.  Only the lawyers and I are allowed to ask questions of witnesses.  You are not permitted to ask questions of witnesses.

During the trial, I will permit you to take notes.  A word of caution is in order.  There is always a

14:42:36 1    tendency to attach undue importance to matters which one has

14:42:41 2    written down.   Some testimony which is considered

14:42:44 3    unimportant at the time presented and thus not written down

14:42:47 4    takes on greater importance later in the trial in light of

14:42:51 5    all the evidence presented.   Therefore, you're instructed

14:42:55 6    that your notes are only a tool to aid your own individual

14:42:59 7    memory.   You should not compare your notes with other

14:43:02 8    jurors' concept of any testimony or evaluating the

14:43:07 9    importance of any evidence.   Your notes are not evidence and

14:43:10 10   are by no means a complete outline of the proceedings or a

14:43:13 11   list of the highlights of the trial.   Above all, your memory

14:43:17 12   should be your greatest asset when it comes time to deliver

14:43:21 13   and render a decision in this case.   If you do take notes,

14:43:25 14   leave them in your seats.   At the end of the day my deputy

14:43:29 15   will collect them and return them to your seat the next day.

14:43:32 16   Remember, they are only for your own personal use.

14:43:36 17           I will give you detailed instructions on the law

14:43:38 18   at the end of the case and those instructions will control

14:43:41 19   your deliberations.

14:43:45 20           This is a civil case.   Mr. Szubielski is a party

14:43:50 21   that brought this lawsuit.   Mr. Pierce is a party against

14:43:54 22   whom the lawsuit was filed.   Mr. Szubielski has a burden of

14:43:58 23   proving the claims of his case by what is called the

14:44:02 24   preponderance of the evidence.   That means Mr. Szubielski

14:44:05 25   has to prove to you that in light of all the evidence, what

he claims to be true is more likely than not true.  To say it differently, if you were to put the evidence favorable to Mr. Szubielski and the evidence favorable to Mr. Pierce on opposite sides of the scales of justice, Mr. Szubielski would have to make the scales tip somewhat slightly to his side.  If Mr. Szubielski fails to meet this burden, the verdict must be for Mr. Pierce.  If Mr. Szubielski meets the burden, the verdict must be for him.

If you find after considering all the evidence that a claim or fact is more likely so than not so, then the claim or fact has been proving by a preponderance of the evidence.

In determining whether any facts has been proved by a preponderance of the evidence in the case, you may unless otherwise instructed consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.  On certain issues, called affirmative defenses, a defendant has the burden of proving the elements of the defense by a preponderance of the evidence.  If Mr. Pierce asserts an affirmative defense, I will instruct you on the facts that will be necessary for you to find on this affirmative defense.  An affirmative defense is proven if you find after considering all evidence in the case that Mr. Pierce has succeeded by proving that the required facts

14:45:48 1  are more likely so than not so.

14:45:50 2          You may have heard of the term proof beyond a

14:45:54 3  reasonable doubt.  That is a stricter standard of proof and

14:45:57 4  it applies only in criminal cases.  It does not apply in

14:46:02 5  civil cases.  And as such, you should put it out of your

14:46:06 6  mind.

14:46:06 7          The trial will proceed in the following manner.

14:46:09 8  First, the attorney for Mr. Szubielski will make his opening

14:46:12 9  statement to you.  Next, the attorney for Mr. Pierce will

14:46:15 10 make an opening statement.  What is said in opening

14:46:19 11 statement is not evidence, but is simply an outline to help

14:46:24 12 you understand what each party expects the evidence to show.

14:46:29 13         Once the attorneys have made their opening

14:46:32 14 statement, each party is given an opportunity to present its

14:46:35 15 evidence.  Mr. Szubielski goes first because Mr. Szubielski

14:46:38 16 has the burden of proof.  Mr. Szubielski will present

14:46:41 17 witnesses who counsel for Mr. Pierce may cross-examine.  And

14:46:46 18 Mr. Szubielski may also present evidence such as documents

14:46:50 19 and testimony.

14:46:51 20         Following Mr. Szubielski's case, Mr. Pierce may

14:46:55 21 present evidence.  Counsel for Mr. Szubielski may

14:47:01 22 cross-examine witnesses for the defense.  After the party's

14:47:03 23 main case is presented, they may be permitted to present

14:47:04 24 what is called rebuttal evidence.

14:47:05 25         After all the evidence has been presented, I

will again instruct you on the law and then the attorneys

will present to you closing arguments to summarize in a way

that is helpful to their client's position.  As with opening

statements, closing arguments are not evidence, but rather

evidence of the case from the perspective of each party.

Once the closings arguments are completed, I

will then instruct you on the law for a final time.  After

that, you will retire to the jury room to deliberate on your

verdict in this case.

So you have heard me say this during voir dire.

I want to again outline the schedule I expect to maintain

during the course of the trial.  This case is expected to

take three days to try.  We will normally begin a day at

9:00 a.m. promptly.  So I may have said during voir dire

that we anticipated starting at 9:30 tomorrow, but we are

going to try to start at 9:00 a.m., we will go until

approximately 1:00 p.m. and after a one-hour break we'll

return from 2:00 p.m. to 4:30 p.m., there will be a

fifteen-minute break at morning and another fifteen minute

break at afternoon.  The only significant exception to this

schedule may occur when the case is submitted to you for

deliberation.  On that day, the proceedings might last

beyond 5:00 p.m.

We will post a copy of your schedule for your

convenience in your jury room.  Please keep in mind this is

14:48:51  1    a timed trial.  That means I have allocated each party a

14:48:55  2    maximum number of hours in which to present all portions of

14:48:58  3    its case.  That allows me to assure you that this case is

14:49:02  4    expected to be completed by Monday.  In fact, you can help

14:49:04  5    us stay on schedule by getting here promptly each morning

14:49:09  6    and being ready to proceed at the end of each break.

14:49:12  7              And with that, I will release you for the day.

14:49:20  8    We will see you back here at 9:00 a.m. tomorrow.  We'll

14:49:25  9    anticipate getting started bright and early with opening

14:49:29 10    statements.

14:49:30 11              Ms. Garfinkel, you may take the jury out.

14:49:33 12              (Jury leaving the courtroom at 2:49 p.m.)

14:49:50 13              THE COURT:  Please be seated.  Is there anything

14:50:11 14    else we need to address this afternoon?

14:50:14 15              MS. CLINE:  Just one more question.  So as I

14:50:16 16    understand it, tomorrow we're going to flip so we'll be over

14:50:19 17    here with Jerry, and the question about how he is going to

14:50:22 18    be escorted or how he is going to transport himself to the

14:50:26 19    witness box in front of the jury.

14:50:28 20              THE COURT:  We did wonder about that.  There is

14:50:30 21    a couple of possibilities and I would be open to hear

14:50:34 22    counsel's position on them.  If you wanted to have him walk

14:50:37 23    up to the jury box, we can have the jury here and when you

14:50:41 24    call him, we can find out from whoever has custody of this

14:50:45 25    person how they can safely get him up there.  The other

14:50:49 1    possibility is if you wanted, we could send the jury out and

14:50:55 2    have him situated and then have him already up on the stand

14:50:58 3    and bring the jury back in.

14:51:00 4              MS. CLINE:  Do you know whether he'll be

14:51:03 5    shackled at the wrist or the feet?

14:51:05 6              THE COURT:  I unfortunately don't know that.

14:51:07 7              Ms. McCowan?

14:51:09 8              MS. McCOWAN:  I believe he will.

14:51:10 9              THE COURT:  Be shackled at both his wrist and

14:51:12 10   his feet?

14:51:13 11             MS. CLINE:  During testimony as well.

14:51:15 12             MS. McCOWAN:  I would assume so.

14:51:20 13             MS. CLINE:  May I consult?

14:51:22 14             THE COURT:  Yes.

14:51:38 15             MS. CLINE:  Your Honor, so we are -- if it

14:51:41 16   pleases the Court, I think it would be best if

14:51:44 17   Mr. Szubielski was brought to the stand before the jury was

14:51:47 18   brought in.  And then just a related question.  We had

14:51:50 19   spoken with Judge Andrews about getting him a long sleeve

14:51:52 20   T-shirt to cover up the tats and I don't know how it's going

14:51:56 21   to work with handcuffs, but we were hoping to meet with him

14:52:01 22   before the trial started so he can put that on.

14:52:03 23             THE COURT:  I do remember seeing that in the

14:52:05 24   transcript.

14:52:06 25             Ms. McCowan, do you have an understanding of how

14:52:09  1    we can proceed with that?

14:52:10  2              MS. McCOWAN:  From what I understand, I don't

14:52:13  3    know that we were aware that you were going to be giving him

14:52:16  4    one.  I think he may have already had one.

14:52:20  5              MR. SHIEKMAN:  Excuse me.  I met with him.

14:52:21  6    Larry Shiekman, also for Mr. Szubielski.  I met with him at

14:52:26  7    the prison yesterday.  He does not have a T-shirt.  We have

14:52:29  8    one here.  We're happy to give it to the lawyers and they

14:52:33  9    can make arrangements, we're happy to deliver it to the

14:52:35 10    marshals now and they can search it.  It's in a Target bag

14:52:39 11    from which someone purchased it for him.

14:52:41 12              THE COURT:  I'm wondering whether, because I

14:52:44 13    assume they can unshackle him when he's in the holding cell,

14:52:48 14    I wouldn't think he would be shackled the whole time when

14:52:52 15    he's done here, so I could be wrong about that.

14:52:54 16              MS. McCOWAN:  I'm not sure.

14:52:55 17              THE COURT:  It is my understanding that Judge

14:52:58 18    Andrews issued an order that was permitting this, so we need

14:53:00 19    to try to figure out a way to make it happen.  I prefer not

14:53:02 20    to reopen it, but we don't have enough information right

14:53:02 21    now.

14:53:10 22              MR. WAN:  If they're able, hopefully we can try

14:53:11 23    to coordinate.  They should be able to speak with them

14:53:14 24    tomorrow morning I think before trial, so maybe at that

14:53:15 25    time, or maybe now bring it to the marshals, okay, he's

14:53:23  1    supposed to wear this long sleeve shirt.  I'm only speaking

14:53:27  2    from my experience from state court where we go down to

14:53:30  3    speak with prisoners, they want some type of exchange there,

14:53:34  4    I don't know how it is with U.S. Marshals.

14:53:37  5                THE COURT:  If there is a question about that,

14:53:39  6    we can take it up tomorrow morning if it becomes an issue,

14:53:42  7    and we can bring the folks in here and see if there is some

14:53:45  8    way we can work this out.  It seems to me, and again, I'm

14:53:48  9    not a federal agent, I don't know what their plan is, but it

14:53:51 10    seems to me if he's unshackled and in the cell in the

14:53:55 11    morning there ought to be some kind of opportunity to do a

14:53:58 12    quick change, but we'll take it up tomorrow.

14:54:01 13                MR. SHIEKMAN:  I'll go down as soon as court is

14:54:03 14    over today and explain to the marshal what we're doing.  I

14:54:08 15    can leave the T-shirt with them or bring it back.

14:54:10 16                THE COURT:  All right.  So what might make the

14:54:18 17    most sense is for us to plan on doing the opening statements

14:54:21 18    right in the morning and then taking a quick break.

14:54:24 19                Do we have a sense, and you don't have to tell

14:54:26 20    me, about how long the opening statements are going to take

14:54:30 21    for each side?

14:54:31 22                MS. MUNNINGS:  About thirty minutes, Your Honor.

14:54:33 23                THE COURT:  Okay.

14:54:34 24                MR. WAN:  Five minutes.

14:54:35 25                THE COURT:  Okay.  All right.  Well, we'll take

14:54:38   1   a quick brief break after those are done if he intends to be

14:54:43   2   your first witness.

14:54:44   3              I don't have a recollection if there was a

14:54:47   4   ruling in the pretrial order about exchange of opening

14:54:53   5   statement slides or exhibits the night before.  Do you have

14:54:58   6   slides and is there going to be an exchange to the other

14:55:01   7   side?

14:55:01   8              MS. MUNNINGS:  We do not anticipate using

14:55:04   9   slides.

14:55:04  10              THE COURT:  Does the state?

14:55:05  11              MR. WAN:  No, Your Honor.

14:55:06  12              THE COURT:  That makes things easy.  Very good.

14:55:09  13   All right.  Anything else?

14:55:12  14              MS. SONG:  Your Honor, there is one matter about

14:55:14  15   impeachment evidence.  We all know Mr. Szubielski has a

14:55:23  16   record, and I had provided written notice to plaintiff's

14:55:26  17   counsel on the use of conviction record, I wasn't sure if

14:55:31  18   this was the appropriate time to raise that.  I do believe

14:55:35  19   plaintiff's counsel is objecting.

14:55:38  20              THE COURT:  Is there going to be an objection to

14:55:40  21   the use of a prior criminal conviction as impeachment.

14:55:42  22              MR. SHIEKMAN:  Again, Larry Shiekman.  We did

14:55:43  23   respond to Ms. Song in an e-mail, I believe I did last week,

14:55:52  24   and I have not heard from her about discussing -- to discuss

14:55:55  25   that.  Why don't we try to discuss it after court today and

14:55:59 1   see if we can reach some agreement.  I think in light of how

14:56:02 2   we intend to present the case, it is likely that it will not

14:56:07 3   be an issue, but we ought to have a chance to talk about it

14:56:10 4   first, I think.

14:56:11 5             THE COURT:  Very good.  I'll ask you to meet and

14:56:14 6   confer and then we'll raise it at 8:30 in the morning if

14:56:18 7   there is still an issue.  We're talking about Federal Rule

14:56:21 8   of Evidence 609.

14:56:23 9             MS. SONG:  Yes, Your Honor.

14:56:24 10             THE COURT:  Very good.  Anything else?

14:56:26 11             MS. CLINE:  Not from plaintiffs.

14:56:28 12             MR. WAN:  I don't think so, Your Honor.

14:56:30 13             THE COURT:  All right.  I think we can say in

14:56:32 14   hindsight that we probably made the right call in how to

14:56:35 15   proceed today, thinking about everything that's happened.  I

14:56:39 16   hope you all get a good night sleep tonight and we'll see

14:56:42 17   everybody in the morning.

14:56:43 18             (Court recessed at 2:56 p.m.)

19

20             I hereby certify the foregoing is a true and
    accurate transcript from my stenographic notes in the proceeding.

21

22                            /s/ Dale C. Hawkins
                            Official Court Reporter
23                            U.S. District Court

24

25