13:12:40

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

GERARD SZUBIELSKI,              )
                               )
          Plaintiff,           )
                               ) C.A. No. 15-984(RGA)(JLH)
v.                             )
                               )
WARDEN DAVID PIERCE,           )
et al.,                        )
                               )
          Defendants.          )

                    Friday, July 9, 2021
                    8:52 a.m.
                    Jury Trial

                    844 King Street
                    Wilmington, Delaware

BEFORE:   THE HONORABLE JENNIFER L. HALL
          United States District Court Magistrate Judge

APPEARANCES:

                    TROUTMAN PEPPER HAMILTON SANDERS LLP
                    BY:  JOANNA J. CLINE, ESQ.
                    BY:  COURTNEY A. MUNNINGS, ESQ.
                    BY:  KARLI E. COZEN, ESQ.
                    BY:  LAURENCE Z. SHIEKMAN, ESQ.
                    BY:  NICOLE CROSSEY, ESQ.

                         Counsel for the Plaintiff

**APPEARANCES CONTINUED:**

                **DELAWARE DEPARTMENT OF JUSTICE**
                **BY:  KENNETH LEE-KAY WAN, ESQ.**
                **BY:  ALLISON JEAN McCOWAN, ESQ.**
                **BY:  REBECCA SONG, ESQ.**

                    **Counsel for the Defendant**

                        — — — — — — — —

                **THE COURT:  Please be seated.**

So I appreciate your patience this morning and appreciate you all getting your letters on time about the jury instructions.  So I have some ideas that I want to throw out to you about what we can do here and then what I would ask is that either at the lunch break or at the next break you try to work together, I think we can get this all worked out.

So let me just pull up my notes.  So the parties agree that some of the language on page 4 is going to get omitted, so we'll take that out.  So turning to the elements of the 1983 claims, the plaintiff has pointed out that the fact that plaintiff served as an exemplar is an undisputed fact in the pretrial order.  Does the defendant dispute that?  I'm inclined to go with plaintiff's submission that we move that question from the verdict form and instruct the jury accordingly.

08:53:38 1                    Good morning, Mr. Wan, sorry.

08:53:42 2                    MR. WAN:  Your Honor, I apologize.

08:53:43 3                    THE COURT:  I was talking about plaintiff's

08:53:48 4     letter on the first page.  Beginning the first, they point

08:53:56 5     out that in the pretrial order the parties agreed, the

08:54:00 6     plaintiff in fact served as an exemplar in a lawsuit, so

08:54:04 7     it's undisputed that we should instruct the jury that it's

08:54:08 8     undisputed and that we should remove that question from the

08:54:11 9     jury verdict form.  I'm inclined to adopt their suggestion.

08:54:15 10    Do we have any response to that?

08:54:19 11                   MR. WAN:  Your Honor, I think we discussed it at

08:54:24 12    the pretrial conference, I think while -- I think it's

08:54:28 13    something the jury needs to rule on.  I think they still

08:54:31 14    have to prove, they have to meet their burden of proof on

08:54:35 15    that matter.  I would argue that it is still something that

08:54:38 16    has to be given to the jury versus just kind of admitted.

08:54:42 17                   THE COURT:  So I agree that that is a fact that

08:54:44 18    they would have had it approved had you not agreed in the

08:54:47 19    pretrial order that it was undisputed, so what do you have

08:54:52 20    to say to that?

08:54:54 21                   MR. WAN:  As I read, Your Honor, I think that

08:54:57 22    you know, I think that the claim he describes in there, I

08:55:02 23    think -- I still think it's something they have to find for

08:55:07 24    themselves.

08:55:08 25                   THE COURT:  So my ruling that the jury is not

08:55:10 1    going to be the arbiter of what rights, first amendment

08:55:17 2    rights, putting that aside, you dispute that he served as an

08:55:20 3    exemplar in the lawsuit?

08:55:22 4              MR. WAN:  I think the jury has to find that.

08:55:25 5              THE COURT:  Well, the way that I see this is

08:55:27 6    that the pretrial order controls, Judge Andrews and the

08:55:34 7    pretrial order indicates, and it's uncontested that he

08:55:48 8    served as an exemplar in paragraph 12 of the parties'

08:55:53 9    uncontested facts.  So I'm going to adopt plaintiff's

08:55:59 10   suggestion, but I'll ask the parties to work together about

08:56:03 11   exactly how that should be incorporated into the jury

08:56:06 12   instructions and the verdict form.

08:56:07 13             MR. WAN:  Yes, Your Honor.

08:56:10 14             THE COURT:  It should be eliminated from the

08:56:13 15   verdict form essentially, but you need to work together to

08:56:16 16   see if you can come to some agreement on the jury

08:56:18 17   instruction.

08:56:28 18             The plaintiff also has some comments about the

08:56:53 19   language in current question 3, which I am inclined to

08:57:02 20   adopt.  Does the defendant have any comments about that?  So

08:57:02 21   they want to replace "the" with "Mr. Pierce" in current

08:57:12 22   question 3, line 3.

08:57:14 23             MR. WAN:  No, Your Honor, I think that's fine.

08:57:14 24   I think it clarifies the question.

08:57:15 25             THE COURT:  Okay.  So we'll make that change.

08:57:21 1    Was there anything else in plaintiff or defendant?

08:57:24 2              MR. SHIEKMAN:  Yes, Your Honor, if I may.

08:57:25 3              THE COURT:  Yes.

08:57:26 4              MR. SHIEKMAN:  Laurence Shiekman again.  I

08:57:32 5    believe in light of the Court's instruction that Mr. Pierce

08:57:36 6    will be permitted to assert an affirmative defense, we think

08:57:40 7    that on page 21 under deliberations, paragraph 3, line 2,

08:57:46 8    that it should be revised to reflect that each party has a

08:57:51 9    burden of proof and we propose some language in our letter

08:57:55 10   to that effect.

08:57:56 11             THE COURT:  Okay.  Let me take a look at that.

08:58:00 12             MR. SHIEKMAN:  It's at the bottom of the first

08:58:02 13   page of our letter.

08:58:04 14             THE COURT:  Okay.  What is defendant's position

08:58:17 15   on that?

08:58:18 16             MR. WAN:  It's fine, Your Honor.

08:58:19 17             THE COURT:  Okay.  So we'll adopt that change as

08:58:22 18   well.

08:58:22 19             Anything else I missed from plaintiff?

08:58:25 20             MR. SHIEKMAN:  I think that's it, Your Honor.

08:58:27 21   And I think in response to -- excuse me, in response to your

08:58:31 22   other question, depending upon how you rule on the matters

08:58:36 23   in the defendant's letter, I think the verdict form can be

08:58:39 24   corrected from our perspective simply by eliminating the

08:58:41 25   first question and then renumbering the remaining questions

08:58:46 1    accordingly.

08:58:47 2              THE COURT:  Yes.  I understand your position on

08:58:49 3    that.

08:58:49 4              MR. SHIEKMAN:  Thank you, Your Honor.

08:58:50 5              THE COURT:  All right.  So let's turn to

08:58:54 6    defendant's letter.  We have got an issue here and the way I

08:59:04 7    see the issue is this, defendant reserved the right in the

08:59:08 8    pretrial order to contest that the action amounted to an

08:59:13 9    adverse action, but then the parties submitted jury

08:59:17 10   instruction subsequent to that in which the parties jointly

08:59:22 11   proposed that the jury be instructed that the parties agree

08:59:26 12   that the action is adverse.  So let's hear from somebody on

08:59:32 13   defendant's side about how this should get resolved, because

08:59:38 14   one view of this is that -- and I think what I'm going to

08:59:41 15   hear from them is that you told them you weren't going to

08:59:43 16   contest that and they presented all their evidence thinking

08:59:47 17   that element was uncontested.

08:59:53 18             MR. WAN:  I guess similar I think to the

08:59:58 19   proposed -- I think the pretrial order kind of controls

09:00:02 20   that.  I would argue the pretrial order controls that

09:00:02 21   because it preserves the issue, it's something the jury

09:00:02 22   should decide at this point.

09:00:11 23             THE COURT:  Let me ask you specifically about

09:00:12 24   what you have asked me to add to the verdict form.  You have

09:00:18 25   asked the Court to add the following language:  Did Gerald

09:00:25  1    Szubielski prove that he suffered an adverse action as a

09:00:28  2    result of the veto.  I don't know that that actually gets at

09:00:32  3    what the question is here even if I agreed with you that

09:00:35  4    this is a fact that should go to the jury.  And so the way

09:00:40  5    that I read the case law, and in particular Rauser v. Horn,

09:00:48  6    241 F.3d at 330 from the Third Circuit in 2001, what the

09:00:58  7    jury needs to decide is whether the type of action that is

09:01:05  8    alleged, which I don't think is in dispute, it was a veto,

09:01:10  9    is the type of action that is sufficient to deter an

09:01:14 10    ordinary, a person of ordinary skill from exercising their

09:01:18 11    constitutional right.  I don't know if the question you have

09:01:21 12    proposed gets at that.

09:01:24 13              And so let me just before you continue, let me

09:01:28 14    ask you this.  What about something like did Mr. Szubielski

09:01:36 15    prove that a warden's veto of a prisoner's reclassification

09:01:43 16    from maximum security to medium security would be likely to

09:01:47 17    deter an ordinary person in Mr. Szubielski's circumstances

09:01:51 18    engaged --

09:01:53 19              MR. WAN:  Your Honor, it's funny you mention

09:01:56 20    that.  Having read the case law, the actual wording does say

09:02:01 21    ordinary person, so it seems to be objectively.  In the

09:02:05 22    cases I cited in the letter they seem to be applying it

09:02:09 23    subjectively because I don't know how else you -- I mean, I

09:02:12 24    don't know how else you establish an ordinary person

09:02:14 25    standard.  So I feel like while it does say an ordinary

09:02:18 1    person, the language appears to be objective when it's

09:02:20 2    applied, they always seem to look at, you know, in that case

09:02:24 3    what the defendant's actions were, it wasn't an expert who

09:02:27 4    says an ordinary person or anything like that, so I think as

09:02:31 5    applied, it's a strange dynamic.

09:02:34 6           I do think that asking was Mr. Szubielski

09:02:38 7    deterred I think is appropriate given how the cases, at

09:02:41 8    least the ones I cited, apply that ruling and they look to

09:02:44 9    see what the actual defendant did after the complaint of

09:02:51 10   conduct.

09:02:51 11          THE COURT:  Do you agree that there is no --

09:02:55 12   there is no model instruction that addresses the particular

09:02:58 13   question even though the model jury instruction comment

09:03:02 14   seems to indicate that whether an action is adverse could be

09:03:05 15   a contested issue that needs to go to a jury?

09:03:08 16          MR. WAN:  I think it's a little unclear, Your

09:03:10 17   Honor, probably why we have this strange dynamic.

09:03:13 18          THE COURT:  Is it defenses' view that if

09:03:18 19   Mr. Szubielski, in fact, did file a lawsuit after the veto,

09:03:22 20   that plaintiffs have failed to establish their claim?

09:03:25 21          MR. WAN:  I think so, Your Honor.

09:03:27 22          THE COURT:  Okay.  Let me hear from counsel for

09:03:30 23   plaintiff.

09:03:33 24          MR. SHIEKMAN:  Thank you, Your Honor.  First of

09:03:36 25   all, I think Your Honor is correct that the parties

1    negotiated heavily in advance of the beginning of the trial

2    over the proposed jury instructions.  The instruction as

3    drafted, the defense conceded on page 18 of the proposed

4    language that there was an adverse action.  They, in fact,

5    specifically contested the exemplar question as indicated by

6    footnote 5 on page 18 of the preliminary instructions, but

7    didn't contest the question of whether there was an adverse

8    action.

9           Second, in addition to the case that Your Honor

10   found, my colleagues were busily at work last night and

11   there are a number of Third Circuit cases that stand for the

12   proposition that it's an objective question, and I think

13   under the circumstances of this case, and I'm not talking

14   about other cases, one of the cases cited in the defendants'

15   footnote involve someone who filed 31 cases against various

16   prison officials.  That's not the situation here.

17          The fact is that Mr. Szubielski wrote one letter

18   to Judge Robinson that they mentioned but didn't put into

19   evidence, and actually was one of I think a hundred

20   plaintiffs who sued a bunch of prison officials after the

21   riot.  I think there may have been a habeas letter of some

22   kind that Judge Andrews dismissed.  That's clearly not what

23   we're talking about here.  What we're talking about here is

24   an inmate who was in solitary confinement for eight plus

25   years and then was forced to stay there for another year.

And I think the Court is correct in these circumstances under these facts to instruct the jury that that additional year in solitary confinement was an adverse action.  And you then properly left to the jury to decide the causation question, which is was the veto the cause of his remaining in solitary for another year.  But I don't think there is any question on this record on these facts where we are.

THE COURT:  So regardless of whether I agree with you on this record as to whether a reasonable jury could find otherwise, it sounds like you're asking for a judgment as a matter of law on these issues because I do see in the Third Circuit cases that there is an instruction that something that is a factual issue that needs to go to a jury.

Let me ask you this.  If I allowed this question to go to the jury, is there prejudice that you suffer here in terms of how you would have presented your case different because I can tell you, we were all in the courtroom yesterday, I heard the testimony, it seems like there was evidence in the record from which the jury could find this was an adverse action that could deter an ordinary person from engaging in conduct.

MR. SHIEKMAN:  I think the short answer to your question is yes, and the reason I say that is we did not

09:06:42 1   discuss at all on direct examination or redirect at all the

09:06:48 2   issue of why Mr. Szubielski filed a couple of cases after he

09:06:55 3   was an exemplar in the CLASI case.  And I think we would

09:06:59 4   have presented our case slightly differently had we known

09:07:02 5   that that was going to be an issue.  So as a practical

09:07:05 6   matter, I think the answer is yes to your question.

09:07:18 7              THE COURT:  One moment.

09:07:19 8              MR. SHIEKMAN:  Sure.

09:07:33 9              THE COURT:  All right.  Please be seated.

09:07:35 10             MR. SHIEKMAN:  Thank you.  Here is what we're

09:07:47 11  going to do.  At the end of the day the pretrial order

09:07:52 12  rules.  So because the defense reserved it, we're going to

09:07:58 13  let this question go to the jury.  However, I want to make

09:08:01 14  clear that I am ruling that I agree with the plaintiff that

09:08:05 15  it is an objective slander and I would like the parties to

09:08:09 16  work together to both develop an instruction about it being

09:08:14 17  objective standard as well as an appropriate question to be

09:08:20 18  put on the verdict form.

09:08:26 19             At the top of my head, you can work off the

09:08:30 20  following language which is did Mr. Szubielski prove that a

09:08:34 21  warden's veto of a prisoner's reclassification from maximum

09:08:40 22  security to medium security would be likely to deter an

09:08:45 23  ordinary person in Mr. Szubielski's position from engaging

09:08:52 24  and participating as an exemplar lawsuit.  But I don't know

09:08:57 25  if that has too much detail or not.  So I'll let you all see

09:09:04 1      if you can work that out.

09:09:06 2              I wasn't able to find in the Third Circuit model

09:09:10 3      jury instructions an instruction about the factual question

09:09:20 4      of whether the alleged retaliatory conduct was sufficiently

09:09:25 5      adverse, but there is a recognition I think by the Third

09:09:29 6      Circuit that there may be cases where the parties dispute

09:09:32 7      whether an actionable adverse action occurred, and that it

09:09:37 8      should be sent to the jury.

09:09:39 9              I can also tell you that with a quick rule

09:09:45 10     search we did see an instruction in the Seventh Circuit that

09:09:48 11     said something like an element of the case being whether

09:09:54 12     defendant's alleged retaliatory conduct would be likely to

09:09:58 13     deter an ordinary person in plaintiff's circumstances from

09:10:04 14     engaging in that conduct.  I think we're on the right track

09:10:12 15     here with respect to the type of question that should go to

09:10:14 16     the jury and I would ask the parties to work together.

09:10:17 17             Is there any question about what I'm asking

09:10:19 18     folks to do?

09:10:20 19             MR. SHIEKMAN:  I'm confused about your initial

09:10:26 20     statement, that's why if I might ask you, please.  You said

09:10:31 21     that the pretrial governs, the pretrial order had the

09:10:36 22     defendants' concession in it, and now you're saying we need

09:10:40 23     to work out an instruction to the contrary?

09:10:42 24             THE COURT:  So the pretrial order had as a

09:10:46 25     disputed issue whether or not this was adverse.  I have the

09:11:01  1    jury instruction that was submitted under separate cover.

09:11:07  2    It's my understanding that was not made part of the pretrial

09:11:10  3    order, the way I understand, I got this case, I had a

09:11:14  4    pretrial order and then I had jury instructions later, one

09:11:17  5    might have thought there was an agreement between the

09:11:20  6    parties that they come to some sort of agreement and it was

09:11:24  7    never ordered by the court.

09:11:28  8                MR. SHIEKMAN:  Now, I understand.  Thank you

09:11:29  9    very much.

09:11:30 10                THE COURT:  Any questions from defendants about

09:11:31 11    what I'm asking the parties to do?

09:11:33 12                MR. WAN:  No, Your Honor.

09:11:34 13                THE COURT:  Okay.  So I have given some thought

09:11:49 14    to our discussion yesterday about an instruction about

09:11:55 15    Mr. Pierce at trial.  My recollection was that plaintiff's

09:12:01 16    counsel was about whether or not they intended to say

09:12:05 17    anything in closing arguments about him not being here, and

09:12:09 18    a further thought about his body not in the chair during

09:12:13 19    closing arguments, so it's really inappropriate to mention

09:12:16 20    it during closing argument.  So do we have anything anybody

09:12:21 21    wants to say about the state's request for an instruction.

09:12:25 22    I don't think the instruction is needed necessarily if

09:12:28 23    plaintiff doesn't intend to mention it during closing.

09:12:31 24                MR. SHIEKMAN:  We have no objection to -- we

09:12:35 25    have no intention of mentioning it in closing and we have no

09:12:37  1    objection to Your Honor's instructing the jury regarding his

09:12:41  2    absence.

09:12:42  3                    THE COURT:  Okay.  If you're not going to

09:12:44  4    mention it in closing, do you still want an instruction?

09:12:47  5                    MR. WAN:  No, I think the whole point it would

09:12:50  6    be almost curative if they did it, but if they don't mention

09:12:52  7    it, there is no point for an instruction.

09:12:54  8                    THE COURT:  Okay.  So I'm not going to add that

09:12:57  9    instruction.

09:13:00 10                    Is there anything else I'm missing from

09:13:02 11    defendants' letter?

09:13:04 12                    MR. WAN:  Not from our standpoint, Your Honor.

09:13:08 13                    THE COURT:  Okay.  Any housekeeping matters we

09:13:11 14    need to address before we bring in the jury?

09:13:15 15                    MS. McCOWAN:  Your Honor, we would like to have

09:13:18 16    a Rule 50 motion as a matter of law judgment, would you like

09:13:22 17    to hear it now.

09:13:23 18                    THE COURT:  Why don't we preserve it for the

09:13:25 19    record.  If you want to say a few words for the record, you

09:13:32 20    can put that on the record and then I'll hear from the

09:13:34 21    other.

09:13:40 22                    MS. McCOWAN:  I'm happy to do it.  And we'll

09:13:42 23    reserve.  Thank you, Your Honor.  Alice McCowan on behalf of

09:13:45 24    defendant, David Pierce.  At this time as plaintiff has

09:13:42 25    closed its case in chief, defendant Pierce moves under

09:13:52  1    Rule 50 for a judgment as a matter of law because plaintiff
09:13:56  2    has failed to submit sufficiently any evidentiary grounds
09:13:59  3    for a reasonable jury to find for him on three issues.
09:14:02  4    First, we don't believe that Mr. Szubielski proved a prima
09:14:07  5    fascia case of retaliation.  And we can go into it further
09:14:10  6    when we argue after we have closed.
09:14:12  7            We further believe that the evidence
09:14:15  8    demonstrates that Mr. Pierce is entitled to qualified
09:14:19  9    immunity.
09:14:19 10            And finally, we don't believe there is
09:14:21 11    sufficient evidence in the record to prove that they are
09:14:24 12    entitled to collect compensatory damages as the PLRA
09:14:29 13    prohibits damages where there is no physical jury.
09:14:33 14            THE COURT:  Okay.  So with respect to the third
09:14:36 15    element, I recall there was testimony about plaintiff
09:14:42 16    suffering headaches during the time that he was in the SHU.
09:14:49 17    Is it reasonable to infer that those headaches would have
09:14:53 18    continued during the additional years he was in the maximum
09:14:57 19    security and that counts as physical injury?
09:15:01 20            MS. McCOWAN:  I don't believe there is any
09:15:02 21    evidence of timing, Your Honor, so everything we heard from
09:15:04 22    the medical experts read in deposition testimony, there is
09:15:08 23    no timing, there is no this happened in 2015, he was on
09:15:12 24    these medications in 2015, he had headaches in 2015, and
09:15:16 25    plaintiff's testimony was overly broad, so when you're

09:15:19 1    instructing the jury that they can only consider damages

09:15:22 2    that were proven from 2015 to 2016, we would assert that

09:15:26 3    there is no evidence of damage during that time.

09:15:28 4              THE COURT:  Okay.  All right.  No further

09:15:34 5    questions on that.

09:15:35 6              MS. McCOWAN:  Thank you, Your Honor.

09:15:36 7              THE COURT:  Brief response from the other side.

09:15:40 8              MS. CLINE:  Thanks, Your Honor.  Just starting

09:15:43 9    with the standard for a JMOL, it's appropriate if the Court

09:15:48 10   finds that a reasonable jury would not have a legally

09:15:51 11   sufficient evidentiary basis to find for injury.  Injury as

09:15:56 12   a judgment as a matter of law is sparingly invoked and

09:16:00 13   granted only if viewing the evidence in the light most

09:16:04 14   favorable giving our side the advantage of every fair and

09:16:07 15   reasonable inference, there is insufficient evidence from

09:16:10 16   which a jury can find liability.

09:16:12 17             Ms. McCowan mentioned three issues, the

09:16:15 18   retaliation claim, there are three elements of that claim.

09:16:17 19   Certainly one has been conceded.  We would argue the second

09:16:20 20   one was as well.  But in any event we think there is more

09:16:23 21   than ample evidence on that.  From our perspective the only

09:16:26 22   evidence conceivably in dispute was whether the veto was a

09:16:31 23   motivating factor -- sorry, whether Gerard Szubielski's

09:16:35 24   participation in the CLASI lawsuit was a motivation factor

09:16:35 25   in the veto.  I have a list of ten or twelve facts that I

09:16:45 1    can articulate, or we can save that for later.

09:16:46 2            We think there are some undisputed facts as well

09:16:49 3    as facts based on Mr. Szubielski's testimony that are more

09:16:52 4    than ample.

09:16:52 5            THE COURT:  Thank you.  At this time I am going

09:16:54 6    to deny the motion.  We will need to have submitted it to

09:16:57 7    the jury subject to the court later deciding the legal

09:17:00 8    question raised by the motion.  The parties can file the

09:17:03 9    motions for matter of law and they will be observed in

09:17:09 10   accordance with the Federal Rules of Civil Procedure.

09:17:16 11           MS. McCOWAN:  Thank you, Your Honor.

09:17:29 12           THE COURT:  Very briefly turning back to the

09:17:33 13   question of the adverse action, I intended to but didn't

09:17:39 14   state that to the extent plaintiff would like to recall

09:17:48 15   witnesses from their case in chief, you said there was

09:17:52 16   evidence they didn't get in but would have wanted to get in

09:17:55 17   had they known that the issue of adversity was still on the

09:18:03 18   table to be litigated, that's something that the Court would

09:18:09 19   consider.  Do you have any questions about that?

09:18:11 20           MS. CLINE:  No questions, but I think we would

09:18:13 21   like to confer at some point.

09:18:15 22           THE COURT:  Of course.

09:18:21 23           Anything else we need to address at this time?

09:18:25 24           MS. McCOWAN:  No.

09:18:26 25           THE COURT:  What do we expect to see here today

09:18:29 1    in terms of testimony?

09:18:30 2              MS. McCOWAN:  Your Honor, this morning for the

09:18:32 3    state you'll only hear from Deputy Warden Parker.  And he is

09:18:37 4    here and ready to give testimony.

09:18:38 5              THE COURT:  Do you have a sense of how long his

09:18:40 6    direct examination will be?

09:18:42 7              MS. McCOWAN:  Maybe twenty to thirty minutes.

09:18:44 8              THE COURT:  Okay.  In light of that, it sounds

09:18:47 9    like this case may go to the jury today.  So everyone should

09:18:54 10   keep that in mind.  If we have to take a break over lunch to

09:18:58 11   work out these final issues on the jury instructions, we can

09:19:01 12   do that, but we're going to need to get this done rapidly so

09:19:06 13   we don't keep the jury any longer than we need to.

09:19:09 14              Is everyone prepared to proceed?

09:19:11 15              MS. McCOWAN:  Yes, Your Honor.

09:19:12 16              MS. CLINE:  Yes, Your Honor.

09:19:13 17              THE COURT:  All right.  Bring the jury in.

09:19:59 18              (Jury entering the courtroom at 9:19 a.m.)

09:20:08 19              THE COURT:  Please be seated.

09:20:22 20              Good morning, ladies and gentlemen of the jury.

09:20:22 21   We'll continue with testimony today.

09:20:32 22              Who does the defendant call next?

09:20:36 23              MS. McCOWAN:  Good morning, Your Honor.  On

09:20:40 24   behalf of David Pierce, we're calling Deputy Warden Philip

09:20:42 25   Parker.

09:20:44  1                    THE COURT:  Thank you.  Mr. Parker, would you

09:20:49  2      please come to the witness stand.

09:21:16  3                    COURT CLERK:  Please state and spell your name

09:21:16  4      for the record.

09:21:16  5                    THE WITNESS:  Philip D. Parker, P-A-R-K-E-R.

09:21:16  6                    PHILIP D. PARKER, having been duly sworn was

09:21:16  7      examined and testified as follows:

09:21:25  8                         DIRECT EXAMINATION.

09:21:25  9      BY MS. McCOWAN:

09:21:26 10      Q.        Good morning, Mr. Parker.  If you have any problems

09:21:28 11      hearing me, please let me know and I'll speak up.  I would

09:21:31 12      like to start this morning if I may by hearing about your

09:21:35 13      current employer and what your current ob is?

09:21:37 14      A.        Delaware Department of Corrections.  Deputy Warden,

09:21:41 15      James E. Vaughn Correctional Center.

09:21:44 16      Q.        How long have you worked in this position?

09:21:46 17      A.        Since October of 2013.

09:21:52 18      Q.        Has this position changed at all between October of

09:21:56 19      2013 and today?

09:21:57 20      A.        No, not much.

09:21:59 21      Q.        And so is it correct to say that you were in the same

09:22:02 22      position in 2015 at James T. Vaughn?

09:22:05 23      A.        Yes, ma'am.

09:22:06 24      Q.        Will you briefly describe your role as Deputy Warden

09:22:10 25      for JTVCC?

09:22:12 1    A.       Yeah, I'm the two.  Deputy warden one, deputy warden

09:22:18 2    two oversee all the operations as far as security, safety

09:22:22 3    and sanitation and through the chain of command, all the

09:22:26 4    security staff also report to me.

09:22:27 5    Q.       So is it fair to say you're the security side of the

09:22:31 6    house?

09:22:31 7    A.       Yes.

09:22:31 8    Q.       Wonderful.

09:22:32 9             Are you familiar with the plaintiff,

09:22:35 10   Mr. Szubielski?

09:22:36 11   A.       Yes, I know the name.

09:22:39 12   Q.       Do you recall any specific interactions with

09:22:42 13   Mr. Szubielski in 2015?

09:22:44 14   A.       I don't recall any personal interaction, but he did

09:22:49 15   write me a letter.

09:22:52 16   Q.       There is a book up there, I believe, that's titled

09:22:56 17   Plaintiff's Exhibits.  Can you please turn to Plaintiff's

09:23:00 18   Exhibit 3.  And I will note for the record that this has

09:23:17 19   already been offered and admitted into evidence.

09:23:20 20            Is this something that you wrote?  Is this

09:23:25 21   letter something that you wrote to Mr. Szubielski in 2015?

09:23:30 22   A.       Yes.

09:23:33 23   Q.       And can you read the contents of the letter to me?

09:23:36 24   A.       It says, "I received your letter reference to your

09:23:40 25   classification.  I suggest you continue to be patient and

maintain your good behavior.  We know your prior history and
why there is a reluctance to move you out of maximum
security regardless of your classification."

Q.     Now I would like to take the last sentence in two
parts.  The first part being "you know your history."

       Can you recall what you meant by when you said
you know your history?

A.     I was referring to there were investigations regards
Mr. Szubielski promoting prison contraband, getting stuff
into the facility.

Q.     Can you describe in further detail what you
understood that investigation to be?

A.     Just drugs, he was having -- making arrangements to
have shipped in and I believe there was even a belief that
his mother was involved.

Q.     And why would importing drugs to the facility be a
problem in your opinion?

A.     It's no different than drugs on the street.  I mean,
people die from them.  People, you know, obviously people
distribute it for money purposes.  So it's no different than
inside the prison.  You're already in prison for criminal
behavior, so to continue that is not corrective behavior, so
we should protect it from society.

Q.     In your opinion was this the history that you're
referring to regarding Mr. Szubielski?

09:25:25 1    A.      Yes.

09:25:27 2    Q.      If you take the second part of that last sentence,

09:25:31 3    you wrote "there is a reluctance to move you out of maximum

09:25:37 4    security."

09:25:37 5            Do you recall what you meant by that statement?

09:25:39 6    A.      Yeah, that was based on the promoting prison

09:25:44 7    contraband investigation.

09:25:46 8    Q.      Who had the reluctance?

09:25:49 9    A.      Ultimately the warden vetoed the classification, so

09:25:53 10   even if he was in maximum security, if he scored medium, the

09:25:58 11   warden has the authority to veto it and keep him in maximum

09:26:03 12   security.

09:26:03 13   Q.      Did you share the reluctance to move Mr. Szubielski

09:26:07 14   out of maximum security?

09:26:08 15   A.      Yes.

09:26:10 16   Q.      Did you have any conversations with former Warden,

09:26:13 17   Mr. Pierce about the investigations and your reluctance?

09:26:17 18   A.      No, his name came up in some of our meetings.

09:26:24 19   Q.      Do you recall any other reason for reluctance to move

09:26:29 20   Mr. Szubielski from maximum security?

09:26:31 21   A.      Not that I'm aware of.

09:26:35 22   Q.      I would like you to turn next to what's been

09:26:38 23   previously marked as Plaintiff's Exhibit 23.  Can you

09:26:52 24   identify this document for me?

09:26:57 25   A.      It's a daily roster.  It shows the history of where

09:27:05 1    he was.

09:27:05 2    Q.    Just for the record, this exhibit has been marked and

09:27:08 3    moved into evidence.

09:27:09 4            Who is this housing record for?

09:27:12 5    A.    Mr. Szubielski.

09:27:14 6    Q.    If you turn, if I can direct you to turn to page 3.

09:27:27 7    Can you tell me the date that Mr. Szubielski was transferred

09:27:29 8    out of maximum security?  From what I have been told it's

09:27:44 9    easier to read these on a computer than on a printout.

09:27:58 10   A.    It looks like in 2016.

09:28:03 11            MS. McCOWAN:  I have no further questions for

09:28:04 12   this witness.

09:28:06 13            THE COURT:  Thank you.

09:28:13 14            Cross-examination.

09:28:15 15              CROSS-EXAMINATION.

09:28:15 16   BY MS. COZEN:

09:28:23 17   Q.    Good morning, Mr. Parker.

09:28:24 18   A.    Good morning.

09:28:33 19   Q.    When inmates are found to have violated prison rules,

09:28:37 20   an incident report is written up?

09:28:39 21   A.    Yes.

09:28:40 22            MS. McCOWAN:  Objection, this is out of the

09:28:42 23   scope of the direct examination.

09:28:44 24            THE COURT:  Overruled.

09:28:52 25   Q.    Are you aware, you're not aware of any incident

09:28:58 1    reports between 2014 and 2015 for Mr. Szubielski, Jerry?

09:29:04 2    A.      That's a long time.  I don't know.

09:29:06 3    Q.      Sitting here today, are you aware of any?

09:29:09 4    A.      No.

09:29:10 5    Q.      The date of Mr. Pierce's veto was October 14th, 2015.

09:29:16 6    Isn't that true?

09:29:18 7    A.      I don't know.

09:29:21 8    Q.      Let's turn to Plaintiff's Exhibit 3 which defendants'

09:29:29 9    counsel already mentioned, he was talking to you about.

09:29:48 10   This appears to be a memo from you to Jerry on October 1st,

09:29:56 11   2015; right?

09:29:57 12   A.      Yes.

09:29:58 13   Q.      You wrote the sentence, "I suggest you continue to be

09:30:05 14   patient and maintain your good behavior."

09:30:09 15   A.      Yes.

09:30:10 16   Q.      And you meant what you said, didn't you?

09:30:13 17   A.      Excuse me?

09:30:14 18   Q.      You meant what you said, you meant what you wrote;

09:30:18 19   isn't that true?

09:30:19 20   A.      Yes.

09:30:21 21            MS. COZEN:  No further questions.

09:30:22 22            THE COURT:  Redirect?

09:30:24 23            MS. McCOWAN:  I have nothing on redirect, Your

09:30:26 24   Honor.

09:30:26 25            THE COURT:  Mr. Parker, you may step down.

09:30:44  1          MS. McCOWAN:  Can he be excused, Your Honor?

09:30:47  2          THE COURT:  Yes, you may be excused.

09:30:49  3          THE WITNESS:  Thank you.

09:30:57  4          THE COURT:  Does the defense have any further

09:30:59  5    witnesses?

09:31:00  6          MS. McCOWAN:  We do not have any further

09:31:01  7    witnesses.  Mr. Pierce rests, Your Honor.

09:37:13  8          THE COURT:  Can I see counsel at side-bar

09:37:13  9    briefly.

09:37:13 10          (Side-bar discussion.)

09:37:13 11          THE COURT:  I thought it would be easier to have

09:37:13 12    this discussion out of the hearing of the jury.

09:37:13 13          So we're moving a little faster than I think

09:37:13 14    some of us had anticipated today.  Just before we heard

09:37:13 15    testimony from the witness this morning, I had mentioned

09:37:13 16    that there could be a possibility of the plaintiff

09:37:13 17    requesting to call for more testimony with respect to the

09:37:13 18    issue that we are now going to be instructing the jury on

09:37:13 19    but had not.

09:37:13 20          So the first question I have for plaintiff's

09:37:13 21    side is did you plan on any redirect this morning?  And if

09:37:13 22    so, is it the same witness that you might need to consider

09:37:13 23    whether or not to add some questions with respect to?

09:37:14 24          MS. CLINE:  Can we have ten seconds in the

09:37:14 25    corner here?

09:37:14 1          THE COURT:  Of course.

09:37:14 2               (Pause).

09:37:14 3          MR. SHIEKMAN:  Your Honor, it's not our

09:37:14 4  intention to put on additional evidence on the adverse

09:37:14 5  action point.  What we would like to do with your permission

09:37:14 6  in light of the JMOL argument and Deputy Warden Parker's

09:37:14 7  testimony, the very last part of his testimony would be to

09:37:14 8  put Mr. Szubielski back on the stand and ask him three

09:37:14 9  questions.

09:37:14 10          Number one, please describe your medical

09:37:14 11 condition during 2015 after the veto up until the time you

09:37:14 12 were released.

09:37:14 13          Second, could you confirm that you were in the

09:37:14 14 maximum security during the entirety of the period following

09:37:14 15 the veto until you were released in October?

09:37:14 16          And then three, that they are going to argue is

09:37:14 17 not maximum security.

09:37:14 18          THE COURT:  Any objection?

09:37:14 19          MR. WAN:  I would object, Your Honor.  If it

09:37:14 20 could be called evidence, that one adverse action, they were

09:37:14 21 aware of every other issue in this case, whether it's for

09:37:14 22 his injuries, their case is closed.

09:37:14 23          THE COURT:  Well, so I do recall that there was

09:37:14 24 a question at least raised in the defenses' case when the

09:37:14 25 warden was on the stand about the buildings that he was in

09:37:14  1   during the year after the veto, so I do think it's fair to

09:37:14  2   hear from plaintiff on redirect about that year.

09:37:14  3            Counsel?

09:37:14  4            MS. SONG:  Your Honor, I believe I had asked him

09:37:14  5   where -- which buildings he had been housed in when I did

09:37:14  6   cross-examination.  If I could just review my notes, I asked

09:37:14  7   him about specific time frames, so I believe that issue has

09:37:14  8   already been addressed.  I would have to consult my notes.

09:37:14  9            THE COURT:  Here is what I think we should do.

09:37:14 10   Given that I'm hearing from plaintiff that the only witness

09:37:14 11   that might get recalled is a witness that's currently

09:37:14 12   shackled and we're going to need to send the jury out

09:37:14 13   anyway, let's send the jury out for a brief break and then

09:37:14 14   we'll decide how to proceed.

09:37:14 15            MS. McCOWAN:  Your Honor, just to be clear, you

09:37:14 16   are contemplating allowing Mr. Szubielski's testimony only

09:37:14 17   to the housing location that he was in 2015 to 2016, and not

09:37:14 18   the medical testimony?

09:37:14 19            THE COURT:  That is what I am contemplating.

09:37:14 20            MS. McCOWAN:  Thank you, Your Honor.

09:37:14 21            MR. SHIEKMAN:  Understood.

09:37:14 22            (End of side-bar.)

09:37:14 23            THE COURT:  Ladies and gentlemen of the jury,

09:37:14 24   the good news is we think we might be able to give you this

09:37:14 25   case today for your deliberations.  What that means is we do

09:37:15 1   have a few housekeeping matters to take care of before we

09:37:15 2   give the case to you.  There may be some additional

09:37:15 3   testimony as I mentioned during the preliminary instructions

09:37:15 4   that the plaintiff may call some witnesses during the

09:37:15 5   rebuttal case.  At this point in time, we're going to send

09:37:15 6   you back to the jury room.  We're going to minimize the

09:37:15 7   amount of time you're back there to the extent we can.

09:37:15 8   We'll bring you back here as soon as we can.

09:37:15 9             Please take the jury out.

09:37:15 10            (Jury leaving the courtroom at 9:37 a.m.)

09:37:15 11            THE COURT:  Please be seated.  Give us one

09:37:15 12   minute.

09:37:15 13            (Pause).

09:37:40 14            So we recall there were three questions that you

09:37:42 15   wanted.  Could we see you at side-bar because we can't

09:37:47 16   remember question number two.

09:42:56 17            (Side-bar discussion:)

09:42:56 18            THE COURT:  So for the record, we have come to

09:42:56 19   side-bar because we have got the potential witness sitting

09:42:56 20   here.

09:42:56 21            MR. SHIEKMAN:  So in light of Warden Parker's

09:42:56 22   testimony we intend to call Mr. Szubielski in rebuttal to

09:42:56 23   ask him two questions.  Please look at Exhibit 23, page 3.

09:42:56 24   Were you housed in maximum security the entire period from

09:42:56 25   October 13th, 2015, until October 11th of 2016?

09:42:56 1          And the second question we wanted to ask him

09:42:56 2  which is was building 23 maximum security or not.

09:42:56 3          THE COURT:  Any objection?

09:42:56 4          MS. SONG:  Your Honor, those two issues have

09:42:56 5  already been addressed during his direct and cross.  I

09:42:56 6  specifically had asked him which buildings were you housed

09:42:56 7  in and he went through July 2015 to October 11th, 2016.

09:42:56 8          THE COURT:  We're going to let these two

09:42:56 9  questions get asked on direct.

09:42:56 10          MS. SONG:  Yes, Your Honor.

09:42:56 11          MR. WAN:  To the extent that the witness might

09:42:56 12  go beyond just confirming that, are we allowed to question

09:42:56 13  him?

09:42:56 14          THE COURT:  I'm hearing two questions and we'll

09:42:56 15  deal with what happens based on the answers.

09:42:56 16          MR. WAN:  Thank you.

09:42:56 17          MR. SHIEKMAN:  Thank you, Your Honor.

09:42:56 18          (End of side-bar.)

09:42:56 19          THE COURT:  So I'm trying to decide the best way

09:42:57 20  to proceed here.  I think we're going to probably need to

09:42:57 21  give the parties fifteen or twenty minutes to try to work

09:42:57 22  out the language of the proposed jury instruction and the

09:42:57 23  verdict form, and then we're going to need a brief amount of

09:42:57 24  time to get this typed up and printed out so that we can

09:42:57 25  read the jury instruction before closing arguments.

09:42:57 1          We have to bring the jury back in to hear the

09:42:57 2     redirect, but I think I'm inclined to not make a spectacle

09:42:57 3     of it, do it now and then send them back for another half

09:42:57 4     hour.  I think we should get the jury instruction figured

09:42:57 5     out, then have the redirect and then go straight into the

09:42:57 6     instruction, a brief break for moving the plaintiff back to

09:42:57 7     his seat at counsel table.

09:42:57 8          Does anybody have any thoughts on that, because

09:42:57 9     I could be persuaded to do it differently.

09:42:57 10         MR. WAN:  I don't have any objection.  I guess

09:42:57 11    would it be beneficial for maybe me and one of the counsel

09:42:57 12    for plaintiff to start working on that now?

09:42:57 13         THE COURT:  I think that's what I'm proposing.

09:42:57 14         MS. CLINE:  We agree, we can knock it out pretty

09:42:57 15    quickly.

09:42:57 16         THE COURT:  All right.  So why don't you work on

09:42:57 17    that, and then why don't you e-mail that language to us,

09:42:57 18    we'll put it on the docket for purposes of the record, and

09:42:57 19    then we will insert it into the form.  I'll come back and

09:42:57 20    take the bench, we'll all read through the final version and

09:42:57 21    then we'll make the copy.

09:42:57 22         MS. McCOWAN:  Your Honor, one more thing.  Since

09:42:57 23    we rested we would intend to renew our judgment as a matter

09:42:57 24    of law and add that we should have a directed verdict on our

09:42:57 25    affirmative defense that there is no dispute that the jury

09:42:57 1    would find that he would have taken this action for purposes

09:42:57 2    of retaliation.

09:42:57 3                 THE COURT:  That's reserved for the record.  It

09:42:57 4    will be denied at this time without prejudice for you to

09:42:57 5    renew it at the appropriate time.

09:42:57 6                 MS. CLINE:  Just before you go, Your Honor, just

09:42:57 7    to be sure we're square, the main part of what we need to

09:42:57 8    work out is the language regarding to incorporate your

09:42:57 9    ruling on the adverse action piece?

09:42:57 10                THE COURT:  That's right.  As well as the

09:42:57 11   exemplar piece because I think I can do that part myself,

09:42:57 12   and then we'll come back out to make any final changes.

09:42:57 13                MR. WAN:  I think the first part is just taking

09:42:57 14   out the question.

09:42:57 15                THE COURT:  Exactly.

09:42:57 16                We'll be in a short recess.

09:42:53 17                (A brief recess was taken.)

10:41:32 18                THE COURT:  Please be seated.  Just for purposes

10:41:37 19   of the record, I will be read the e-mail we received from

10:41:40 20   Mr. Wan, the opposing counsel, regarding jury instruction on

10:41:54 21   adverse action.  The proposed language sent to me by the

10:41:52 22   parties was if you find that Mr. Pierce's veto would be

10:42:00 23   likely to deter an ordinary person in Mr. Szubielski's

10:42:07 24   circumstances from exercising his first amendment rights,

10:42:10 25   then this element has been established.

10:42:12 1            And I also received from the parties proposed

10:42:16 2    verdict form language on adverse action.  Did Gerard

10:42:21 3    Szubielski prove that Mr. Pierce's veto would be likely to

10:42:24 4    deter an ordinary person in Mr. Szubielski's circumstances

10:42:28 5    from exercising his First Amendment right?

10:42:32 6            So that's the e-mail I received.  We added --

10:42:36 7    made those changes to the Court's proposed verdict form and

10:42:41 8    the Court's proposed final jury instructions.  We also made

10:42:52 9    changes with a respect to a couple of typos that were found,

10:42:56 10   the first one was the Delaware Department of Corrections,

10:42:59 11   and I believe it should be the Delaware Department of

10:43:01 12   Correction; is that correct?

10:43:03 13           MR. WAN:  Yes, that's correct.

10:43:04 14           THE COURT:  And then we adopted the parties'

10:43:09 15   request for changes as submitted in their objection letters

10:43:13 16   this morning with the exception of one edit under the

10:43:20 17   Section 1983, Declaration of a Federal Right, plaintiff had

10:43:26 18   proposed that there be a clause at the very end that says

10:43:30 19   you should find this element should be established.  Since

10:43:32 20   we didn't have that on the verdict form, we just ended it

10:43:36 21   with this element of the claim is not in dispute since we're

10:43:39 22   not asking the jury for a finding on that because it's not

10:43:42 23   one of the interrogatories that we put to the jury on the

10:43:45 24   verdict form.

10:43:46 25           Is there any objection to that deletion?

10:43:49 1              MR. SHIEKMAN:   There is no objection to that

10:43:51 2  deletion, but at some point just for the record I would like

10:43:54 3  to record an objection to the adverse action instruction

10:44:00 4  even though we worked out the language per the Court's

10:44:03 5  instruction, we would like to preserve that for the record

10:44:06 6  and I can do that whatever the Court would prefer.

10:44:08 7               THE COURT:   Why don't we do that now.

10:44:11 8               MR. SHIEKMAN:   Okay.   The plaintiff objects

10:44:25 9  under Federal Rule of Civil Procedure 51 to the Court's

10:44:29 10  instruction on adverse action.   We believe that that matter

10:44:34 11  had been waived by the defendant by its agreement to the

10:44:39 12  preliminary jury instructions in the agreed pretrial order.

10:44:45 13  And we believe that it's not supported by the Third Circuit

10:44:48 14  cases.   So I just wanted to put that on the record for

10:44:51 15  purposes of future action, if necessary.

10:44:55 16               THE COURT:   Okay.   Very good.   Thank you.

10:44:59 17               Does the state want to respond to that on the

10:45:01 18  record?   I think we have your position.

10:45:05 19               MS. McCOWAN:   Your Honor, I believe as you

10:45:12 20  previously stated that one of defendants' remaining disputes

10:45:16 21  of fact listed in the pretrial order was number one, whether

10:45:21 22  an adverse action had happened at all.   Since that order was

10:45:24 23  so ordered by Judge Andrews and there was no dispute during

10:45:28 24  the pretrial conference or at any time before in our meet

10:45:32 25  and confer leading up to the pretrial conference, we would

10:45:36 1    object or oppose the motion.

10:45:38 2                 THE COURT:  Thank you.

10:45:38 3                 All right.  The objection will be overruled.

10:45:42 4                 The parties have before them the final final

10:45:51 5    version of the Court's proposed jury instructions.  Are

10:45:54 6    there any other objections for the record?

10:45:58 7                 MR. SHIEKMAN:  There are none from the

10:46:00 8    plaintiff.

10:46:00 9                 MS. McCOWAN:  Your Honor, we just have one, and

10:46:03 10   we have just raised this with the plaintiff.  And we felt

10:46:07 11   that one of the verdict form questions was a little bit

10:46:11 12   unclear and we would love the Court's guidance if you share

10:46:15 13   our view, but we understand that the jury instructions have

10:46:25 14   -- in the verdict form, number 2, did Mr. Pierce prove that

10:46:30 15   he would have made the same decisions to veto the

10:46:34 16   reclassification of Mr. Szubielski to a lower security level

10:46:38 17   even if Mr. Szubielski's protected activity had played no

10:46:45 18   role in the decision or Mr. Pierce's decision.  The proposed

10:46:48 19   final jury instruction includes kind of two positions for

10:46:52 20   Mr. Pierce.  And we would prefer -- I think we thought that

10:46:58 21   it seems, that question seems a little unclear, so our

10:47:02 22   proposed language would be did Mr. Pierce prove that he

10:47:05 23   would have made the same decision to veto the

10:47:09 24   reclassification of Mr. Szubielski to a lower security level

10:47:12 25   whether or not Mr. Szubielski engaged in protected activity?

10:47:17 1   And that language is found on page 16 of the proposed jury

10:47:22 2   instruction, final jury instruction.

10:47:24 3          We do recognize, though, the second part of that

10:47:27 4   last paragraph in the proposed final jury instruction mirror

10:47:32 5   the verdict form.  So, you know, in doing a final read we

10:47:37 6   thought that that verdict interrogatory seemed a little

10:47:41 7   strange and we would prefer the whether or not.

10:47:44 8          I will also note I think that plaintiffs and

10:47:47 9   defendants were interested in switching 2 and 3, the

10:47:51 10  questions 2 and 3 since plaintiff bears the burden of proof

10:47:56 11  on both of those and then defendant bears the burden of

10:48:01 12  proof on number 2.  So I think we were in agreement that we

10:48:04 13  would like to have those switched if Your Honor would be

10:48:07 14  willing.

10:48:08 15         THE COURT:  Let me hear from plaintiff first

10:48:10 16  about the proposed edit to question two.

10:48:14 17         MR. SHIEKMAN:  Your Honor, in the instructions

10:48:18 18  on page 16 to which the defendant just agreed or stated it

10:48:23 19  had no objection, the Court's instruction begins, if

10:48:27 20  Mr. Pierce proves, the last sentence on page 16, the verdict

10:48:34 21  question mirrors what the Court's instruction says.  And we

10:48:39 22  would like the question to remain as it's framed in the

10:48:42 23  instruction, which we also believe is consistent with Third

10:48:47 24  Circuit law on what the burden of proof is on Mr. Pierce.

10:48:51 25         THE COURT:  So this objection to reword question

10:48:57 1    two is going to be overruled.  I believe it is consistent

10:49:00 2    with Third Circuit law and the jury instructions as the

10:49:05 3    parties have not objected to.

10:49:12 4              With respect to renumbering questions 2 and 3,

10:49:41 5    based upon the parties' agreement I will renumber questions

10:49:44 6    2 and 3.

10:49:47 7              MS. McCOWAN:  Thank you, Your Honor.

10:49:49 8              MR. SHIEKMAN:  Thank you, Your Honor.

10:49:50 9              THE COURT:  Okay.  Anything else we need to

10:49:53 10   address?

10:49:56 11             MS. McCOWAN:  I don't think so, Your Honor.

10:49:57 12             MS. CLINE:  Agreed.

10:49:59 13             THE COURT:  Here is how I propose we proceed.  I

10:50:01 14   propose we bring Mr. Szubielski back on to the stand.  I see

10:50:05 15   that he's not actually here right now, so I'm not sure if

10:50:09 16   he's perhaps eating lunch or taking a restroom break.

10:50:13 17             MR. SHIEKMAN:  He is waiting downstairs in the

10:50:15 18   holding cell and I will text the officer to bring him up

10:50:19 19   right now.

10:50:19 20             THE COURT:  Let's text to bring him up now.  I

10:50:22 21   propose that Mr. Szubielski take the stand, we have the

10:50:27 22   questioning and then we send the jury back out for just a

10:50:30 23   couple of minutes while I print out copies of the final jury

10:50:34 24   instructions and the verdict form.  And then we will read

10:50:35 25   the final jury instructions up to page 20, and including

```
10:50:50  1    page 20, and then we hear closing arguments and then I will
10:50:56  2    finish up by reading pages 21, 22, 23 and 24 as well as walk
10:51:03  3    through the verdict form with the jurors, by which I mean
10:51:07  4    I'm going to read the jury verdict form to the jurors and
10:51:11  5    then we will let them go deliberate.
10:51:15  6              Do we have a sense of how long closing arguments
10:51:18  7    are going to take?  I won't hold you to it.
10:51:22  8              MS. COZEN:  Fifteen to twenty minutes, Your
10:51:26  9    Honor.
10:51:26 10              MS. SONG:  The same, Your Honor.
10:51:27 11              THE COURT:  It sounds like we can get this all
10:51:29 12    done before lunch.  And we ordered the jurors lunch so I
10:51:32 13    think that's going to work out perfectly.  Okay.  Since
10:51:36 14    we're waiting for Mr. Szubielski to come back up, I'm going
10:51:39 15    to go ahead and run down and get the preparations all made
10:51:43 16    for the paperwork to hand out to the jurors so that we will
10:51:47 17    be ready to proceed right away.
10:51:59 18              (A brief recess was taken.)
11:05:18 19              THE COURT:  Please be seated.  Are we ready to
11:05:20 20    proceed?
11:05:30 21              MS. McCOWAN:  We are, Your Honor.
11:05:32 22              MS. CLINE:  Yes, Your Honor.
11:05:33 23              THE COURT:  All right.  Let's bring the jury in.
11:05:36 24              (Jury entering the courtroom at 11:05 a.m.)
11:06:22 25              THE COURT:  Please be seated, everyone.
```

| 11:06:48 | 1 | At this time we'll give plaintiff an opportunity |
| 11:06:51 | 2 | to call their rebuttal witnesses.  You may call your next |
| 11:06:54 | 3 | witness. |
| 11:06:55 | 4 | MS. MUNNINGS:  The plaintiff calls Gerard |
| 11:06:58 | 5 | Szubielski. |
| 11:07:04 | 6 | REDIRECT EXAMINATION |
| 11:07:04 | 7 | BY MS. MUNNINGS: |
| 11:07:06 | 8 | Q.    Good morning, Jerry. |
| 11:07:08 | 9 | A.    Good morning. |
| 11:07:09 | 10 | Q.    Can you please look at Exhibit 23 at page 3? |
| 11:07:13 | 11 | A.    Yes. |
| 11:07:15 | 12 | THE COURT:  Before the plaintiff begins, I'll |
| 11:07:17 | 13 | remind him that he is still under oath. |
| 11:07:19 | 14 | THE COURT:  Okay. |
| 11:07:19 | 15 | BY MS. MUNNINGS: |
| 11:07:23 | 16 | Q.    Jerry, were you housed in maximum security from |
| 11:07:26 | 17 | October 14th, 2015 to October 2016? |
| 11:07:29 | 18 | A.    Yes, I was. |
| 11:07:33 | 19 | Q.    When you were living in building 23, was that also |
| 11:07:37 | 20 | maximum security? |
| 11:07:38 | 21 | A.    Yes, it was. |
| 11:07:42 | 22 | MS. MUNNINGS:  No further questions. |
| 11:07:42 | 23 | THE COURT:  Thank you. |
| 11:07:42 | 24 | Any cross-examination? |
| 11:07:47 | 25 | MS. McCOWAN:  We have no cross, Your Honor. |

11:07:48  1          THE COURT:  Okay.  Ladies and gentlemen of the

11:07:51  2    jury, we'll need to get resituated and then we will take a

11:07:55  3    very brief break, less than five minutes, we'll bring you

11:08:00  4    back to read you the final jury instructions and then we'll

11:08:03  5    do closing arguments for the parties.  So we'll return you

11:08:07  6    to the jury room for a very brief break.

11:08:11  7          (Jury leaving the courtroom at 11:08 a.m. )

11:09:18  8          THE COURT:  For purposes of the record, can

11:09:21  9    plaintiff confirm that there are no additional rebuttal

11:09:24 10    witnesses?

11:09:25 11          MS. CLINE:  Confirmed, Your Honor.

11:09:26 12          THE COURT:  Okay.  Very good.  So what we'll do

11:09:29 13    just so the jury is not confused when we bring them back in,

11:09:32 14    we'll have you announce for the record that you're resting

11:09:35 15    your entire case and then we'll start the final jury

11:09:39 16    instructions.

11:09:42 17          Anything else we need to address?

11:09:46 18          MS. CLINE:  Not from us.

11:09:47 19          MS. McCOWAN:  Nothing from the defendant.

11:09:49 20          THE COURT:  My law clerk has gone to pull the

11:09:52 21    papers off the printer.

11:10:32 22          Are there any additional applications we should

11:10:40 23    consider before we send the matter to the jury?

11:10:42 24          MR. SHIEKMAN:  Nothing from the plaintiff, Your

11:10:47 25    Honor.

11:10:47   1          MS. McCOWAN:   Your Honor, we will renew our

11:10:50   2    judgment as a matter of law given that we anticipate that

11:10:55   3    the plaintiff will rest its entire case when the jury comes

11:10:59   4    back.

11:10:59   5          THE COURT:   Okay.   Can everyone double-check the

11:15:02   6    verdict form and make sure I made the appropriate edit with

11:15:10   7    renumbering the question?

11:15:19   8          MS. CLINE:   Looks good to us, Your Honor.

11:15:22   9          MS. McCOWAN:   Yes, Your Honor.

11:15:24  10          THE COURT:   All right.   Very good.   Let's bring

11:15:26  11    the jury back in.

11:15:35  12              (Jury entering the courtroom at 11:15 a.m.)

11:16:26  13          THE COURT:   Please be seated.   Welcome back,

11:16:32  14    ladies and gentlemen of the jury.

11:16:39  15          Plaintiff, do we have any additional witnesses

11:16:42  16    today?

11:16:42  17          MS. CLINE:   We do not.   The plaintiff rest, Your

11:16:44  18    Honor.

11:16:44  19          THE COURT:   Okay.   With that, we'll proceed to

11:16:42  20    the next phase of this jury trial.   At this point in time

11:16:52  21    I'm going to read to you a portion of the final jury

11:16:57  22    instructions.   We'll hear closing arguments from the

11:17:01  23    counsel, and then we'll hear the final instructions.

11:17:04  24          Ms. Garfinkel, will you hand out copies of the

11:17:08  25    final jury instructions to the jury.

Members of the jury, it is now time me for to instruct you about the law that you must follow in deciding this case.  Each of you have been provided a copy of these instructions.  You may read along while I deliver them if you prefer, however I would encourage you to focus your attention on me while the instructions are being read.  You will be able to take the copies with you into the deliberation and refer to them at that time if necessary.

I will start by explaining your duties and the general rules applied in every civil case.  Then, I will explain some rules that you must use in evaluating particular testimony and evidence.  I will explain the positions of the parties and the law you will apply in this case.  Finally, I will explain the rules that you must follow during the deliberations in the jury room and the possible verdicts that you may return.  Please listen very carefully to everything I say.

Members of the jury, it is important that you bear in mind the distinction between your duties and my duties.  You have two main duties as jurors.  The first one is to decide what the fact are from the evidence that you saw and heard here in court.  You are the sole judges of the facts.  It is your judgment, and your judgment alone, to determine what the facts are, and nothing I have said or done during this trial was meant to influence your decisions

about the facts in any way.  Your second duty is to take the law that I give you, apply it to the facts and decide, if by a preponderance of the evidence the defendant is liable.

Now as far as my duty is concerned, I have the duty of advising you about the law that you should apply to the facts as you find them.  You are not to consider whether the principles I state to you are sound or whether they accord with your own views about policy.  You are bound by the oath that you took at the beginning of the trial to follow instructions that I give you, even if you personally disagree with them.  You must accept them despite how you feel about their wisdom.  This includes the instructions that I gave you before and during the trial, and these instructions.  All instructions are important, and you should consider them together as a whole.

Perform these duties fairly, do not let any bias, sympathy, or prejudice that you may feel toward one side or the other influence your decision in any way.

You must make your decision based only on the evidence that you saw and heard here in court.  Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence from which you are to find the facts consist of the following:

1.   The testimony of the witness or read from transcripts;

2.   Documents and other things received as exhibits.

The following things are not evidence:

1.   Statements, arguments, and questions of the lawyers for the parties in this case;

2.   Objections by lawyers;

3.   Any testimony I tell you to disregard; and

4.   Anything you may see or hear about this case outside the courtroom.

Nothing else is evidence.  The lawyers' statements and arguments are not evidence.  The arguments of the lawyers are offered solely as an aid to help you in your determination of the facts.  Their questions and objections are not evidence.  My legal rulings are not evidence.  My comments and questions are not evidence.

You should use your common sense in weighing the evidence.  Consider it in light of your every day experience with people and events, and give it whatever weight you believe it deserves.  If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

There are rules that control what can be received into evidence.  When a lawyer asks a question or

offers an exhibit into evidence, and a lawyer on the other
side thinks that is not permitted by the rules of evidence,
that lawyer may object.  This simply means that the lawyer
is requesting that I make a decision on a particular rule of
evidence.  You should not be influenced by the fact that an
objection is made.  Objections to questions are not
evidence.  Lawyers have an obligation to their clients to
make objections when they believe that evidence being
offered is improper under the rules of evidence.  You should
not be influenced by the objection or by the Court's ruling
on it.  If the objection is sustained, ignore the question.
If it is overruled, treat the answer like any other.  If you
are instructed that some item of evidence is received for a
limited purpose only, you must follow that instruction.

There are two types of evidence that you may use
in reaching your verdict.  One type of evidence is calling
"direct evidence."  An example of "direct evidence" is when
a witness testifies about something that the witness knows
through his own senses, something that the witness has seen,
felt, touched, or heard or did.  If a witness testified that
he saw it raining outside, and you believed him, that would
be direct evidence that it was raining.  Another form of
direct evidence is an exhibit where the fact to be proved is
its existence or current condition.

The other type of evidence is circumstantial

evidence.  Circumstantial evidence is proof of one or more facts from which you could find another fact.  If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

You should consider both kinds of evidence that are presented to you.  The law makes no distinction in the weight to be given to either direct or circumstantial evidence.  You are to decide how much weight to give any evidence.

In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe.  You are the sole judges of the credibility of the witnesses.  Credibility means whether a witness is worthy of belief.  You may believe everything a witness says or only part of it or none of it.  In deciding what to believe, you may consider a number of factors including the following:

The opportunity and ability of the witness to see or hear or know the things the witness testifies to; the quality of the witness's understanding and memory; the witness' manner while testifying, whether the witness has an interest in the outcome of the case or any motive, bias, or prejudice; whether the witness is contradicted by anything

the witness said or wrote before trial or by other evidence;
how reasonable the witness's testimony is when considered in
the light of other evidence that you believe; and any other
factors that bear on believability.

You are the sole judges of each witness's
credibility.  That includes the parties.  You should
consider each witness's meanings of knowledge, strength of
memory, opportunity to observe, how reasonable or
unreasonable the testimony is; whether it is consistent or
inconsistent; whether it has been contradicted; the
witness's biases, prejudices, or interests; the witness's
manner or demeanor on the witness stand; and all
circumstances that according to the evidence could affect
the credibility of the testimony.

If you find the testimony to be contradictory,
you may try to reconcile it, if reasonably possible, so as
to make one harmonious story of it all.  But if you can't do
this, then it is your duty and privilege to believe the
testimony that, in your judgment, is most believable and
disregard any testimony that in your judgment is not
believable.

The weight of the evidence to prove a fact does
not necessarily depend on the number of witnesses who
testify.  What is more important is how believable the
witnesses were, and how much weight you think their

testimony deserves.

A deposition is sworn testimony of a witness taken before trial.  The witness is placed under oath and swears to tell the truth, and lawyers for each party may ask questions.  A court reporter is present and records the questions and answers.

Deposition testimony is entitled to the same consideration and is to be judged, insofar as possible, in the same way as if the witness has been present to testify.  Do not place any significance on the behavior or tone of voice or any person reading the questions or answers.

This is a civil case.  Gerard Szubielski is the party that brought this lawsuit.  David Pierce is the party against whom the lawsuit was filed.  Mr. Szubielski has the burden of proving his claims and damages by what is called a preponderance of the evidence.  Proof by a preponderance of the evidence means proof that something is more likely true than not.

To say it differently, if you were to put the evidence favorable to Mr. Szubielski and the evidence favorable to Mr. Pierce on opposite sides of the scales, Mr. Szubielski would have to make the scales tip somewhat on his side.  If Mr. Szubielski fails to meet his burden, because either the scales tip in Mr. Pierce's favor or the scales are the same, the verdict must be for Mr. Pierce.  If

you find after considering all the evidence that a claim or fact is slightly more likely so than not so, then the claim or fact has been proved by a preponderance of the evidence.

In determining whether any fact has been proved by a preponderance of the evidence in the case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

On one issue, called an affirmative defense, Mr. Pierce has the burden of proving the elements of the defense by a preponderance of the evidence.  I will instruct you on the facts that will be necessary for you to find on this affirmative defense.  An affirmative defense is proven if you find, after considering all evidence in the case, that Mr. Pierce has succeeded in proving that the required facts are more likely so than not so.

You may have heard of the term proof beyond a reasonable doubt.  That is a stricter standard of proof and it applies only to criminal cases.  It does not apply in civil cases such as this.  So you should put it out of your mind.

Mr. Szubielski is suing under Section 1983, a civil rights law passed by congress that provides a remedy to persons who have been deprived of their federal

constitutional rights under color of state law.  In other words, Mr. Szubielski must show that Mr. Pierce was using power that he possessed by virtue of state law.

Mr. Szubielski must prove both of the following elements by a preponderance of the evidence.  First, Mr. Pierce acted under color of state law.  Second, while acting under color of state law, Mr. Pierce deprived Mr. Szubielski of a federal constitutional right.

I will now give you more details on actions for color of state law, after which I will tell you the elements Mr. Szubielski must prove to establish the violations of his federal constitutional rights.

The first element of Mr. Szubielski's claim is that Mr. Pierce acted under color of state law.  Because Mr. Pierce was an official of the State of Delaware at all relevant times, I instruct you that he was acting under color of state law.  In other words, this element of Mr. Szubielski's claim is not in dispute, and you must find that this element has been established.

The second element of Mr. Szubielski's claim is that Mr. Pierce deprived him of a federal constitutional right.  Mr. Szubielski claims that Mr. Pierce, while acting under color of state law, vetoed the reclassification of Mr. Szubielski to a lower security level in retaliation for Mr. Szubielski's participation as an exemplar in a lawsuit

against the Delaware Department of Correction in violation
of the First Amendment.

         To succeed on this claim, Mr. Szubielski must
prove each of the following facts by a preponderance of the
evidence.

         First:  That Mr. Szubielski engaged in a
protected activity under the First Amendment by serving as
an exemplar in the lawsuit against the Delaware Department
of Correction.  It is my duty to instruct you on whether an
activity is protected by the First Amendment.  A person's
right to access the courts by serving as an exemplar in a
lawsuit is conduct that is protected by the First Amendment.
The parties have agreed that Mr. Szubielski served as an
exemplar in the lawsuit against the Delaware Department of
Correction.  In other words, this element of
Mr. Szubielski's claim is not in dispute.

         Second.  That Mr. Pierce subjected
Mr. Szubielski to adverse action by vetoing the
reclassification of Mr. Szubielski to a lower security
level.  If you find that Mr. Pierce's veto would be likely
to deter an ordinary person in Mr. Szubielski's
circumstances from exercising his First Amendment rights,
then this element has been established.

         Third.  That Mr. Szubielski's participation in
the lawsuit against the Delaware Department of Correction as

an exemplar was a substantial or motivating factor in
Mr. Pierce's decision to veto the reclassification of
Mr. Szubielski to a lower security level.

          In showing that Mr. Szubielski's protected
activity was a motivating factor for Mr. Pierce's action,
Mr. Szubielski is not required to prove that his protected
activity was the sole motivation or even the primary
motivation for Mr. Pierce's decision.  Mr. Szubielski need
only prove that his protected activity played a motivating
part in Mr. Pierce's decision even though other factors may
also have motivated Mr. Pierce.  Mr. Szubielski could make
this showing in a number of ways.  The timing of events can
be relevant.  For example, if Mr. Pierce's action follow
very shortly after Mr. Pierce became aware of
Mr. Szubielski's protected activity.  But a more extended
passage of time does not necessarily rule out a finding that
Mr. Szubielski's protected activity was a motivating factor.
For instance, you may also consider any antagonism shown
toward Mr. Szubielski or any change in demeanor toward
Mr. Szubielski.

          If you find that Mr. Szubielski has proven by a
preponderance of the evidence that his participation in the
lawsuit against the Delaware Department of Correction was a
substantial or motivating factor in Mr. Pierce's decision to
veto the reclassification of Mr. Szubielski to a lower

1   security level, then you should consider Mr. Pierce's

2   affirmative defense.  Mr. Pierce argues that he would have

3   made the same decision to veto Mr. Szubielski's

4   reclassification whether or not Mr. Szubielski had engaged

5   in the protected activity.  If Mr. Pierce proves by a

6   preponderance of the evidence that Mr. Pierce would have

7   taken the same adverse action regarding Mr. Szubielski even

8   if Mr. Szubielski's protected activity had played no role in

9   the decision, then your verdict must be for Mr. Pierce.

10          I am now going to instruct you on damages.  Just

11   because I am instructing you on how to award damages does

12   not mean that I have any opinion on whether or not

13   Mr. Pierce should be held liable.

14          If you find Mr. Pierce liable, then you must

15   consider the issue of compensatory damages.  You must award

16   Mr. Szubielski an amount that will fairly compensate him for

17   any jury he actually sustained as a result of Mr. Pierce's

18   conduct.

19          Mr. Szubielski must show that the injury would

20   not have occurred without Mr. Pierce's act.  Mr. Szubielski

21   must also show that Mr. Pierce's act played a substantial

22   part in bringing about the injury, and that the injury was

23   either a direct result or a reasonable probable consequence

24   of Mr. Pierce's act.

25          During the course of this trial, you have heard

that Mr. Szubielski was held in maximum security from 2007 to October 11, 2016.  However, Mr. Pierce's veto did not occur until October 14, 2015.  I am instructing you that, if you were to find Mr. Pierce liable, you may only award Mr. Szubielski damages for injuries that occurred as a result of Mr. Szubielski's time in maximum security from October 14, 2015, to October 11, 2016.

Compensatory damages must not be based on speculation or sympathy.  They must be based on the evidence presented at trial, and only on that evidence. Mr. Szubielski has the burden of proving compensatory damages by a preponderance of the evidence.

Mr. Szubielski claims the following items of damage:

Physical harm to Mr. Szubielski during and after the events at issue, including ill health, physical pain, disability, disfigurement, or discomfort, and any such physical harm that Mr. Szubielski is reasonably certain to experience in the future.

Until assessing such harm, you should consider the nature and extent of the jury and whether the jury is temporary or permanent.

Emotional and mental harm to Mr. Szubielski during and after the events at issue, including fear, humiliation, mental anguish, and any such emotional and

11:36:45 1    **mental harm that Mr. Szubielski is reasonably certain to**

11:36:48 2    **experience in the future.**

11:36:49 3            **You may not award compensatory damages for**

11:36:53 4    **physical injury to Mr. Szubielski unless you find that**

11:36:56 5    **Mr. Szubielski proved that he actually sustained physical**

11:37:00 6    **injury.  Similarly, you may not award compensatory damages**

11:37:04 7    **for emotional or mental harm unless you find that**

11:37:08 8    **Mr. Szubielski actually sustained physical injury.  To award**

11:37:13 9    **compensatory damages for physical injury or emotional or**

11:37:17 10    **mental harm, Mr. Szubielski must show that he suffered**

11:37:20 11    **physical injury that is more than minor or trivial, but he**

11:37:25 12    **need not show that his physical injury was significant or**

11:37:29 13    **substantial.**

11:37:30 14            **If you find that Mr. Szubielski has shown actual**

11:37:33 15    **injury, you may award compensatory damages even if the**

11:37:37 16    **monetary value of his injury is difficult to ascertain.**

11:37:42 17            **If you return a verdict for Mr. Szubielski, but**

11:37:45 18    **Mr. Szubielski has failed to prove compensatory damages,**

11:37:48 19    **then you must award nominal damages of $1.**

11:37:52 20            **A person whose federal rights were violated is**

11:37:56 21    **entitled to a recognition of that violation, even if he**

11:38:02 22    **suffered no actual injury.  Nominal damages (of $1)  are**

11:38:08 23    **designed to acknowledge the deprivation of a federal right,**

11:38:14 24    **even where no actual injury occurred.**

11:38:20 25            **However, if you find actual injury, you must**

11:38:23 1    award compensatory damages (as I instructed you)  rather

11:38:28 2    than the nominal damages.

11:38:37 3            I have read a number of instructions to you.

11:38:40 4    The fact that some particular point may be covered in the

11:38:43 5    instructions more than some other point should not be

11:38:48 6    regarding as meaning that I intended to emphasize that

11:38:54 7    point.  You should consider these instructions as a whole,

11:39:00 8    and you should not choose any one or more instructions and

11:39:06 9    disregard the others.  You must follow all the instructions

11:39:12 10   that I have given you.

11:40:22 11           At this time, we'll hear closing arguments.

11:40:29 12   Plaintiff, please proceed when you're ready.

11:40:34 13           MS. COZEN:  Thank you, Your Honor.

11:40:45 14           Ladies and gentlemen of the jury, I would like

11:40:46 15   to start by thanking you for your service.  We know you all

11:40:50 16   planned to be somewhere else this week and we very much

11:40:53 17   appreciate the sacrifices you made to be here and the close

11:40:58 18   attention you paid to this trial.  So thank you.

11:41:02 19           This case is about how former Warden David

11:41:05 20   Pierce chose to take the law into his own hands and go

11:41:10 21   against the recommendation of the classification board and

11:41:15 22   unnecessarily house Jerry Szubielski in solitary confinement

11:41:20 23   for an additional year.  Ladies and gentlemen of the jury,

11:41:25 24   you have now heard all of the evidence.  You have now heard

11:41:25 25   how former Warden Pierce broke the rules and Jerry paid the

price.

At the start of this trial, you heard from my colleague, Courtney Munnings.  She broke this suit down into five key details to keep in mind.  Each detail has now been proven.

First, the evidence has shown that Jerry was an exemplar in a lawsuit brought on behalf of vulnerable prisoners suffering with poorly treated mental illnesses.  You saw this in the evidence.  You were shown a CLASI, Plaintiff's Exhibit 15.  Jerry told you how he was prisoner number 3 in the complaint.  He also provided testimony to back this up.  He testified that he spent years in the Pennsylvania Psychiatric Institute as a young child and the complaint includes this detail.  Awele Maduka-Ezeh stated in her deposition how Jerry was hospitalized at Kent General Hospital in Dover as an adverse reaction to Haldol.  This complaint includes this detail, too.

And Jerry's incarceration at the James T. Vaughn Correctional Center started in 2017 and he was housed in the SHU for almost the entire sentence.  He told you this.  His house records support this.  And the complaint includes this detail, too.  Simply put, the allegations surrounding prisoner number 3 describe Jerry.  It could be no one else.

Second, the evidence has shown former Warden Pierce and his staff knew Jerry and they knew he was an

11:43:21 1   exemplar in the CLASI suit.  You heard from Jerry.  You

11:43:26 2   heard how he was on a letter writing campaign and he wrote

11:43:29 3   to Pierce often, and occasionally Pierce even responded.

11:43:33 4   You saw letters in evidence.

11:43:36 5           Jerry talked about how he needed to speak up

11:43:39 6   about the conditions in the SHU, so he participated in the

11:43:45 7   CLASI lawsuit and responded to the flyer.  He participated

11:43:50 8   in interviews with CLASI as Warden Pierce stood in the

11:43:53 9   doorway trying to intimidate him.  But he wasn't intimidated

11:43:55 10  and he was used as an exemplar in the complaint.

11:44:02 11          You also heard from James Scarborough.  He

11:44:10 12  stated that Jerry was a high profile inmate.  They were

11:44:13 13  always watching him.  He stated that Jerry was on the prison

11:44:18 14  administrator's radar and that Pierce knew him.  Of course

11:44:22 15  Scarborough even testified that he personally spoke to

11:44:26 16  Pierce about Jerry.  Scarborough also testified that he knew

11:44:30 17  about the CLASI complaint.  He read it as Deputy Warden at

11:44:35 18  the time, so do you really believe that former Warden

11:44:38 19  Pierce, Warden at the time of this lawsuit, at the time this

11:44:42 20  lawsuit was filed, didn't read the complaint when his Deputy

11:44:46 21  Warden did?

11:44:49 22          Scarborough testified that he didn't agree with

11:44:51 23  the complaint.  It disappointed him.  You heard that.  You

11:44:57 24  heard him testify that he was not happy about it, and that

11:45:00 25  Pierce, Pierce was angry.  And you heard from Pierce

11:45:03 1    himself.  You heard that he participated in a lengthy

11:45:07 2    meeting with many lawyers about the CLASI suit and a

11:45:11 3    potential resolution.  You heard how at this meeting the

11:45:15 4    discussion focused on the conditions of confinement for

11:45:19 5    mentally ill inmates in the SHU and how Warden Pierce knew

11:45:24 6    inmates were being interviewed for the lawsuit.

11:45:27 7              Third, the evidence has shown Pierce's staff

11:45:30 8    recommended that Jerry be released from solitary.  This

11:45:34 9    couldn't be more clear.  You saw the prison record.  You saw

11:45:39 10   Jerry's classification form explicitly stating this.  You

11:45:44 11   heard this from Jerry.  And you heard this from Pierce

11:45:47 12   himself.  He confirm that both the JTVCC and the MDT board

11:45:54 13   recommended Jerry be classified as medium.  And you also

11:45:58 14   heard how Jerry was so excited when he found this out, how

11:46:03 15   he called his family, how he had hope for the first time in

11:46:08 16   years.

11:46:09 17             Fourth, the evidence has shown that Pierce

11:46:13 18   vetoed that decision without an explanation in violation of

11:46:18 19   DOC rules and the law, and with indifference to Jerry's

11:46:22 20   wellbeing.  The Warden veto report is submitted into

11:46:26 21   evidence.  It's the second page of Plaintiff's Exhibit 4.

11:46:30 22   It's dated October 14th, 2015, a mere two months after the

11:46:38 23   CLASI suit was filed; a suit challenging former Warden

11:46:44 24   Pierce's precious prison practice.

11:46:45 25             Ladies and gentlemen of the jury, there is no

justification written on this form.  You saw that.  Pierce
admitted that.  There is no reasoning.  You heard the
deposition testimony of Shane Troxler.  He stated that a
reason was required for the veto.  That former Warden Pierce
should have reported this in the comments of the form, but
he didn't.  And you have seen the policy, you have seen
Classification Policy 3.3.  It's Plaintiff's Exhibit 5 in
evidence, and I would encourage you to look at this in
deliberations.

On page 15, it says wardens must submit written
justifications for their veto decisions.  Must.  I repeat,
must.  That's not optional.  There is no exception.  And
Pierce stated that this policy applied to him.  He stated it
was the law, and he violated it.

Fifth, and finally, the evidence has shown that
as a result of Pierce's veto, Jerry spent another 362
miserable days in solitary confinement.  You saw in the
documents and heard from the testimony how Warden Pierce
vetoed Jerry's classification on October 14th, 2015, and how
he stayed in max until October 11th, 2016.  That's an
additional 362 days.  362 long miserable days.  That is the
evidence.  That is what you heard and what you saw over the
past two days.

And this meets all of the elements of
plaintiff's retaliation claims.

11:48:42  1          And now let's talk a little bit about the law to

11:48:46  2     which the Court just gave you instructions.  Jerry's

11:48:46  3     retaliation claim consist of three simple parts.  First,

11:48:46  4     that he engaged in a protected activity.  He did.  Serving

11:48:46  5     as an exemplar in a lawsuit is a protected activity.  The

11:49:08  6     Judge has instructed you on that.  That is not in dispute.

11:49:08  7          Second, that Mr. Pierce subjected Jerry to

11:49:13  8     adverse action by vetoing his classification.  He did.

11:49:17  9     Pierce admitted that he vetoed Jerry's classification and

11:49:23 10     the veto was an adverse action because it would deter an

11:49:28 11     ordinary person from continuing to engage in protected

11:49:32 12     conduct.  It would deter an ordinary prisoner from speaking

11:49:37 13     up in a lawsuit because it cost Jerry to stay in solitary an

11:49:42 14     additional year.

11:49:42 15          And third, plaintiffs must show that it's more

11:49:45 16     likely than not that Jerry's service as an exemplar in the

11:49:51 17     CLASI suit was a substantial or motivating factor in former

11:49:58 18     Warden Pierce's decision to use the veto.  Not that it was

11:50:01 19     the only factor, just that it was a motivating factor.

11:50:06 20     That's it.  That's all.  That's all you need to decide.  And

11:50:10 21     plaintiff proved that.

11:50:12 22          I just explained to you all the evidence that

11:50:12 23     supports the veto was an adverse action and Jerry's service

11:50:12 24     as an exemplar was more likely than not the motivating

11:50:21 25     factor in the veto decision.  So Jerry has met his burden.

11:50:28   1          So in response to that, what does the state do?

11:50:32   2   They offer two after-the-fact justifications that quite

11:50:37   3   frankly have no support and don't make a lot of sense,

11:50:41   4   neither of which defendant shows are more likely not to be

11:50:46   5   true.

11:50:47   6          To start, former Warden Pierce now claims that

11:50:50   7   he vetoed Jerry's classification in part due to slow down

11:50:56   8   concerns.  But ladies and gentlemen of the jury, this

11:50:59   9   doesn't make sense.  For one, if this were true, why didn't

11:51:03  10   he write it?  He could have easily listed that on the

11:51:06  11   classification form and we wouldn't be here today.  But he

11:51:09  12   didn't.  And quite frankly, the contemporaneous document

11:51:15  13   contradicts this justification.

11:51:17  14          In deliberations, look at Jerry's housing

11:51:20  15   record, Plaintiff's Exhibit 23.  Opposing counsel went

11:51:24  16   through this with Jerry.  They did not flow him down to

11:51:28  17   medium.  After the veto he was kept in SHU building 19 for a

11:51:34  18   few months.  And then he was moved into another SHU building

11:51:37  19   with slightly more privileges, building 23, for a few more

11:51:41  20   months.  After that he wasn't moved into medium, he was

11:51:47  21   moved in a more restrictive building, building 17, for

11:51:51  22   another few months.  That's not flowing him down to medium,

11:51:55  23   that's just moving him around SHU.

11:51:57  24          And you also heard that the MDT had flow down

11:52:01  25   concerns that they wrote as comments in Exhibit 10, concerns

11:52:04 1    Mr. Wan questioning David Pierce about, and David Pierce

11:52:09 2    pointed out that the NET wrote this in their comments on the

11:52:14 3    form.

11:52:15 4              So why couldn't Pierce have wrote this on the

11:52:18 5    form?  Why couldn't he list that rationale, too?  And

11:52:24 6    despite these concerns, the MDT, the dispute these alleged

11:52:28 7    flow down concerns the MDT recommended Jerry be classified

11:52:32 8    as medium.  If flow down was a true reason for keeping Jerry

11:52:37 9    in max, why didn't the MDT do the same?

11:52:42 10             Former Warden Pierce also claims that he vetoed

11:52:46 11   Jerry's classification in part due on to a contraband

11:52:51 12   investigation.  He throws around a bunch of incident reports

11:52:54 13   and mentions a threatening letter all of which Jerry

11:52:57 14   acknowledges openly, and claims that these back up the

11:53:02 15   investigation.  But do they?  I urge you to look at the date

11:53:07 16   on these incident reports.  Not a single one of these

11:53:11 17   reports is from 2015, the year of the veto.  Not a single

11:53:15 18   one it mentions an alleged investigation.  And the officer,

11:53:23 19   Officer McMann, the officer Jerry threatened in a letter in

11:53:27 20   2013 is the same officer who Jerry testified delivered him

11:53:33 21   the good news that he was now classified and approved for

11:53:33 22   medium security.

11:53:41 23             You also heard the testimony of Parker this

11:53:42 24   morning.  Parker claims there was an investigation in 2015,

11:53:46 25   and he claims this based on a letter, Plaintiff's Exhibit 3.

11:53:52  1    But this isn't mentioned in the letter, and he claims they

11:53:56  2    talked about the investigation meetings.  So apparently it's

11:54:01  3    not a secret investigation after all, it was openly

11:54:05  4    discussed in meetings.  So if this is true, why didn't the

11:54:08  5    IBC and the MDT know about it and classify Jerry in the max,

11:54:14  6    too?  Why weren't they told?

11:54:16  7             In the letter to Jerry, Plaintiff's Exhibit 3

11:54:19  8    which says you know your history means as Parker claims it

11:54:26  9    to mean, it means Jerry knew of some alleged investigation

11:54:30 10    in 2015.  Why couldn't Pierce write this justification on

11:54:34 11    the veto form?  What's the so-called security risk if he

11:54:40 12    already knew?

11:54:42 13             So really, really all we have supporting this

11:54:44 14    investigation is the word of David Pierce.  David Pierce is

11:54:49 15    the defendant in this case who could be found liable.  The

11:54:54 16    prison kept records of everything.  Don't you think if there

11:54:58 17    were documents or records supporting this investigation and

11:55:02 18    referencing this investigation, an alleged contraband

11:55:06 19    investigation in 2015, they would be exhibits in this

11:55:10 20    lawsuit?  And don't you think if this was the real reason

11:55:15 21    for the veto, Pierce would have said that either in his

11:55:21 22    deposition, that he would have remembered considering he

11:55:27 23    uses the veto less than one percent of the time.  But he

11:55:31 24    didn't.

11:55:32 25             You heard how he was asked directly at his

11:55:36 1    deposition, quote, when you vetoed the IBCC's classification

11:55:43 2    decision, do you recall why you did that?  And you know what

11:55:49 3    he said, he said not on that specific date.  Really?

11:55:53 4    Really?  He vetoes classifications less than one percent of

11:55:57 5    the time, but he couldn't remember a reason at his

11:56:00 6    deposition.  And now he wants you to believe he suddenly

11:56:05 7    remembered over five years post veto, he conveniently

11:56:10 8    remember the justification at the time of trial.  Ladies and

11:56:15 9    gentlemen of the jury, thinking about former Warden Pierce's

11:56:19 10   motivations, he will be held liable if you find for Jerry.

11:56:23 11            And you know who he could have called as a

11:56:26 12   witness, the one person he claims could corroborate his

11:56:31 13   testimony?  Investigator Michelle Roberts.  But he didn't.

11:56:38 14   He offers unsubstantiated claims that she told him about the

11:56:44 15   investigation, that she had the files, that she gave him a

11:56:46 16   reason for the veto.  But where are those files?  He

11:56:49 17   certainly didn't introduce any.  And where is Michelle

11:56:53 18   Roberts?  Pierce never called her.  You never saw her on the

11:56:57 19   witness stand.  So all we have supporting this investigation

11:57:02 20   story is Pierce's inconsistent self interested tale that

11:57:09 21   openly violates DOC policy and the law, and there is not a

11:57:12 22   shred of additional evidence to back it up.

11:57:16 23            The facts are simple, Jerry served as an

11:57:20 24   exemplar in the CLASI lawsuit.  Mr. Pierce was angry about

11:57:24 25   it and he vetoed Jerry's classification in spite because of

11:57:29  1    it.  He didn't write a justification because he didn't have

11:57:34  2    a legal justification.  The veto destroyed Jerry's chance to

11:57:41  3    enter general population after eight long years on his own.

11:57:45  4    The veto caused Jerry to spend an additional 362 days in

11:57:52  5    maximum security.

11:57:54  6              Now, I want to talk to you a little bit about

11:57:57  7    damages.  When you agreed to be jurors, you committed to

11:58:02  8    being committed to awarding Jerry damages if he proved his

11:58:05  9    case, and he has.  The Judge instructed you that Jerry is

11:58:09 10    seeking damages for physical and emotional harm for the

11:58:14 11    362 days after a period of eight years that he spent in

11:58:19 12    solitary because of former Warden Pierce's veto.  And when

11:58:24 13    you think about this, when you think about the damages, I

11:58:28 14    want you to take a look at the evidence.  I will have them

11:58:34 15    back with you in deliberations.  I want you to look at

11:58:38 16    Exhibit 1 and take a look at the cell.  Jerry testified that

11:58:42 17    this photo of the cell was exactly like his cell except the

11:58:47 18    bed he had was on a frame.  Look at the picture of the

11:58:50 19    recreation area which Jerry was forced to testify in, think

11:58:52 20    about this, and think about Jerry's testimony.  He told you

11:59:01 21    how the SHU was hell, simply hell.  Extreme isolation, food

11:59:07 22    and meds given to him through a hole in the wall, little to

11:59:11 23    no mental health treatment, simply given pills and

11:59:15 24    encouraged to go to sleep.

11:59:18 25              And he told you how he suffered extreme neck and

11:59:21 1  back pain.  He told you that in 2015-2016, the relevant

11:59:28 2  period, he got an MRI because of these injuries.  He saw two

11:59:33 3  surgeons and this led to surgery leaving a disc in his neck.

11:59:39 4  He told you how he still experiences headaches from the

11:59:43 5  bright lights in the SHU to this day.  And how the bang,

11:59:50 6  bang, bang of the metal flaps and doors in the SHU still

11:59:56 7  torments his mind.  And most importantly, Jerry told you how

12:00:01 8  the veto caused his fragile mental health to deteriorate.

12:00:07 9  How he was so excited to finally get out of the SHU and then

12:00:12 10  he got the veto news.  And it broke his heart.  He was numb.

12:00:18 11  And he had suicidal thoughts.  Think about that.  Think

12:00:23 12  about those 362 days.  Think about how much each day, each

12:00:32 13  hour, each minute living in this total hell is worth, and

12:00:40 14  think about the physical and mental damage Pierce inflicted

12:00:43 15  on Jerry, damage that still affects him to this day.  He

12:00:49 16  should be compensated for all of it, every single day.

12:00:53 17          Ladies and gentlemen of the jury, Jerry has done

12:00:58 18  wrong in his life.  We don't deny that.  He has acknowledged

12:01:03 19  that.  But he is a person, and he should not have been

12:01:07 20  treated this way.  I ask you to remember that when you leave

12:01:11 21  the courtroom today, and I ask you to hold former Warden

12:01:17 22  Pierce liable and to award Jerry damages for each and every

12:01:22 23  day of harm he suffered because of Warden Pierce.

12:01:25 24          Thank you.

12:01:29 25          THE COURT:  Thank you.  Let's hear from

12:01:35  1    defendants.

12:01:40  2              MS. SONG:  May it please the Court, plaintiff's

12:01:44  3    counsel, and members of the jury.  Your Honor, permission to

12:01:51  4    approach.  I won't go beyond the court reporter.

12:01:53  5              THE COURT:  Permission granted.

12:01:55  6              MS. SONG:  I am a threat to your security in

12:01:58  7    ways you don't even know.  That is what Gerard Szubielski

12:02:03  8    said to Counselor McMann in a letter when he was an inmate

12:02:06  9    at Vaughn and that's the kind of person he is, he is a

12:02:09 10    threat to prison security.  He wants you to believe that he

12:02:14 11    was a victim of retaliation by David Pierce because he

12:02:17 12    participated as an exemplar in the CLASI lawsuit.  Which by

12:02:24 13    the way, does not identify him by name.  There is really no

12:02:29 14    way a person would know that it was him.

12:02:33 15              He wants you to believe that David Pierce vetoed

12:02:36 16    his reclassification because of his involvement in that

12:02:40 17    lawsuit and that's not the case.  Members of the jury, my

12:02:46 18    name is Rebecca Song and I represent Mr. Pierce along with

12:02:49 19    my co-counsel, Ken Wan and Alison McCowan.

12:02:52 20              Before I go into the evidence in this case, I

12:02:55 21    wanted to talk a little bit about the burden of proof.

12:03:00 22    Burden of proof the plaintiff has that.  And in a civil case

12:03:03 23    the burden of proof is preponderance of the evidence.  That

12:03:07 24    simply means that if you weigh the evidence on a scale,

12:03:10 25    plaintiff's evidence, defense evidence, if the plaintiff's

12:03:14 1    evidence tips slightly in favor of plaintiff, they have met

12:03:18 2    their burden by a preponderance of the evidence.

12:03:25 3           And as members of the jury, you're the fact

12:03:29 4    finders, right, so you get to evaluate the evidence, assess

12:03:33 5    credibility of the witnesses, and decide what really

12:03:36 6    happened here.  Right?  And is Mr. Pierce liable for

12:03:40 7    retaliation?

12:03:41 8           One of the really important tools that you

12:03:43 9    members of the jury have in your disposal is common sense.

12:03:47 10   And common sense is something that you use every day, making

12:03:51 11   every day decisions.  What lane should I drive when I drive

12:03:54 12   on I-95?  What should I eat for lunch, common sense is

12:03:59 13   something that you use every day and it's something that you

12:04:02 14   can use here and should use here when you evaluate the

12:04:06 15   evidence.

12:04:06 16          And I would like to ask you, does it make sense

12:04:11 17   that David Pierce would retaliate against an inmate when he

12:04:16 18   has a job as a Warden?  He's overseeing over 2,400 inmates,

12:04:21 19   over a thousand staff members.  He's going to retaliate

12:04:26 20   against an inmate for participating in the CLASI lawsuit?

12:04:30 21   He's not even named as a party.  David Pierce isn't being

12:04:35 22   sued in this complaint.

12:04:38 23          And you're going to have a chance to look at the

12:04:40 24   complaint.  Right?  You're going to see again, his name is

12:04:45 25   not on there.  Szubielski is not on there, neither is

12:04:51 1    Pierce.  Why would he care?

12:04:54 2              Again, you've heard Mr. Pierce testify and he

12:05:00 3    testified that he did not know that the plaintiff was an

12:05:04 4    exemplar in this complaint.  He didn't know.  He didn't know

12:05:08 5    about the CLASI lawsuit until after the settlement which

12:05:12 6    occurred in 2016.  And I would like to remind you when you

12:05:16 7    get to look at the complaint, but it was filed in

12:05:19 8    August 2015.  So he didn't know about it until over a year

12:05:22 9    after.  And he testified that he was fine with the change.

12:05:30 10   The changes from the CLASI settlement, he was fine with it.

12:05:34 11   He was not concerned about CLASI, period.

12:05:39 12             And when he was the Warden at Vaughn, he

12:05:45 13   testified, Mr. Pierce testified that DOC, the Department of

12:05:50 14   Correction, handed out questionnaires to inmates if they

12:05:54 15   wanted to participate in this lawsuit.  So inmates were

12:06:00 16   getting notice that they could participate in this lawsuit,

12:06:08 17   Mr. Szubielski also received that.  Is that someone who

12:06:11 18   would be really concerned about CLASI?  No.

12:06:19 19             Now I'm going to go into the claims of

12:06:22 20   retaliation.  So the burden of proof.  The plaintiff has the

12:06:25 21   burden of proof for retaliation of three elements.  The

12:06:29 22   first element really isn't in dispute, did Mr. Szubielski,

12:06:32 23   was he an exemplar in the CLASI lawsuit?  We're not

12:06:37 24   disputing that, not at issue.

12:06:39 25             Two.  Did Mr. Szubielski suffer an adverse

12:06:44  1   action because of the veto?  That is at issue.  And the
12:06:48  2   question is not did he have a miserable time in the SHU.
12:06:52  3   That's not the question.  The question is would the veto
12:06:57  4   deter an ordinary person from, in plaintiff's circumstances,
12:07:02  5   from exercising his First Amendment right like filing
12:07:06  6   lawsuits?  And on the stand you heard Mr. Szubielski testify
12:07:09  7   that yeah, after the veto I filed this lawsuit, and I filed
12:07:13  8   another lawsuit against Centurion in '20 and '21.  So no,
12:07:19  9   the veto did not deter his desire to exercise his First
12:07:24  10  Amendment rights because he filed lawsuits.
12:07:27  11          And by the way, the veto happened on 10/14/2015.
12:07:38  12  And Mr. Szubielski testified that he was in building 23 at
12:07:43  13  the time.  He was in building 23 from September 2015 to
12:07:48  14  October 11, 2016, and building 23 is the one of the lesser
12:07:52  15  restrictive buildings in max.  That's what Mr. Szubielski
12:07:55  16  testified to.
12:07:57  17          So no, he did not suffer an adverse action here.
12:08:01  18  Plaintiff did not meet their burden of proving that to you.
12:08:04  19          Now, the third element is did plaintiff prove by
12:08:08  20  a preponderance of the evidence that his -- that because he
12:08:11  21  participated in CLASI, that was the substantially motivating
12:08:12  22  factor in the warden's decision to veto his classification.
12:08:22  23  And the answer is no.  They didn't meet their burden.  And
12:08:27  24  simply because Mr. Pierce, he can't be motivated by
12:08:31  25  something that he doesn't know about.  He didn't know that

| | |
|---|---|
| 12:08:34 | 1 |
| 12:08:39 | 2 |
| 12:08:43 | 3 |
| 12:08:47 | 4 |
| 12:08:51 | 5 |
| 12:08:57 | 6 |
| 12:08:59 | 7 |
| 12:09:03 | 8 |
| 12:09:08 | 9 |
| 12:09:12 | 10 |

Mr. Szubielski served as an exemplar, period.  That was one
of the last things that he testified on the stand yesterday.
He said that -- I'm sorry, the plaintiff said that the
Warden, Mr. Pierce, had seen him when he was talking to his
attorney, one of the CLASI interviews.  He also testified
that yeah, there were twenty to thirty attorneys talking to
like a ton of inmates, hundreds of inmates.  So he wasn't
even -- it wasn't as if CLASI attorneys were interviewing
him only, this was a situation where twenty to thirty
attorneys would be talking to a ton of people.  There is no
way that Pierce would have known that he, Mr. Szubielski,
was the exemplar in this lawsuit.

And also, Mr. Szubielski couldn't even give you
a date of when or even an approximate date of when he
supposedly saw Pierce when he was talking to the attorneys.

Substantially motivating factors, that's a very
interesting term.  You can think of it in two ways.  Number
one, timing.  The veto happened 10/14/2015 -- I'm sorry, the
CLASI action happened in 2015 and the veto happened 2015, so
there is like a two-month gap.  Does it really make sense?
Are those two events so close in time that it would be
subjective of retaliation?  No, it's not.  That's a really
long time.  It really doesn't make sense that one event
happened and then two months later another event happened
and somehow they are retaliatory.  It's not.  You can also

12:10:27 1  think of it as timing plus other reason, like, if there is a

12:10:33 2  pattern of antagonism from Mr. Pierce toward Mr. Szubielski

12:10:37 3  and there is no pattern, there is no pattern, how do we

12:10:40 4  know?  Because Mr. Szubielski testified that I didn't really

12:10:43 5  see the guy.  I didn't see the guy.  Mr. Pierce also said

12:10:46 6  that, too, both people agreed.  No antagonism.  So the

12:10:51 7  answer is no, the plaintiff did not meet their burden by a

12:10:55 8  preponderance of the evidence that there was a substantially

12:11:00 9  motivating factor.

12:11:02 10          Now, in the plaintiff's counsel's closing

12:11:06 11 argument she made kind of a big deal about if there were

12:11:11 12 these other reasons that Mr. Pierce had the veto, why didn't

12:11:16 13 he just put it on the paper.  Right?  But Mr. Pierce

12:11:21 14 explained to you the reasons why he couldn't put that on the

12:11:24 15 paper.  He was being investigated.  He was being

12:11:27 16 investigated for smuggling contraband into the prison.

12:11:31 17          Let me remind you, ladies and gentlemen,

12:11:34 18 Mr. Pierce was the warden of Vaughn, and managing the

12:11:37 19 day-to-day operation of a prison that houses over 2,400

12:11:42 20 people is presumably a very difficult job, especially when

12:11:42 21 you have to house them 24 hours a day.  There is no break.

12:11:42 22 So security is a huge issue.  You don't want anyone hurting

12:11:52 23 each other.  You want to prevent any incidents with the

12:11:52 24 inmates.  Right?  So promoting contraband is a big deal in

12:12:02 25 the prison.  And the administrators like Mr. Pierce have to

take it seriously, very seriously, because not only does it affect that inmate, but it has the potential to affect other inmates and staff who deal with that inmate.  So it's incumbent on the warden to take it very seriously.

Now, what did we hear from Mr. Szubielski? Well, I had the opportunity to ask him about the contraband. So what did he admit to?  Oh, yeah, he admitted to having a cell phone.  He broke it when they tried to seize it. Razors.  Wire, soap, stamps, envelopes, so the soaps and the stamps and the envelopes may seem like harmless items, he has a few extra soaps.  What's the big deal?  Well, the Deputy Warden Parker, he's still the deputy warden and former Deputy Warden Scarborough explained that promoting contraband is serious.  And former Deputy Warden Scarborough explained that stamps can be used as currency among the inmates.  And also, some inmates there is some sort of drug laced on the stamps, it can cause bad effects on inmates, it can cause death.  Envelopes can also be used as currency. And also both Deputy Warden Scarborough and Parker talked about investigations.  There were investigations going on about the DOC and smuggling contraband in with his mom. These are all concerns that are going on in Mr. Pierce's mind.

This isn't a case about retaliation, this is a case about prison security.  And he was doing his job, as he

12:13:50  1    should.  So the defense actually has to also -- we also have

12:13:59  2    a burden of showing you that, and we have through the

12:14:03  3    testimony of Mr. Szubielski who admitted to all the

12:14:06  4    contraband that he brought in; to the testimony of

12:14:10  5    Mr. Pierce who explained to you why that is a serious

12:14:13  6    problem; and through the testimony of the former Deputy

12:14:16  7    Warden Scarborough and current Deputy Warden Parker.

12:14:22  8             So I do want to talk a little bit about

12:14:28  9    compensatory damages.  As the jury instructions stated, if

12:14:32 10    you do find as fact finders, if you do find Mr. Pierce

12:14:38 11    liable of retaliation, you can get to consider compensatory

12:14:42 12    damages, but for you to do that, the plaintiff has to show

12:14:45 13    injuries.  He has to show that he suffered injury.  Not only

12:14:51 14    does he have to show you injury, he has to show you that

12:14:55 15    injury would not have happened without the veto, and the

12:14:58 16    plaintiff did not prove that.  And how do we know?  Where

12:15:02 17    are the medical records?  There are none.  No medical

12:15:05 18    records.  And whatever testimony that they read into you

12:15:09 19    yesterday had nothing to do with the specific time frame.

12:15:12 20    You're limited, but as fact finders you're limited by a

12:15:20 21    certain period of time.

12:15:21 22             For compensatory damages, you can only look at

12:15:24 23    the evidence from 10/14/2015, the time of the veto, to

12:15:29 24    10/11/2016 when he got out of max.  So the plaintiff offered

12:15:32 25    you no evidence about injury during that time frame.  2012,

12:15:41 1    that's when the plaintiff said that he started getting

12:15:45 2    headaches and neck pain.  Okay?  Again, no evidence about

12:15:52 3    that from that time frame that you are limited to.

12:15:59 4              Mental health, that wasn't caused by the veto.

12:16:02 5    He had suffered from mental health issues since he was a

12:16:06 6    kid.  They have not shown you injury.  They did not meet

12:16:11 7    their burden and so compensatory damages should not be

12:16:15 8    awarded.

12:16:17 9              So I mentioned a little bit about credibility.

12:16:20 10   So you get to decide who are you going to believe.  You have

12:16:25 11   seen people testify yesterday and today.  And you hear the

12:16:31 12   story, you check out the demeanor, how are they talking, how

12:16:36 13   are they moving, those are all things that you can evaluate

12:16:40 14   when you decide who am I going to believe.  Mr. Szubielski

12:16:44 15   says he has to live with the pain.  He says he's suffering

12:16:47 16   from headaches and neck pain since 2012 and he's still

12:16:52 17   living with this pain.  Let me ask you, ladies and

12:16:55 18   gentlemen, when he was on the stand, did he look like he was

12:16:57 19   in pain to you?  Did he look like he was suffering from neck

12:17:01 20   pain?  Was he moving around in pain?  He was not.  Did it

12:17:08 21   appear that he was actually in fine physical health?

12:17:12 22              Now, Mr. Szubielski, he is an incarcerated

12:17:18 23   person, you know that because there is ample testimony about

12:17:20 24   that.  Right?  He said that he committed three violent

12:17:25 25   felonies and he got sentenced in a way that now he's serving

12:17:29 1   a life sentence.  And a person who is serving a life

12:17:33 2   sentence, well, okay, so he's at Vaughn now.  How is he

12:17:38 3   behaving?  Is he a model inmate or is he continuing

12:17:43 4   practices that are disruptive, disorderly and harmful

12:17:49 5   potentially to other inmates and the security of the prison?

12:17:52 6           Ladies and gentlemen, he has been continuing his

12:17:59 7   bad behavior throughout his time in prison.  And we know

12:18:04 8   that because he has admitted to that.  He testified to

12:18:07 9   having a cell phone he's not supposed to have.  He has

12:18:14 10  wires.  He has razors and stamps and drug paraganglia, soap.

12:18:21 11  That was interesting, Mr. Pierce described the soap.  As lay

12:18:25 12  people who are not in prison, you don't think of soap as

12:18:28 13  being -- who cares if this guy has extra soap.  Mr. Pierce

12:18:32 14  explained to you, oh, by the way, you can use a razor to

12:18:35 15  just slice it open, carve it out, carve out the middle and

12:18:40 16  put contraband in there, put it back in, hide it in the

12:18:43 17  shower so that the next inmate can pick up the contraband.

12:18:47 18          You're supposed to believe a guy who he says to

12:18:51 19  you on the stand, I hardly interact with anybody at the SHU.

12:18:55 20  I hardly socialize with anybody.  I'm locked up.  This, by

12:19:01 21  the way, for a person who is locked up in max, he's somehow

12:19:06 22  able to secure all these items.  How did he do that?  That's

12:19:10 23  something you need to consider.

12:19:12 24          You also had a chance to observe Mr. Pierce.

12:19:16 25  How did he act?  Was he calm?  Yeah.  Did he explain

12:19:20 1  himself?  Yeah, he did.  And he explained the reasons for

12:19:25 2  why he vetoed Mr. Szubielski.  Why he was not fit to go to

12:19:33 3  medium security.  And there were two reasons, sure, and

12:19:37 4  yeah, he didn't put it on the form, sure, but that's not

12:19:40 5  what he is suing for, what he's being sued for is

12:19:47 6  retaliation.  He told you it was because you have the

12:19:50 7  investigations.  He was being investigated.  And the flow

12:19:53 8  down issue, yeah, it can be really difficult for a mental

12:19:58 9  health person to go from solitary to medium security where

12:20:02 10  they have to interact with more people, people with mental

12:20:06 11  health issues, and that can be a problem.  He has to think

12:20:09 12  about not just Mr. Szubielski, but all the other inmates

12:20:12 13  that are housed in his prison and the staff who help them or

12:20:16 14  manage them, supervise them, monitor them.

12:20:20 15          Did it make sense to you, though, if he's going

12:20:24 16  to get investigated for bringing contraband, why would you

12:20:29 17  put that on the form for others to see.  It's an ongoing

12:20:33 18  investigation.  It wasn't closed.

12:20:35 19          So ladies and gentlemen, the evidence shows that

12:20:40 20  the plaintiff, Mr. Szubielski's actions created a very

12:20:42 21  unsafe environment in the prison.  And does it really make

12:20:51 22  sense, the question you have to ask yourself when you go

12:20:53 23  back in the room there and deliberate is does it really make

12:20:56 24  sense that Pierce would retaliate against Szubielski for

12:21:00 25  this CLASI complaint or does it really make more sense that

12:21:05 1   the plaintiff was a threat to security?  He was a threat to

12:21:08 2   security.  As he said he would be to Townsend McNare, and

12:21:13 3   that the veto was actually necessary, absolutely necessary,

12:21:17 4   because he presented himself to be a security risk.  He said

12:21:21 5   he would be.

12:21:25 6          So I would ask you, ladies and gentlemen of the

12:21:31 7   jury, that you find the plaintiff did not meet their burden.

12:21:35 8   They did not prove by a preponderance of the evidence

12:21:39 9   retaliation.  And even if you find that they did prove it,

12:21:43 10  that Mr. Pierce still is not liable because the veto would

12:21:53 11  have happened anyway.  He had all these other -- he had all

12:21:56 12  these other security concerns that he had to think about.

12:22:00 13  It wasn't about CLASI, he didn't know about it, he didn't

12:22:05 14  know he was involved, it was about prison security, the most

12:22:10 15  important concern as a warden.

12:22:12 16         And I would also ask you to find that plaintiff

12:22:16 17  didn't meet their burden of proof in showing damages,

12:22:21 18  either, because they provided you absolutely no evidence

12:22:24 19  about the time frame that you are limited to about this

12:22:29 20  injury.

12:22:30 21         Thank you.

12:22:31 22         THE COURT:  Thank you.

12:22:38 23         MS. COZEN:  We'll waive rebuttal.

12:22:40 24         THE COURT:  Okay.  Ladies and gentlemen of the

12:22:45 25  jury, that concludes the closing arguments.  I am now going

12:22:49  1    to read to you the further instructions that are also on

12:22:52  2    your final jury instruction packet that we handed out.  When

12:23:05  3    you retire to jury room to deliberate, you may take with you

12:23:08  4    these instructions, your notes, and the exhibits that the

12:23:11  5    Court has admitted into evidence.

12:23:12  6            One member of the jury will serve as your

12:23:14  7    foreperson.  By custom of this Court, the foreperson is

12:23:18  8    juror number 1.  That person will preside over the

12:23:22  9    deliberations and speak for you here in open court.

12:23:25 10            You have two main duties as jurors.  The first

12:23:28 11    one is to decide what the facts are from the evidence that

12:23:30 12    you saw and heard here in court.  Deciding what the facts

12:23:33 13    are is your job, not mine, and nothing that I have said or

12:23:37 14    done during this trial is meant to influence your decision

12:23:40 15    about the facts in any way.

12:23:41 16            Your second duty is to take the law that I give

12:23:45 17    you, apply it to the facts, and decide if under their

12:23:50 18    respective burdens of proof the parties have established

12:23:53 19    their claims and/or defenses.  It is my job to instruct you

12:23:57 20    about the law, and you are bound by the oath that you took

12:24:01 21    at the beginning of the trial to follow the instructions

12:24:04 22    that I give you, even if you personally disagree with them.

12:24:08 23    This includes the instructions that I gave you before and

12:24:11 24    during the trial, and these instructions.  All instructions

12:24:14 25    are important, and you should consider them together as a

12:24:17 1      whole.  Perform these duties fairly.  Do not let bias,

12:24:21 2      sympathy, or prejudice that you may feel toward one side or

12:24:25 3      the other influence your decision in any way.

12:24:28 4             As jurors, you have a duty to consult with each

12:24:32 5      other and to deliberate with the intention of reaching a

12:24:35 6      verdict.  Each of you must decide the case for yourself, but

12:24:39 7      only after a full and impartial consideration of all of the

12:24:43 8      evidence with your fellow jurors.  Listen to each other

12:24:47 9      carefully.  In the course of your deliberations, you should

12:24:50 10     feel free to re-examine your own views and to change your

12:24:54 11     opinion based upon the evidence.  But you should not give up

12:24:58 12     your honest convictions about the evidence just because of

12:25:08 13     the opinions of your fellow jurors.  Nor should you change

12:25:12 14     your mind just for the purpose of obtaining enough votes for

12:25:15 15     a verdict.

12:25:16 16            When you start deliberating, do not talk to the

12:25:20 17     jury officer, to me, or to anyone but each other about the

12:25:23 18     case.  During your deliberations, you must not communicate

12:25:27 19     with or provide any information to anyone by any means about

12:25:30 20     this case.  You may not use any electronic device or media

12:25:32 21     such as a cell phone, smartphone, or computer of any kind;

12:25:41 22     the internet, any internet service, or any text or instant

12:25:47 23     messaging service; or any internet chat room, blog, website,

12:25:52 24     or social networking service, to communicate to anyone any

12:25:56 25     information about this case or to conduct any research about

this case until I accept your verdict.

You may not use these electronic means to investigate or communicate about the case because it is important that you decide this case based solely on the evidence presented in this courtroom.  Information on the internet or available through social media might be wrong, incomplete, or inaccurate.  Information that you might see on the internet or on social media has not been admitted into evidence and the parties have not had a chance to discuss it with you.  You should not seek or obtain such information and it must not influence your decision in this case.

If you have any questions or messages for me, you must write them down on a piece of paper, have the foreperson sign them, and give them to the jury officer. The officer will give them to me, and I will respond as soon as I can.  I may have to talk to the lawyers about what you have asked, so it may take some time to get back to you.

One more thing about messages.  Never write down or tell anyone how you stand on your votes.  For example, do not write down or tell anyone that a certain number is voting one way or another.  Your votes should stay secret until you are finished.

Your verdict must represent the considered judgment of each juror.  In order for you as a jury to

return a verdict, each juror must agree to the verdict. Your verdict must be unanimous.

A form of verdict has been prepared for you.  It has a series of questions for you to answer.  You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will fill it in and have your foreperson, juror number 1, date and sign the form.  You will then return to the courtroom and your foreperson will give your verdict.

Unless I direct you otherwise, do not reveal your answers until you are discharged.  After you have reached a verdict, you are not required to talk with anyone about the case unless I order you to do so.

Once again, I want to remind you that nothing about my instructions and nothing about the form of verdict is intended to suggest or convey in any way or manner what I think your verdict should be.  It is your sole and exclusive duty and responsibility to determine the verdict.

I'll now ask Ms. Garfinkel to hand out copies of the verdict form.  A form of verdict has been prepared for you.  You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date and sign the form.  You will then return to the courtroom, your foreperson will give the form to my deputy clerk and your verdict shall be

announced.

It is proper to add a caution that nothing said in these instructions and nothing in the form of a verdict is meant to suggest or convey in any way or manner any intimation as to what verdict I think you should find.  What the verdict shall be is your sole and exclusive duty and responsibility.  Your verdict must represent the considered judgment of each juror.

In order for you as a jury to answer a question on the verdict form, each juror must agree to the answer.  In other words, your answers to each question must be unanimous.  I will review this form with you now.

Verdict form.  Please answer the following questions on which all of you must unanimously agree.

Question 1.  Did Gerard Szubielski prove that his participation in the lawsuit against the Delaware Department of Correction as an exemplar was a substantial or motivating factor in Dave Pierce's decision to veto the reclassification of Mr. Szubielski to a lower security level?

If your answer to question 1 is yes, proceed to question 2.  If your answer to question 1 is no, stop and go to the final instruction on the next page.

Question 2.  Did Mr. Szubielski prove that Mr. Pierce's veto would be likely to deter an ordinary

person in Szubielski's circumstances from exercising his First Amendment rights.

If your answer to question 2 is yes, proceed to question 3.  If your answer to question 2 is no, stop and go to the final instruction below.

Question 3.  Did Mr. Pierce prove that he would have made the same decision to veto the reclassification of Mr. Szubielski to a lower security level even if Mr. Szubielski's protected activity had played no role in Mr. Pierce's decision?

If your answer to question 3 is no, proceed to question 4.  If your answer to question 3 is yes, stop and go to the final instruction below.

Question 4.  Did Mr. Pierce's veto described in question 1 above cause injury to Mr. Szubielski?

If your answer to question 4 is yes, proceed to question 5A and skip question 5B.  If your answer to question 4 is no, skip question 5A and proceed to question 5B.

5A.  Please state the amount that will fairly compensate Mr. Szubielski for any injuries he actually sustained as a result of Mr. Pierce's conduct.

5B.  Because you answered no to question 4, Mr. Szubielski is awarded nominal damages in the amount of $1.

12:32:30 1                    Final instruction.  When you have completed the

12:32:37 2       necessary questions above, please sign and date below and

12:32:41 3       let the court officer know you have reached a verdict.  So

12:32:45 4       say we all, this line, fill in the date on which you reach

12:32:49 5       the verdict, day of July 2021 and then it has a spot for

12:32:55 6       signature of the jury foreperson.

12:32:57 7                    (Side-bar discussion:)

12:33:19 8                    THE COURT:  So we're about to send the jury

12:33:24 9       back.  Is there anything we will need to put on the record

12:33:26 10      before we do that?

12:33:27 11                   MS. McCOWAN:  No.

12:33:28 12                   MR. SHIEKMAN:  Nothing from plaintiff.

12:33:31 13                   MR. WAN:  Nothing from defendant.

12:33:31 14                   THE COURT:  I'm hearing nothing from either side

12:33:34 15      so at this time we'll have Ms. Garfinkel.

12:33:38 16                   COURT CLERK:  We have to swear in the CSO and

12:33:40 17      then we'll send the jury back.

12:34:00 18                   (End of side-bar discussion.)

12:34:11 19                   THE COURT:  At this time we'll have my courtroom

12:34:12 20      deputy swear in the jury officer.

12:34:27 21                   COURT CLERK:  Please state and spell your name

12:34:30 22      for the record.

12:34:32 23                   JURY OFFICER:  John Gregor, J-O-H-N,

12:34:36 24      G-R-E-G-O-R.

12:34:36 25                   (Jury officer was sworn.)

12:34:54 1          THE COURT:  Can you take the jury back.

12:34:56 2               (Jury leaving the courtroom at 12:35 p.m.)

12:35:25 3          THE COURT:  Please be seated.  So the jury is

12:35:39 4     back in deliberations.  We have ordered them lunch.  It's my

12:35:43 5     understanding that their lunch is arriving around 1:00 p.m.

12:35:47 6     so they can hopefully continue their deliberations as

12:35:50 7     they're eating.

12:35:51 8          I ask that all of you make sure that

12:35:54 9     Ms. Garfinkel has your contact information so that we can

12:35:57 10    give you a call if we have a question from the jury, we can

12:36:00 11    bring everybody back in and discuss how to respond.  Once we

12:36:04 12    have a verdict from the jury we can call you back in to get

12:36:08 13    the jury's verdict.

12:36:09 14          Anything else we need to address?

12:36:11 15          MS. CLINE:  Not from plaintiff.

12:36:13 16          MS. McCOWAN:  Nothing from us, Your Honor.

12:36:14 17          THE COURT:  Thanks very much, everybody.  Enjoy

12:36:16 18    your lunch and we'll see you back here either this afternoon

12:36:20 19    or we'll let you know if we're coming back on Monday.

14:18:22 20               (A brief recess was taken.)

14:18:22 21          THE COURT:  Good afternoon, everyone.  Please be

14:34:27 22    seated.  So we have a question from the jury.  My courtroom

14:34:31 23    deputy has provided each side with a copy of the question.

14:34:36 24    I will read it for the record.  It says, "We would like to

14:34:39 25    request the 2019 deposition of Mr. Pierce, questions and

14:34:45 1    answers from Mr. Pierce regarding his deposition from

14:34:49 2    defense and plaintiff."  And it's signed by the jury

14:34:54 3    foreperson.

14:34:57 4             Let's have the parties' positions on how we

14:35:00 5    should answer the question.

14:35:02 6             MS. CLINE:  From plaintiff's perspective, we

14:35:04 7    think the proper way to deal with it is we have the portions

14:35:07 8    of the trial transcript containing Pierce's deposition

14:35:10 9    transcript that has been admitted read back to the jury.

14:35:14 10            THE COURT:  Okay.

14:35:18 11            MS. SONG:  Your Honor, the defense would object

14:35:20 12   to that.  And according to the jury instructions they are

14:35:23 13   limited to -- they're limited to the testimony of the

14:35:28 14   witnesses that were read from transcripts, documents, things

14:35:33 15   that were received as exhibits, basically what they remember

14:35:36 16   from the trial.

14:35:37 17            THE COURT:  So I guess we were like ships

14:35:42 18   passing in the night.  So I tend to agree to the extent

14:35:46 19   plaintiff is suggesting the jury is asking about -- well, I

14:35:51 20   tend to agree with defendants the jury is asking for the

14:35:55 21   deposition, it appears that this jury is asking for the

14:35:55 22   deposition transcript at this point.

14:35:55 23            And so one way that we could answer this is by

14:36:02 24   saying that the 2019 deposition transcript is not in

14:36:02 25   evidence.  If we got a follow-up question from the jury

14:36:12 1   suggesting that they wanted to read back trial testimony, we

14:36:17 2   could take that up at that time.

14:36:20 3              What are your thoughts about that, Ms. Cline?

14:36:23 4              MS. CLINE:  I think it would be inaccurate to

14:36:26 5   say the entirety of the transcript is not in evidence

14:36:29 6   because portions of it are.  I understand the Court's

14:36:34 7   inclination to take it iteratively, but our response might

14:36:38 8   be you can't have the entire transcript because it's not in

14:36:41 9   evidence, we continue to think that the portions of it that

14:36:44 10  have been admitted should be available for read back.

14:36:48 11             MS. SONG:  Your Honor, just to respond, the

14:36:50 12  trial transcript is not in evidence.  I don't know if they

14:36:52 13  have a final copy.

14:36:54 14             THE COURT:  I don't have a transcript of the

14:36:56 15  trial.  So that's one of the issues.  I don't know if anyone

14:37:01 16  else has ordered one and has received it.

14:37:04 17             MS. CLINE:  So we do and we have received it,

14:37:06 18  yes.

14:37:07 19             THE COURT:  All right.

14:37:09 20             MS. McCOWAN:  Your Honor, if I can speak to --

14:37:11 21  to be fair, I understand that their position is that the

14:37:13 22  deposition transcript that was discussed on the stand is in

14:37:18 23  evidence.  I don't believe that that's accurate.  I believe

14:37:21 24  that the testimony is evidence, but the deposition itself

14:37:25 25  and the excerpts were never offered into evidence and I

14:37:28 1    think it's improper, impeachment evidence in general is not

14:37:31 2    offered into evidence and it wasn't in this case.

14:37:34 3              THE COURT:  Well, let me tell you one

14:37:39 4    possibility of how we can respond and let me think.  I can

14:37:44 5    say something like, jury, a copy of the transcript of the

14:37:49 6    2019 deposition testimony is not in evidence.  We can all

14:37:52 7    agree that that is, in fact, the case.  We refer to it as a

14:37:56 8    copy of the transcript.

14:38:03 9              We could also say if a witness -- if a witness

14:38:09 10   testified at trial regarding deposition testimony, you may

14:38:13 11   consider that testimony.

14:38:16 12             What do you think about something like that?

14:38:18 13   And then if we get a call for a read back, then we can

14:38:22 14   discuss whether or not they should get a read back.

14:38:25 15             MS. CLINE:  May we consult?

14:38:28 16             THE COURT:  Yes.

14:38:52 17             MS. CLINE:  Could Your Honor just hit us again

14:38:54 18   with your proposed solution?

14:38:58 19             THE COURT:  It's being revised as I speak.

14:39:18 20   Let's try this.  Dear jury, a copy of the transcript of

14:39:22 21   Warden Pierce's 2019 deposition testimony is not in

14:39:33 22   evidence.  If a witness testified at trial regarding their

14:39:42 23   prior deposition, you may consider that trial testimony as

14:39:42 24   part of the evidence in this case.

14:39:52 25             MS. McCOWAN:  Your Honor, I think that's an

14:40:00  1   accurate statement of the law and we would support that

14:40:02  2   instruction.

14:40:11  3            MS. CLINE:  So our only concern is that my

14:40:14  4   understanding of the law which we're rapidly researching as

14:40:17  5   we speak is that it's inappropriate to discourage a jury

14:40:22  6   from requesting a read back, so we're grappling with whether

14:40:26  7   the instruction that you just read as framed would

14:40:29  8   discourage that.  So I think we can live with the first

14:40:32  9   sentence.  We're willing to agree to that.

14:41:34 10            THE COURT:  You're in agreement that this is an

14:41:36 11   appropriate response?

14:41:37 12            MS. CLINE:  We do, yes.

14:41:38 13            THE COURT:  The state is in agreement as well?

14:41:40 14            MS. McCOWAN:  Yes, Your Honor.

14:41:41 15            THE COURT:  I don't know if my handwriting is

14:41:43 16   good enough to write it on here, so -- but I'll give it a

14:41:49 17   shot.

14:42:17 18            We're going to get this typed up on an official

14:42:21 19   caption and then we'll provide everyone with a copy after

14:42:23 20   we're done with that.  But I don't anticipate taking the

14:42:27 21   bench again.  And we have exactly verbatim what I told you I

14:42:31 22   am going to put on the answer.  Okay.

14:42:34 23            MS. CLINE:  Thank you.

14:42:35 24            MS. McCOWAN:  Thank you, Your Honor.

14:42:37 25            (A brief recess was taken.)

15:47:29  1            THE COURT:  Please be seated.  We have another

15:47:31  2   note from the jury that says as follows:  We are asking for

15:47:35  3   the trial testimony of Mr. Pierce regarding his deposition

15:47:40  4   and subsequent answers for the questions asked by the

15:47:43  5   defense and plaintiff.  It is signed by the jury foreman.

15:47:48  6            Let's have plaintiff's position as to how we

15:47:51  7   should answer?

15:47:51  8            MS. CLINE:  Plaintiff's position is that we

15:47:53  9   should read back to the jury just the portions of

15:47:56 10   Mr. Pierce's transcripts that were read into the record

15:47:58 11   during the trial.

15:47:59 12            THE COURT:  Okay.

15:47:59 13            MS. CLINE:  We would like -- it will be

15:48:03 14   relatively short, not a burden.

15:48:06 15            THE COURT:  Let me hear what your proposals are.

15:48:15 16            MS. CLINE:  So the first relates to the question

15:48:25 17   about how many times Warden Pierce exercised the veto.

15:48:31 18   Colloquy about the deposition, on page 134, line 23, handing

15:48:36 19   a transcript of that deposition, he's going to talk about

15:48:42 20   having copies exchanged.  And then line 10 of page 135, I

15:48:46 21   would like to direct your attention to page 150, line 25,

15:48:49 22   I'm going to read this testimony into the record.  On

15:48:52 23   line 25 it says:

15:48:52 24            "QUESTION:  Could you estimate how many times

15:48:55 25   you used it?

15:48:56 1          "ANSWER:  It would be a rough estimate if I did.

15:48:58 2    I would estimate it at one percent at best.

15:49:00 3          "QUESTION:  Did I read that correctly?

15:49:03 4          "ANSWER:  You did."

15:49:04 5          And then the other two portions of the

15:49:06 6    transcript we could find quotes related to the questioning

15:49:09 7    around whether Warden Pierce could recall reasons for the

15:49:13 8    veto.  Under plaintiff's questioning, page let's say 219,

15:49:22 9    line 1, I would like to direct your attention to line 6.  I

15:49:26 10   apologize, page 253, line 6.  In the transcript page 219

15:49:32 11   line 5:

15:49:32 12         "QUESTION:  Turning aside from that when you

15:49:36 13   veto the AVCC classification decision, do you recall why you

15:49:40 14   did that?

15:49:41 15         "ANSWER:  Not to that specific date.

15:49:43 16         "QUESTION:  Did I read that correctly?

15:49:46 17         "ANSWER:  You did."

15:49:47 18         Then on redirect page 224 of the trial

15:49:55 19   transcript, let's say line 15, Mr. Wan asked the witness

15:50:00 20   whether he recall that he was asked about the testimony and

15:50:08 21   Mr. Wan follows up:

15:50:10 22         "QUESTION:  Yeah, let's take a look at line 9.

15:50:12 23   Am I correct that when you said not on that specific date,

15:50:12 24   that wasn't your entire response; is that correct?

15:50:17 25         "ANSWER:  That's correct.

15:50:18  1                "QUESTION:  You also said I mentioned that I

15:50:21  2  thought the process was slowing down which that could have

15:50:25  3  represented that I wouldn't want him to go from a very

15:50:28  4  structured single cell to a B or C straightaway, that was

15:50:34  5  your complete answer; correct?

15:50:35  6                "ANSWER:  That's correct."

15:50:36  7           THE COURT:  Okay.  Anything else you want to say

15:50:41  8  in support of your position?  I'll give you a chance to

15:50:45  9  respond after we hear from defendant.

15:50:46 10           MS. CLINE:  No, Your Honor, that's it.

15:50:48 11           THE COURT:  Let's hear from the defendant as to

15:50:50 12  whether the read backs are appropriate.

15:50:57 13           MS. SONG:  Your Honor, I think the danger here

15:51:02 14  is is we don't actually have a final transcript of what

15:51:05 15  occurred yesterday, and so I believe counsel is going from a

15:51:09 16  rough transcript.  What she read actually doesn't reflect

15:51:13 17  what was in the deposition transcript, so there is a danger

15:51:17 18  of reading that to the jury, that would be improper.

15:51:20 19           And in addition, there is some Third Circuit

15:51:22 20  case law and the District of Delaware case law that

15:51:26 21  discusses two reasons why a court should be weary of

15:51:30 22  rereading trial testimony to the jury.  And I would be happy

15:51:33 23  to provide that to Your Honor.

15:51:39 24           THE COURT:  Why don't you tell me the two

15:51:41 25  reasons.

501

15:51:42 1          MS. SONG:  Sure.  The two reasons are that the

15:51:45 2    jury may give undue weight to the testimony that was read

15:51:48 3    back, and the second is requiring the court reporter to

15:51:51 4    produce written transcripts would cause substantial delay to

15:51:55 5    the orderly administration of the trial and I think both

15:51:58 6    issues are present here, if we even attempt to read the

15:52:04 7    rough draft.

15:52:04 8          THE COURT:  All right.  Thank you.  I will hear

15:52:06 9    a brief response from plaintiff, if you have one.

15:52:10 10         MS. CLINE:  Yes, just that we're happy to share

15:52:13 11   our transcript.  I don't know if my reading skills are off.

15:52:17 12   You're welcome to take a look and verify the accuracy, that

15:52:22 13   shouldn't be an issue.  We tried to be fair to read both our

15:52:26 14   questioning and the other side, we so we don't see the

15:52:28 15   prejudice, the testimony is what it is.

15:52:30 16         My understanding is it's customary for the court

15:52:34 17   to allow to have testimony reread to it and that, in fact,

15:52:37 18   it can be error if the jury is discouraged from the request.

15:52:45 19   And my colleague is also telling me that we think the cases

15:52:48 20   from the state are distinguishable on the subject of waiver.

15:52:52 21         THE COURT:  Okay.  All right.  As to providing

15:52:57 22   the portion of Mr. Pierce's testimony, or I should say the

15:53:01 23   portions of Mr. Pierce's testimony that plaintiff proposes

15:53:05 24   by reading it back or providing a portion of the transcript,

15:53:08 25   I have a real concern with that.  In particular I'm

15:53:12 1    concerned and I hereby find if the jury is only providing

15:53:16 2    the portion read by counsel today as plaintiff's counsel has

15:53:20 3    proposed the jury will give undue weight to it, so I find

15:53:24 4    that that is a concern that weighs against providing the

15:53:26 5    jury with a read back of a portion of the transcript.  We're

15:53:30 6    not going to provide the jury a copy of the whole

15:53:34 7    transcript, that's not going to happen for multiple reasons.

15:53:37 8    I don't have a copy of the transcript of the proceedings

15:53:40 9    rough or final.  Defense doesn't have a copy of the

15:53:43 10   transcript rough or final.  Putting together a final copy of

15:53:47 11   the transcript would be exceeding -- I don't think that

15:53:50 12   would be appropriate.  So I propose answering the jury's

15:53:53 13   question about the trial testimony as follows:  You should

15:54:01 14   rely on your own memories regarding the testimony that you

15:54:04 15   heard at trial.  That's my ruling.  Is there any objection

15:54:08 16   to the way I phrased my answer?

15:54:12 17              MS. SONG:  None from defense, Your Honor.

15:54:14 18              MS. CLINE:  No objection to the way you phrased

15:54:16 19   the answer.

15:54:16 20              THE COURT:  I'm going to try to get it to the

15:54:18 21   jury as soon as possible so we are not delayed any longer.

15:54:21 22   So stick close to the courthouse in case they have any more

15:54:23 23   questions.

17:00:01 24              (A brief recess was taken.)

17:00:01 25              THE COURT:  Hi, everyone.  Please be seated.

17:00:06 1    It's five clock now, so I propose sending a note to the jury

17:00:10 2    that says the following:  Dear Members of the Jury,

17:00:13 3    consistent with the schedule that I gave you at the start of

17:00:16 4    trial, if you have not reached a verdict you are free to

17:00:18 5    leave today.  Alternatively, you may deliberate until as

17:00:23 6    late as you wish today as long as you unanimously agree to

17:00:26 7    stay to whatever later time you decide to stay.  If you do

17:00:31 8    not reach a verdict today, you will return Monday morning at

17:00:34 9    9:00 a.m. to continue your deliberations.  Please send me a

17:00:38 10   note to advise me whether you are leaving now or whether you

17:00:41 11   have decided to stay later.  Thank you.

17:00:43 12               Any issues with that note from the plaintiff?

17:00:46 13               MS. CLINE:  Not from plaintiff.

17:00:48 14               THE COURT:  Any issues?

17:00:49 15               MS. McCOWAN:  No, Your Honor.

17:00:51 16               THE COURT:  I'll sign it right now, and I'll

17:00:58 17   hand it to my courtroom deputy to make copies and send that

17:01:01 18   to the jury.  I'm not sure how quickly we're going to get a

17:01:05 19   response.  It could be that it takes them a while to

17:01:08 20   deliberate on whether or not to stay.  So we'll take a

17:01:11 21   recess and I'll be back when we hear from them.

22               (Court adjourned at 5:01 p.m.)

23               I hereby certify the foregoing is a true and
     accurate transcript from my stenographic notes in the proceeding.

24

25                              /s/ Dale C. Hawkins
                              Official Court Reporter
                                U.S. District Court